No. 23-5111

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

SONDIA BELL
Plaintiff/Appellant

vs.

CITY OF TULSA
Defendant/Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

The Honorable James O. Browning
United States District Judge
D.C. No. CIV-21-00061-JB-CDL

---

**APPELLANT'S OPENING BRIEF**

---

Cynthia Rowe D'Antonio, OBA #19652
Green Johnson Mumina D'Antonio
4101 Perimeter Center Drive, Suite 110
Oklahoma City, Oklahoma, 73112
Telephone:    (405) 488-3800
Facsimile:    (405) 488-3802
Email: cynthia@gjmlawyers.com

**ATTORNEY FOR
PLAINTIFF/APPELLANT**

**ORAL ARGUMENT NOT REQUESTED**
**Dated:  May 14, 2024**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................ iii

PRIOR OR RELATED APPEALS ............................................................... viii.

APPELLANT'S OPENING BRIEF ................................................................ 1

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ............................... 2

STATEMENT OF THE CASE ........................................................................ 2

STATEMENT OF THE FACTS ...................................................................... 3

SUMMARY OF THE ARGUMENT .............................................................. 7

ARGUMENT ................................................................................................ 9

I.   **THE DISTRICT COURT GRANTED SUMMARY JUDGMENT ON APPELLANT'S CLAIM OF ADA RETALIATION REGARDING HER TERMINATION, ALTHOUGH CITY OF TULSA FAILED TO PROPERLY DISPUTE THE CLAIM  IN ITS MOTION FOR SUMMARY JUDGMENT**………………………………………………...9

     A.   Standard Of Review..................................................................... 9

     B.   Discussion.................................................................................... 9

II.  **THE DISTRICT COURT FAILED TO PROPERLY CONSIDER THE APPELLANT'S "ASSOCIATION PROVISION" CLAIM OF THE ADAAA, PURSUANT TO 42 U.S.C. § 12112(b)(4)**......................................... 13

     A.   Standard Of Review..................................................................... 13

     B.   Discussion.................................................................................... 13

III. **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE CITY OF TULSA WHEN IT FAILED TO GIVE DUE CONSIDERATION TO MATERIAL ISSUES THAT REMAINED IN DISPUTE AS TO APPELLANT'S §1981 RACE DISCRIMINATION AND RETALIATION CLAIMS; TITLE VII**

i

**RACE DISCRIMINATION AND RETALIATION CLAIMS; AND HER ADAAA DISABILITY ASSOCIATION AND RETAIATION CLAIMS OR OTHERWISE OVERLOOKS CONFLICTING EVIDENCE CONCERNING MATERIAL ISSUES IN DISPUTE.**............... 20

A.    Standard Of Review............................................................... 20

B.    Discussion ............................................................................. 21

CONCLUSION.................................................................................. 38

STATEMENT REGARDING ORAL ARGUMENT ....................................... 39

CERTIFICATE OF COMPLIANCE........................................................... 39

CERTIFICATE OF DIGITAL SUBMISSION .............................................. 40

CERTIFICATE OF SERVICE ................................................................... 41

ADDENDUM

Memorandum Opinion (03/08/2024)

Final Judgment (03/28/24)

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Anderson v. Coors Brewing Co.*,
181 F.3d 1171 (10th Cir. 1999) ........................................................16

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................6,19

*Bekkem v. Wilkie*,
915 F.3d 1258 (10th Cir. 2019) .......................................................21,31

*Boutsis v. Home Depot*,
371 F. App'x 142 (2nd Cir. 2010) ......................................................23

*Burlington Northern Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)................................................................35

*Burrus v. United Tel. Co. of Kan. Inc.*,
683 F.2d 339 (10th Cir. 1982) ........................................................32

*Cantrell v. Knoxville Community Development Corp.*,
60 F.3d. 1177 (6th Cir. 1995) ........................................................28

*Den Hartog v. Wastach Acad.*,
129 F.3d 1076 (10th Cir. 1997) .......................................................11,13

*Doebele v. Sprint/United Mgmt. Co.*,
342 F.3d 1117 (10th Cir. 2003) .......................................................22

*E.E.O.C. v. C.R. England, Inc.*,
644 F.3d 1028 (10th Cir. 2011) .......................................................7,11,18

*Fassbender v. Correct Care Sols. LLC*,
890 F.3d 875 (10th Cir. 2018) ........................................................25

*Goad v. Town of Meeker*,
654 F. App'x 916 (10th Cir. 2016)....................................................10

*Gossett v. Bd. of Regents for Langston Univ.*,
245 F.3d 1172 (10th Cir. 2001) .......................................................19

*Haynes v. Level 3 Commc'ns., LLC*,
456 F.3d 1215 (10th Cir. 2006) ......................................................16

*Hertz v. Luzenac Am., Inc.*,
370 F.3d 1014 (10th Cir. 2004) ......................................................25

*Hunt v. Cromartie*,
526 U.S. 541 (1999)......................................................................20

*Ibrahim v. Alliance for Sustainable Energy, LLC*,
994 F.3d 1193 (10th Cir. 2021) ................................................28,31

*Kendrick v. Penske Transp. Servs. Inc.*,
220 F.3d 1220 (10th Cir. 2000) ......................................................20

*Khalik v. United Air Lines*
671 F.3d 1188 (10th Cir. 2012) ......................................................19

*Lamb v. Montrose Cnty. Sheriff's Office*,
No. 19-1275 (10th Cir. Feb 17, 2022) ............................................25

*Larimer v. Int'l Bus. Machs. Corp.*,
370 F.3d 698 (7th Cir. 2004) .........................................................12

*Lincoln v. BNSF Ry. Co.*,
900 F.3d 1166 (10th Cir. 2018) ................................................20,21

*Mackenzie v. City & County of Denver*,
414 F.3d 1266 (10th Cir. 2005) ......................................................21

*Maughan v. Alaska Airlines, Inc.*,
281 F.App'x 803 (10th Cir. 2008).................................................17

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)..................................................................19,20

*McInerney v. United Air Lines*,
463 F.App'x 709 (10th Cir. 2011).................................................16
*Meiners v. Univ. of Kan.*,
359 F.3d 1222 (10th Cir. 2004) ............................................. 15-16,34

*Morgan v. Hilti, Inc.*,
108 F.3d 1319 (10th Cir. 1997) ........................................................21

*Neyman v. United Telecommunications, Inc.*,
1 F.3d 1249, 1993 WL 279765 (10th Cir. 1993) ......................... 27-28

*O'Neal v. Ferguson Constr. Co.*,
237 F.3d 1248 (10th Cir. 2001) .........................................................32

*O'Shea v. Yellow Technology Services, Inc.*,
185 F.3d 1093 (10th Cir. 1999) .........................................................22

*Pendergraft v. Bd. of Regents of Okla. Colls.*,
No. CV-18-793-D (W.D. Okla. Aug. 13, 2019) ............................ 9-10

*Petersen v. Utah Dep't of Corr.*,
301 F.3d 1182 (10th Cir. 2002) .........................................................24

*Plotke v. White*,
405 F.3d 1092 (10th Cir. 2005) ...........................................................6

*Potter v. Synerlink Corp.*,
562 F. App'x 665 (10th Cir. 2014) .....................................................22

*Randle v. City of Aurora*,
69 F.3d 441 (10th Cir. 1995) ..........................................................6,21

*Reedy v. Werholtz*,
660 F.3d 1270 (10th Cir. 2011) .........................................................10

*Roberts v. Roadway Express, Inc.*,
149 F.3d 1098 (10th Cir. 1998) .........................................................34

*Romero v. Union Pac. R.R.*,
615 F.2d 1303 (10th Cir. 1980) ...........................................................6

*Rule v. Brine, Inc.*,
85 F.3d 1002 (2nd Cir. 1996) ............................................................23

*SCO Group, Inc. v. Novell, Inc.*,
578 F.3d 1201 (10th Cir. 2009) ...........................................................9

v

*Shorter v. IGC Holdings, Inc.*,
188 F.3d 1204 (10th Cir. 1999) ......................................................................20

*Simms v. Oklahoma ex. rel Dept. of Mental Health*,
165 F.3d 1321 (10th Cir. 1999) ...............................................................7,11,18

*Smothers v. Solvay Chemicals, Inc.*,
740 F.3d 530 (10th Cir. 2014) ........................................................................28

*Sotunde v. Safeway, Inc.*,
No. 16-1494, 2017 U.S. App LEXIS 23790 (10th Cir. Nov. 24, 2017) ...................... 22-23

*Stinnett v. Safeway, Inc.*,
337 F.3d 1213 (10th Cir. 2003) .......................................................................22

*Strategic Inv. Alliances Ltd. v General Elec. Capital Servs., Inc.*,
166 F.3d 346, 1998 WL 811606 (10th Cir. 1998) .................................................9

*Swackhammer v. Sprint/United Mgmt. Co.*,
493 F.3d 1160 (10th Cir. 2007) .......................................................................22

*Trujillo v. PacifiCorp*,
524 F.3d 1149 (10th Cir. 2008) .................................................1,11,12,16,32,34

## Statutes

28 U.S.C §1291..............................................................................................2

28 U.S.C. §1331.............................................................................................2

28 U.S.C. §1367.............................................................................................2

42 U.S.C. §1981......................................................................................1,5,19,36

42 U.S.C. §2000e, *et. seq.*...........................................................................1,5,35

42 U.S.C. §12101, *et. seq.*................................................................................5

42 U.S.C. §12112(a) ...............................................................................1,11,20,36

42 U.S.C. §12112(b)(4) ...............................................................................2,11,12

42 U.S.C. §12181, *et. seq.*...............................................................................5

29 C.F.R. §1630.8. .......................................................................... 11-12

Families First Coronavirus Response Act. ...................................... 8-9,12,14,15

**<u>Rules</u>**

Fed. R. App. P. 32(a)(5) .................................................................37

Fed. R. App. P. 32(a)(6) .................................................................37

Fed. R. App. P. 32(a)(7)(B) ............................................................37

Fed. R. App. P. 32(a)(7)(B)(iii) .......................................................37

## <u>PRIOR OR RELATED APPEALS</u>

Appellant submits that there are no prior or related appeals filed or pending in this case

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| **SONDIA BELL,** | ) |
| | ) |
| **Plaintiff-Appellant,** | ) |
| | ) |
| **vs.** | ) **Case No: 23-5111** |
| | ) |
| | ) |
| **CITY OF TULSA,** | ) |
| | ) |
| **Defendant-Appellee.** | ) |

## APPELLANT'S OPENING BRIEF

The Plaintiff/Appellant, Sondia Bell (hereinafter "Appellant" or "Ms. Bell"), files this Opening Brief in and for support of her appeal from the District Court's grant of summary judgment in favor of Defendant/Appellee, City of Tulsa (hereinafter "Appellee" or "City of Tulsa").

## JURISDICTIONAL STATEMENT

Appellant brought her Complaint on February 16, 2021, in the United States District Court for the Northern District of Oklahoma. [Aplt. App. Vol. 1, at A9.] Appellant alleged violations of her rights under the following statutes and for the following claims:

1. Race Discrimination and Retaliation in violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. §2000e, *et.seq.*;

2. Race Discrimination and Retaliation in violation of in violation of 42 U.S.C. §1981;

3. Discrimination And Retaliation in violation of the 42 U.S.C. § 12112(a)- known as the "Association Provision" of the Americans With Disabilities Act. *Trujillo v. PacifiCorp*, 524 F.3d 1149, 154 (10th Cir. 2008.)

[*Id.*]

1

The District Court exercised jurisdiction pursuant to 28 U.S.C. §1331 (federal question) and 28 U.S.C.§1367 (supplemental jurisdiction). This Court has jurisdiction over this appeal pursuant to 28 U.S.C § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW:

**I.   THE DISTRICT COURT GRANTED SUMMARY JUDGMENT ON APPELLANT'S CLAIM OF ADA RETALIATION REGARDING HER TERMINATION, ALTHOUGH CITY OF TULSA FAILED TO PROPERLY DISPUTE THE CLAIM  IN ITS MOTION FOR SUMMARY JUDGMENT.**

**II.  THE DISTRICT COURT FAILED TO PROPERLY CONSIDER THE APPELLANT'S "ASSOCIATION PROVISION" CLAIM OF THE ADA, PURSUANT TO 42 U.S.C. § 12112(b)(4).**

**III. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE CITY OF TULSA WHEN IT FAILED TO GIVE DUE CONSIDERATION TO MATERIAL ISSUES THAT REMAINED IN DISPUTE AS TO APPELLANT'S §1981 RACE DISCRIMINATION AND RETALIATION CLAIMS; TITLE VII RACE DISCRIMINATION AND RETALIATION CLAIMS; AND HER ADAAA DISABILITY ASSOCIATION AND RETAIATION CLAIMS OR OTHERWISE OVERLOOKS CONFLICTING EVIDENCE CONCERNING MATERIAL ISSUES IN DISPUTE.**

## STATEMENT OF THE CASE

This is an appeal from the granting of Summary Judgment in favor of the Appellee, City of Tulsa. Appellant, Sondia Bell, brought her timely complaints on February 16, 2021, in the United States District Court for the Northern District of Oklahoma. [Aplt. App. Vol. 1, at A9.] Appellee, City of Tulsa, filed its Answer on June 23, 2021. [Aplt. App. Vol. 1, at A18.] On December 16, 2022,  Appellee filed its Motion for Summary Judgment. [Aplt. App. Vol. 1, at A29.] On January 3, 2023, Appellant filed "Plaintiff's Motion for Extension of Time of Ten Days to Respond to Defendant's Motion for Summary Judgment". [Aplt.

App. Vol. 3, at A532.] On January 11, 2023, the District Court entered its Order Granting Plaintiff's Request for Extension of Time. [Aplt. App. Vol. 3, at A535.] On January 23, 2023, Appellant filed "Plaintiff's Response in Objection to Defendant's Motion for Summary Judgment." [Aplt. App. Vol. 3, at A537.] On February 1, 2023, Appellee filed "Defendant City of Tulsa's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment. [Aplt. App. Vol. 4, at A753.] The Minutes of Proceedings of the summary judgment hearing were filed on February 3, 2023 [Aplt. App. Vol. 4, at A769.] The District Court entered its initial Order on September 29, 2023. [Aplt. App. Vol. 4, at A771.] Appellant filed its Notice of Appeal on October 10, 2023. [Aplt. App. Vol. 4, at A773.] The Transcript of the Motion Proceedings held on February 3, 2023, was filed on October 26, 2023. [Aplt. App. Vol. 4, at A775.] The District Court entered its Memorandum Opinion on March 8, 2024. [Aplt. App. Vol. 4, at A850.] The Final Judgment was entered on March 28, 2024. [Aplt. App. Vol. 4, at A983.]

## STATEMENT OF THE FACTS

In June 2016,  Ms. Bell, an African American female, was hired as Contract Administrator and later promoted to Senior IT Business Support Administrator, in the Information Technology ("IT") department, for Appellee, City of Tulsa.  At the time of her employment, she had credentials including: Earning a Master's Degree from the University of Tulsa; graduating from the University of Tulsa's Master's Program with a 3.78 Grade point average; and she had previously served as an Adjunct Instructor for Wright Career College. [Aplt. App. Vol. 3, at A588-A590]; [Aplt. App. Vol. 3, at A616, lines 9-12.] It was common knowledge that Ms. Bell was the caregiver of her son, Jacob, who suffered

3

from Autism. In this instance, Appellant filed a grievance against her supervisor, Chris Berg, for rejecting her opportunity to Telecommute. As the Mother of an Autistic child, she needed to attend Speech Therapy, Occupational Therapy, Physical Therapy, and Applied Behavioral Analysis therapy, with her son, Jacob. [Aplt. App. Vol. 3, A654]; [Aplt. App. Vol. 3, A655.] In order to perform her duties, Appellant only needed a laptop, Microsoft Word, and an EXCEL spreadsheet. Her job did *not* call for "physically manipulating certain equipment". [Aplt. App. Vol. 3, A617-A618.]

When Appellant discussed the need to work from home with Chris Berg, he discriminatorily believed that Appellant would not be focused on her work because she had a child with special needs, so he unlawfully denied her request. [Aplt. App. Vol. 3, A592, ¶ 8.]  Chris Berg's decision to deny the work from home request was clearly related to Appellant having a child with special needs. The evidence presented supports that Berg believed, without justification, that Jacob would be a distraction for his Mother, if she was allowed to work from home, as he required special attention due to his disability. On July 17, 2019,  Ms. Bell filed a formal grievance against Chris Berg for his discriminatory denial [Aplt. App. Vol. 3, A642, (states "oral grievance 07-17-19 to Chris Berg")]. On November 18, 2019, Chris Berg, prepared a notice of pre-Termination for Appellant, that consisted of dates beginning from ***July 19, 2019*** through October 16, 2019,  a starting period that was just just two (2) days after Appellant filed a grievance against Berg. [Aplt. App. Vol. 4, A741.]

After Ms. Bell filed the grievance against her supervisor, a spiral effect began. Agents of Appellee, including Ms. Bell's supervisor, Chris Berg; Human Relations Joyce

Powell; and Human Resources employee, Tina McIntosh, to name a few, started a campaign to tarnish Ms. Bell's stellar employment record, which included unwarranted disciplinary actions. Prior to the unjustified disciplinary actions that followed, Appellant's Performance Evaluations were exemplarily. [See, Aplt. App. Vol. 3, at A649-A651]; [Aplt. App. Vol. 4, at A723-A740.] Ms. Bell's *first* retaliatory disciplinary hearing was held on November 21, 2019 and reconvened on December 2, 2019, where Appellee's agents alleged that Appellant violated Work Rule 1, 6, and 7. In that situation, Appellant and another employee, Summer Caughron (W/F) had previously been sharing an area restroom, until Chris Berg instructed that Summer ***lock*** Appellant out of the restroom. Surprised by discovering she had been locked from the restroom without explanation, caused a brief verbal dispute between Appellant and Summer. [Aplt. App. Vol. 3, at A631-A634.] A witness to the incident, Donna Colbert, gave a written statement that Summer called Appellant "*crazy*", and accused Appellant and her autistic son, Jacob, of having "*germs*". However, it was only Ms. Bell that suffered discipline as a result of the confrontation. [Aplt. App. Vol. 3, at A669.] After the hearing, Appellant was given a 5-day suspension, without pay. [Aplt. App. Vol. 4, at A720.]

Ms. Bell received a *second* unjustified disciplinary hearing that took place on August 31, 2020, based on frivolous claims that she violated Work Rule 7, when she clocked out at her scheduled work time of 5:30 p.m. Again, it was Chris Berg who initiated the disciplinary action, even though he was aware that Appellant was working to make up time for FMLA purposes. [Aplt. App. Vol. 3, at A561 "RDF 53".]  As a result, Ms. Bell was unlawfully punished with a 10-day suspension, without pay.  [Aplt. App. Vol. 4, at

A721.]

During the COVID-19 pandemic, Tulsa schools were closed. Appellant's disabled son, Jacob, could not attend school personally, therefore, on July 15, 2020, Ms. Bell requested relief under the *Families First Coronavirus Response Act* ("FFCRA"), which allowed employees affected by the pandemic, 14-days of paid leave. [Aplt. App. Vol. 3, at A700.] Appellant qualified for the relief, however Appellee's agents, including Human Relations, Joyce Powell, and H.R.'s Tina McIntosh, scrutinized Appellant's request and caused her hardships by requesting additional and unnecessary information. Although Ms. Bell's request had been *approved* as early as September 21, 2020, both Human Relations, Joyce Powell and H.R.'s Tina McIntosh, quizzed and harassed Ms. Bell about the benefits, during a telephone conference on September 25, 2020, under the guise that they needed additional information. [Aplt. App. Vol. 3, at A713.] During the September 25, 2020 telephone call between the group, Powell accused Appellant of not needing the relief, and suggested that "she" [Powell] was aware that Appellant's son was a ***level 3 Autistic***, and could personally appear at school. [Aplt. App. Vol. 3, at A478-479; see also Aplt. App. Vol. 3, at A496-497.] Emotionally distraught by Powell's accusation that she was lying about her son's level of Autism, Appellant then advised Powell that she would let the World know how she, as a Mother of an Autistic child, had been treated by City of Tulsa's agents. [Aplt. App. Vol. 3, at A591-594.] Therefore, on October 12, 2020, Appellant sought assistance from outside officials about what had occurred, by emailing her concerns of how she had been mistreated regarding her son's disability. [Aplt. App. Vol. 3, at A715-716.] On November 17, 2020, Powell responded to Appellant's email and threatened her with

6

the words "*it will not go unchecked*", referring to Appellant's criticisms to City officials. [Aplt. App. Vol. 3, at A717-A719.] As promised, on November 23, 2020, Ms. Bell received a Pre-Termination Notice, and was terminated on December 2, 2020. [Aplt. App. Vol. 4, at A722.]  Importantly, prior to the disciplinary actions, and Appellant's termination,  she had filed grievances against both Chris Berg on July 17, 2019, and Joyce Powell on September 23, 2019 [Aplt. App. Vol. 3, at A642, A703.]

## <u>SUMMARY OF THE ARGUMENT</u>

Appellant, Sondia Bell, argues on appeal that the District Court violated the fundamental principles of summary judgment when it viewed the facts below, in the light most favorable to the moving party, Appellee City of Tulsa. In doing so, the District Court severely discounted Appellant's pretextual evidence and the reasonable inferences that could be drawn from the facts. Rather, the District Court below seemingly would have Appellant prove up her entire case at this early stage, and shut her out of her day in court before being afforded the opportunity to present the multitude of material issues remaining in dispute to a jury. Finally, the District Court essentially concluded that no jury could find pretext in this case, based on subjective interpretations of the City of Tulsa's unlawful actions. Appellant urges that a reasonable jury could easily analyze the facts much differently based on allowable circumstantial evidence and reach a very different conclusion.

"It is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind." *Randle v. City of*

*Aurora*, 69 F.3d 441, 453 (10th Cir. 1995.)  "So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial." *Id*. Judgments about intent are best left for trial and are within the province of the jury, and at the summary judgment stage the judge's function is *not to weigh the evidence* and determine the truth of the matter, but to determine whether there is a genuine issue for trial". *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) [emphasis added.] "Questions of motive and intent are particularly inappropriate for summary judgment disposition." *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1309 (10th Cir. 1980).

In reviewing the record, the District Court is required to view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Plotke v. White*, 405 F.3d 1092, 1093-94 (10th Cir. 2005).  A review of items set forth in the District Court's order indicate that a jury could draw different inferences from those facts than those asserted by Appellee City of Tulsa. The District Court failed to consider important factual matters favorable to Appellant, in examining her many complaints regarding Discrimination and Retaliation.

For the above reasons, Appellant submits that the District Court erred in granting judgment in favor of Appellee, City of Tulsa, therefore  the District Court's order should be reversed.

## ARGUMENT

**I.    THE DISTRICT COURT GRANTED SUMMARY JUDGMENT ON APPELLANT'S CLAIM OF ADA RETALIATION REGARDING HER TERMINATION, ALTHOUGH CITY OF TULSA FAILED TO PROPERLY DISPUTE THE CLAIM IN ITS MOTION FOR SUMMARY JUDGMENT.**

### A.    Standard Of Review

This Court conducts a de novo review of an order granting a motion for summary judgment. *E.E.O.C. v. C.R. England, Inc.*, 644 F. 3d 1028, 1037 (10th Cir. 2011).  This Court applies the same legal standard used by the District Court. *Simms v. Oklahoma*, 165 F. 3d 1321, 1326 (10th Cir. 1999).  The District Court granted summary judgment in favor of Appellee, City of Tulsa in its initial September 29, 2023 Order, and later, after some adjustments, concluded its initial summary judge decision was correct in its Memorandum Opinion of March 8, 2024.

### B.    Discussion

In her Complaint, Appellant sufficiently placed Appellee City of Tulsa on notice that she was filing claims alleging that Appellee had discriminated and retaliated against her due to her status as an employee caring for a special needs child.  At paragraph number eleven (11) of the Complaint, Appellant established that she belonged to a protected class as a caregiver of a special needs child. [Aplt. App. Vol. 1, at A10.] At paragraph number 29 of the Complaint, Ms. Bell alleged that she was "terminated" because of her race, and because she had a child with special needs. [Aplt. App. Vol. 1, at A12.] Incorporated into her Fifth and Sixth claims of her Complaint, Appellant reiterated that Appellee City of Tulsa discriminated and retaliated against her by denying her work-from-home schedule

9

request, and "*among other adverse employment action[s]*," (ie. her termination), due to her association with her disabled son. [Aplt. App. Vol. 1, at A15, ¶46-49]. In its Answer, Appellee City of Tulsa admitted to Ms. Bell's allegation that she was the caregiver of a special needs child, but made a generic denial the remaining allegations. [Aplt. App. Vol. 1, at A18, ¶¶ 11, 29, and 46-49.]

On December 16, 2022, Appellee City of Tulsa filed its Motion for Summary Judgment, which included seventy-four (74) alleged "Undisputed Material Facts". [Aplt. App. Vol. 1, at A29.] However, in its Motion for Summary Judgment, Appellee totally failed to dispute Ms. Bell's claims that her *termination* was the result of the City of Tulsa's discrimination and retaliation protected by the "association provision" of the Americans With Disabilities Act ("ADA"). [*Id.*]

On January 23, 2023, Appellant filed her response in objection to Appellee's motion. [Aplt. App. Vol. 3, at A537.] In her response, she submitted evidence demonstrating that agents of Appellee, Joyce Powell of Human Relations and Tina McIntosh, of H.R., had conspired to accomplish her termination due to her fighting for her rights as a Mother of a young son, suffering from Autism. Appellant described how Joyce Powell went as far as disputing the young boy's level of Autism in order to deny Appellant equal rights to the *Families First Coronavirus Response Act*, which allowed employees affected by the pandemic, 14- days of paid leave. Powell also accused Appellant of lying when Appellant explained that her child was partaking in "distance learning", due to schools being closed during the pandemic period. Appellant also described how she sought assistance from Personnel Director, Erica Felix-Warwick, and other City of Tulsa officials,

about the resistance she faced from her Employer. Desperate for help, she sent an email on October 12, 2020 detailing the events and how she had been mistreated, based on, among other things, her son, Jacob's, disability. [Aplt. App. Vol. 3, at A715.] In retaliation, and as a result of Appellant's attempt to protect her rights as a Mother of a special needs child, on November 23, 2020, the City of Tulsa served Ms. Bell with a Pre-Termination Notice [Aplt. App. Vol. 3, at A469], and terminated her on December 3, 2020. [Aplt. App. Vol. 4, at A722.]

Instead of disputing Appellant's claim in its initial motion for summary judgment, Appellee attempted to dispute Ms. Bell's claim that she was terminated due to her association with her Autistic son, for the first time in its *reply brief*. [Aplt. App. Vol. 4, at A753.] City of Tulsa's omission should be deemed a waiver, and Ms. Bell should be allowed to proceed to trial on her claims of unlawful termination, under the "association provision" of the ADA. *See, Strategic Inv. Alliances Ltd. v. General Elec. Capital Servs., Inc.*, 166 F.3d 346, 1998 WL 811606 (10th Cir.1998) (finding issue raised in complaint but not pursued on summary judgment may be deemed waived); *SCO Group, Inc. v. Novell, Inc.*, 578 F.3d 1201, 1226 (10th Cir. 2009) (holding that issues raised for the first time in a reply brief are waived).  "And even for claims raised in the District Court, a party waives a claim if he does not raise it in his opening brief—even if he later raises it in his reply brief. *Pendergraft v. Bd. of Regents of Okla. Colls.*, No. CV-18-793-D, at *14 n.4 (W.D. Okla. Aug. 13, 2019) citing   *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)" *Goad v. Town of Meeker*, 654 F. App'x 916, 7-8 (10th Cir. 2016).

On February 3, 2023, Appellee's motion for summary judgment was set for hearing, before the Honorable Judge Browning. [Aplt. App. Vol. 4, at A775.] During the hearing, Appellant argued that City of Tulsa had waived objection to the ADA retaliation claim, as it was only brought up for the first time in City of Tulsa's reply brief. [Aplt. App. Vol. 4, at A832-A833.] Notwithstanding, the District Court discounted Appellant's arguments and stated that it was "inclined" to rule in favor of the City of Tulsa. [Aplt. App. Vol. 4, at A844, lines 11-23.] At the conclusion of the hearing, the District Court granted City of Tulsa's motion for summary judgment on Ms. Bell's ADA claims, stating that the same was justified because the claim of disability association under the ADA was "narrow." [Aplt. App. Vol. 4, at A844, lines 11-21.]

Thereafter, on September 29, 2023 the District Court entered its initial order granting summary judgment in favor of City of Tulsa, and then, on March 8, 2024, entered its Memorandum Opinion, again finding in favor of Appellee City of Tulsa. The District Court committed error by drawing inferences in favor of the Appellee when it granted summary adjudication on Appellant's ADA claim, finding it "narrow", even though Appellee had failed to dispute the claim in its motion for summary judgment. Appellant respectfully requests that this Court reverse the District Court's order on Appellant's ADA claim as it relates to Appellant's unlawful termination, finding that the City of Tulsa waived any objection to that claim.

II.   **THE DISTRICT COURT FAILED TO PROPERLY CONSIDER THE APPELLANT'S "ASSOCIATION PROVISION" CLAIM OF THE ADA, PURSUANT TO 42 U.S.C. § 12112(b)(4).**

A.   Standard Of Review

This Court conducts a de novo review of an order granting a motion for summary judgment. *E.E.O.C. v. C.R. England, Inc.*, 644 F. 3d 1028, 1037 (10th Cir. 2011).  This Court applies the same legal standard used by the District Court. *Simms v. Oklahoma*, 165 F. 3d 1321, 1326 (10th Cir. 1999).  The District Court granted summary judgment in favor of Appellee, City of Tulsa in its initial October 26, 2023 Order, and later, after some adjustments, concluded its initial summary judge decision was correct in Memorandum Opinion of March 8, 2024.

B.   Discussion

The ADA makes it unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Disability discrimination includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." *Id.* at § 12112(b)(4). This prohibition is known as the "association provision" of the ADA. *Trujillo v. PacifiCorp,* 524 F.3d 1149, 1154 (10th Cir. 2008) (citing *Den Hartog v. Wasatch Acad.,* 129 F.3d 1076, 1082 (10th Cir. 1997)).

"A family relationship is the paradigmatic example of a 'relationship' under the association provision of the ADA." *Den Hartog,* 129 F.3d at 1082 (citing 29 C.F.R. §

13

1630.8). Thus, Ms. Bell's relationship with her son, Jacob, is protected by the association provision.

In *Trujillo v. PacifiCorp.*, 524 F.3d 1149, 1155 (10th Cir. 2008) (quoting *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698 (7th Cir. 2004)), the Court outlines the various categories that demonstrate discrimination and retaliation in violation of the ADA's "association provision", pursuant to 42 U.S.C. § 12112(b)(4). The category of "distraction" entails how the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention. [*Id*. at 700.] In its Memorandum Opinion, the District Court also cited to persuasive authority, *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 470 (2d Cir. 2019), whereby an inference of discriminatory motive was established even if the Employer *thought* that the Employee was, or would be distracted due to their association with a disabled child.  [Aplt. App. Vol. 4, at A975.] Both are instructive here.

At the Court below, Appellant Ms. Bell lodged claims of discrimination and retaliation akin to the "distraction" form of associational discrimination, found in *Trujillo*. She complained that other non-disabled employees were allowed to Telework, while her requests were summarily denied. [Aplt. App. Vol. 3, at A544-A546.] Appellant also testified that her supervisor implied that she could not work from home because Jacob, her son, would be a distraction to her productivity. Additionally, Appellant was terminated when she fought entitlement to Congressionally approved FFCRA[1] benefits that would allow her to assist with her son, Jacob's, "distance learning" during the COVID-19

---

[1] Families First Coronavirus Response Act.

Pandemic. Appellee violated the ADA as it believed that Appellant would not be productive if given these benefits, due to a perceived distraction by her Autistic son.

In order to succeed on her claim, Appellant must prove four elements of the prima facie case of ADA association discrimination, which are as follows: (1) she was "qualified" for the job at the time of the adverse employment action; (2) she was subjected to adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997.) Once a plaintiff meets this burden, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for terminating the employee's employment. *Id.* If the employer does so, the burden shifts back to the plaintiff to provide evidence that the legitimate reasons offered by the defendant were merely a pretext for discrimination.

In its Memorandum Opinion, at page 125, the District Court opined that Appellant successfully satisfied the first three (3) elements of her ADA association discrimination claim. The District Court erroneously determined that "temporal proximity" was triggered by a telephone call that took place between Appellant, Human Relations Joyce Powell and Tina McIntosh of HR, on September 25, 2020. The District Court concluded that Appellant's termination on December 3, 2020 equated to "ten-weeks", between the date of the telephone call and Appellant's termination, thus "the Court does not assign great weight to this fact." [Aplt. App. Vol. 4, at A974.]

However, Appellant demonstrated below that she satisfied the fourth prong with facts sufficient to defeat summary judgment. For example, during the COVID-19 pandemic, Tulsa schools were closed. Appellant's disabled son, Jacob, could not attend school personally, therefore, on July 15, 2020, Ms. Bell requested relief under the *Families First Coronavirus Response Act*, which allowed employees affected by the pandemic, 14-days of paid leave. [Aplt. App. Vol. 3, at A700.] Appellant qualified for the relief, however Appellee's agents, including Human Relations, Joyce Powell, and H.R.'s Tina McIntosh, scrutinized Appellant's request and caused her hardships by requesting additional and unnecessary information.

On September 25, 2020, Joyce Powell and Tina McIntosh telephoned Appellant under the guise that they need additional information in order to approve her request for FFCRA benefits. [Aplt. App. Vol. 3, at A489.] It should be noted that on September 21, 2020, Ms. Bell had already received an email from Tina McIntosh stating that "*to confirm-You have been **approved** for FFCRA*." [Aplt. App. Vol. 3, at A713.] Thus, the only conceivable reason for the telephone call scheduled for September 25, 2020 was for Appellee's agents to over scrutinize Ms. Bell's rights to the Congressional relief benefits, and cause her emotional hardship.

Additionally, on September 18, 2020, Appellant received an email from Tina McIntosh purporting that "*we are completing the final process of your FFCRA requests, please verify if your children will be attending in-person school or Virtual learning for COVID-19 related reasons*." [Aplt. App. Vol. 3, at A701.] Ms. Bell responded to the email

by stating that there has been "*no in-person" school since 3/16/2020,*" and that her Autistic son, Jacob, was distant learning. [*Id.*] McIntosh immediately reported Appellant's response to Joyce Powell stating "*Here's her response.*" [Aplt. App. Vol. 3, at A702.] Powell then responded "*thanks, if we find out he is attending school in person, we can deal with it.*" [Aplt. App. Vol. 3, at A702.] In the emails, it is clear that Joyce Powell questions the truth regarding Appellant's need to participate in the *Families First Coronavirus Response Act* relief for her disabled child. Further, in her response, Powell makes it clear that if they learn that Ms. Bell's son is physically attending school, instead of distant learning, it will be dealt with!

During the September 25, 2020 telephone call between the group, Powell accused Appellant of not needing the relief, and suggested that "she" [Powell] was aware that Appellant's son was a ***level 3 Autistic***, and could personally appear at school. [Aplt. App. Vol. 3, at A478-479; see also Aplt. App. Vol. 3, at A496-497.] Emotionally distraught by Powell's accusation that she was lying about her son's level of Autism, Appellant then advised Powell that she would let the World know how she, as a Mother of an Autistic child, had been treated by City of Tulsa's agents. [Aplt. App. Vol. 3, at A591-594.] Appellant also found it odd that Joyce Powell would suggest that she knew Jacob's specific level of Autism when Appellant had never disclosed that information to her. Therefore, on October 12, 2020, Appellant sought assistance from outside officials about what had occurred, by emailing her concerns of how she had been mistreated regarding her son's disability. [Aplt. App. Vol. 3, at A715-716.] On November 17, 2020, Powell responded to Appellant's email and threatened her with the words "*it will not go unchecked*". [Aplt. App.

17

Vol. 3, at A717-A719.] As promised, on November 23, 2020, Ms. Bell received a Pre-Termination Notice, and was terminated on December 2, 2020. [Aplt. App. Vol. 4, at A722.] Merely six (6) weeks had passed between the date that Appellant exercised protected activity (October 12, 2020), and (November 23, 2020), when she received the notice of Pre-Termination. *See Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004)("A *six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation*, *but a three-month period, standing alone, is insufficient.*"); *Trujillo v. PacifiCorp.*, 528 F.3d 1149, 1157 n. 5 (10th Cir. 2008).

As for her termination, slightly over seven (7) weeks had passed between the date that Appellant exercised protected activity on (October 12, 2020), and (December 3, 2020), when she was terminated. *Anderson v. Coors Brewing Company*, 181 F.3d 1171, 1179 (10th Cir. 1999) (*concluding that two months and one week as sufficient to support a prima facie case of retaliation*). Thus, both the Pre-Termination Notice and Appellant's termination are close in time to her October 12, 2020 email complaints about ADA discrimination regarding her son.

Additionally, both the Pre-Termination Notice and Appellant's termination constitute adverse employment actions. To be sure, in *Haynes v. Level 3 Commc'ns., LLC*, the Tenth Circuit has held that a *written warning* is an adverse employment action *"only* if it effects a significant change in the plaintiffs employment status,"…for example, "affect[ing] the likelihood that the plaintiff will be terminated, undermin[ing] the plaintiffs current position, or affect[ing] the plaintiffs future employment opportunities," *Haynes v. Level 3 Commc'ns., LLC*,  456 F.3d 1215, 1224 (10th Cir.2006).

The Pre-Termination Notice constitutes an adverse action as it is a written warning that effects a significant change in Ms. Bell's employment status, that is, termination. [Aplt. App. Vol. 3, at A469- the letter states further actions would "result in disciplinary action, up to, and including termination."] Similarly, "[t]ermination of employment is 'clearly an adverse employment action', *McInerney v. United Air Lines*, 463 F. App'x 709, 12 (10th Cir. 2011).

Moreover, both of these adverse employment actions "occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." Appellant's need for benefits to care for her disabled child during the COVID-19 Pandemic was strongly resisted by the City of Tulsa and thus a constituted determining factor in its decision to discipline Ms. Bell by serving her with a Pre-Termination Notice, and then terminating her.

Although City of Tulsa failed to dispute this claim in its initial motion for summary judgment, Appellee argued in its *reply brief* that "Ms. Bell's termination was based on (1) her rudeness to other employees during that phone call and (2) her untruthfulness in recanting what happened on the call during a subsequent email." However, Appellee does not direct the District Court, or even this Court to any specific evidence in support. Appellee points to its "MSJ Exh. 26", [Aplt. App. Vol. 3, at A469], however that is a one-sided version of Human Relations Joyce Powell and HR's Tina McIntosh, the same two individuals that had conspired to have Ms. Bell terminated. In the case below, Appellant provided material facts in dispute of Appellee's allegations, regarding the September 25, 2020 telephone call. There is a direct conflict between Ms. Bell's version of events and

Defendants' agents, particularly Joyce Powell, whom Appellant had previously filed a grievance against for disparate treatment and bullying. [Aplt. App. Vol. 3, at A703-A704.] Further, Appellant demonstrated that City of Tulsa's actions were nothing more than pretext for discrimination. *Maughan v. Alaska Airlines, Inc.*, 281 Fed. Appx. 803, 808 (10th Cir. 2008) (finding the employee's dispute of objective facts created a fact question of pretext). The discrepancy between the conflicting versions of events lends to a material issue in dispute that the District Court should have given appropriate deference according to the standard for summary adjudication.  Instead, the District Court gave entirely too much credence to Appellee City of Tulsa's witnesses, leaving credibility issues that should have been reserved for the fact finder—the jury.

**III.**  **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE CITY OF TULSA WHEN IT FAILED TO GIVE DUE CONSIDERATION TO MATERIAL ISSUES THAT REMAINED IN DISPUTE AS TO APPELLANT'S §1981 RACE DISCRIMINATION AND RETALIATION CLAIMS; TITLE VII RACE DISCRIMINATION AND RETALIATION CLAIMS; AND HER ADAAA DISABILITY ASSOCIATION AND RETAIATION CLAIMS OR OTHERWISE OVERLOOKS CONFLICTING EVIDENCE CONCERNING MATERIAL ISSUES IN DISPUTE**

A.    Standard Of Review

This Court conducts a de novo review of an order granting a motion for summary judgment. *E.E.O.C. v. C.R. England, Inc.*, 644 F. 3d 1028, 1037 (10th Cir. 2011).  This Court applies the same legal standard used by the District Court. *Simms v. Oklahoma*, 165 F. 3d 1321, 1326 (10th Cir. 1999).  The District Court granted summary judgment in favor of Appellee, City of Tulsa in its initial October 26, 2023 Order, and later, after some adjustments, concluded its initial summary judge decision was correct in Memorandum

Opinion of March 8, 2024.

B.    <u>Discussion</u>

At critical points in its analysis, without hearing from a single witness, the District Court made factual determinations that essentially resulted in dismissing Appellant's claims. That determination rested on the District Court's opinion that Appellant "continued to act rudely, disrespectfully, and unprofessionally…."; [Aplt. App. Vol. 4, at A969.] and [t]he City of Tulsa provides that S. Bell's termination was based on her history of "rudeness and untruthfulness". [Aplt. App. Vol. 4, at A981.] In a conclusionary fashion, the District Court states "S. Bell has not provided evidence from which a reasonable jury could conclude that firing S. Bell based on her continued failure to cooperate and 'rude and disrespectful' behavior…is pretextual. [Aplt. App. Vol. 4, at A964.] This is not the stage for the District Court to weigh in on such factually intensive matters.  The District Court's role in determining whether to grant a motion for summary judgment is not to weigh evidence and determine the truth of the matter, "but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* <u>477 U.S. 242, 249</u> (1986)." In applying the summary judgment standard,  it is improper for the District Court to weigh evidence or make an assessment of the credibility of witnesses. *Gossett v. Oklahoma,* 245 F. 3d 1172, 1175 (10th Cir. 2001). Moreover, the Opinion gave little, if any, deference to the non-moving party as required by law, but the District Judge freely relied on and cited for support to City of Tulsa's view on material factual issues.

On Appellant's Title VII and §1981 claims, she could plaintiff prove a violation "either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792... (1973)." *Khalik v. United Air Lines*, 671 F. 3d 1188, 1192 (10th Cir. 2012). Although not using the exact phraseology of "direct evidence" but in rearranging the order of the wording to "evidence to contradict directly", the District Court criticized Appellant, and improperly found undisputed facts, by effectively demanding Appellant to prove her case with "direct evidence". For example, in discussing the "work from home rules" the court required "evidence to contradict directly" whether the rule was temporary. [Aplt. App. Vol. 4, at A853, fn. 6]; or "evidence to contradict directly" as to whether the work from home rule was limited to the COVID period. [Aplt. App. Vol. 4, at A883, fn. 73] Notwithstanding the District Court's improper emphasis on direct evidence, Appellant admits she had little direct evidence of discrimination. Her claims of discrimination relied on indirect evidence and the inferences favorably drawn therefrom to defeat summary judgment. *Shorter v. IGC Holdings, Inc*., 188 F. 3d 1204, 1207 (10th Cir. 1999). Similarly, A plaintiff proves a violation of the Americans With Disability Act, 42 U.S.C. § 12112(a), by following the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, Lincoln v. BNSF Ry. Co.,* 900 F. 3d 1166, 1192 (10th Cir. 2018). Accordingly, for the sake of brevity, Appellant's analysis here applies to each of her claims. Also, "[w]hen evaluating an employer's motives or reasons, 'motivation is itself a factual question.'" *Id*. (*quoting Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).

Under the *McDonnell Douglas* framework, for assessing circumstantial evidence of discrimination, a plaintiff must (1) raise a genuine issue of material fact on each element of the prima facie case; (2) the burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision; (3) if the employer does so, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual. *Kendrick v. Penske Transp. Servs. Inc.*, 220 F. 3d 1220, 1226 (10th Cir. 2000).

### A.    <u>Ms. Bell Satisfied Her Prima Facie Case of Discrimination As To Each Claim</u>

After receiving and reading Appellant's and Appellee's briefs below, and hearing arguments of counsel at a February 23, 2023 hearing, the District Court had initially ruled "*I don't think that we've really established a prima facie case, because we don't have proper comparators to Ms. Bell.*" [Aplt. App. Vol. 4, at A814, lines 5-7.] However, by the time the District Court issued its written analysis, the District Court did "an about face" stating "*[c]onsequently, the Court concludes that S. Bell has established a prima facie case of race discrimination at the first step of the <u>McDonnel Douglas</u> framework.*" [Aplt. App. Vol. 4, at A942.] Consequently, as noted above, the ruling that the Appellant had established a prima facie case is applicable to her proof of each claim. *See, Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019)(as to Title VII claims); *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995)(as to Title VII claims), and *Lincoln v. BNSF Ry. Co.,* 900 F. 3d 1166, 1192 (10th Cir. 2018)(regarding ADA retaliation). Accordingly, Appellant has satisfied her prima facie case with regard to such claims.

**B.** **Appellant's Proffered Nondiscriminatory Reason For Appellant's Adverse Employment Action Is Unworthy And Pretexual.**

A plaintiff typically attempts to satisfy her burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Mackenzie v. City & County of Denver*, 414 F.3d 1266, 1278 (10th Cir. 2005) (*quoting Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

As an initial point, Appellant emphasizes that she is not required to prove pretext. The Court "need only determine whether the evidence [Appellant] presented, viewed in a light most favorable to her, could allow a reasonable jury to find that [Appellee]'s reasons were pretextual." *Potter v. Synerlink Corp.*, 562 F. App'x 665, 674-75 (10th Cir. 2014). The burden to establish undisputed facts falls solely on the movant.  In contrast, the nonmovant can satisfy her burden by pointing to contested facts and inferences. Under this standard, judgment is proper only if plaintiff "'failed to produce any evidence from which a reasonable inference could be drawn' that [employer]'s proffered reasons were pretextual." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1218 (10th Cir. 2003)(quotations omitted.); *accord O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1096-97 (10th Cir. 1999)("Because discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted *unless the evidence could not support any reasonable inference* for the nonmovant")(quotations omitted, emphasis added).

Additionally, the evidence of pretext need not point to a discriminatory motive.

*Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003)("The plaintiff need not show both that the defendant's reasons were a pretext and that the real reason was discrimination - the fact of pretext alone may allow the inference of discrimination."); *Swackhammer v. Sprint/United Mgmt. Co.* , 493 F.3d 1160, 1168 (10th Cir. 2007)("[W]e have definitively rejected a 'pretext plus' standard; in order to survive summary judgment, a plaintiff generally need not provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual.") It must be remembered, "[s]ome or all of these pieces of evidence might not be enough in and of themselves to create a genuine issue of material fact as to pretext". *Sotunde v. Safeway, Inc.*, No. 16-1494, 2017 U.S. App. LEXIS 23790, at *11-12 (10th Cir. Nov. 24, 2017). The court may "not look at each piece of evidence in isolation; rather, in assessing whether plaintiff[] ha[s] shown pretext, we are obliged to consider [her] evidence in its totality." *Sotunde*, 2017 U.S. App. LEXIS at *12.

### 1.    Falsity of Accusations Against Ms. Bell and Credibility Issues Preclude Summary Judgment.

In many respects, the underlying case boils down to one of credibility. When an employer's agent's testimony is inconsistent or in conflict with a material issue in the case, thus casting doubt on credibility issues, summary judgment is not appropriate. *See, Boutsis v. Home Depot,* 371 F. App'x 142, 144 (2d Cir. 2010)(reversing summary judgment on credibility issues); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996)(assessing credibility and choices between conflicting versions of the events are matters for the jury). The Appellee relies on the false allegations made against Ms. Bell in Appellee's MSJ

Exhibit 26, involving a single telephone call between Joyce Powell, Tina McIntosh, and Appellant that took place on September 25, 2020.  [Aplt. App. Vol. 3, at A469.] As stated above, there is a direct conflict between Appellant (who denies violating Work Rule 1, Rule 2, and Rule 7) and Appellee's agents, particularly Chris Berg, Joyce Powell, and Michael Dellinger, whom Appellant had previously filed grievances and complaints for disparate treatment. [Aplt. App. Vol. 3, at A642-A643]; [Aplt. App. Vol. 3, at A703-A704.] Ms. Bell provides facts in dispute of Appellee's allegations regarding the "September 25, 2020 telephone call" between the employees.  Apparently, frustrated by what amounted to a 53-minute interrogation by Powell and McIntosh, contrary to Appellee's statement, Appellant did not refuse to answer questions, but at some point asked Powell to "*put it in writing*." [Aplt. App. Vol. 3, at A496.] Appellant stated Powell and McIntosh had been giving her the run around regarding her FFCRA requests, and that she had an acute need of the assistance. [Aplt. App. Vol. 3, at A563, "RDF 60."] Powell and McIntosh knew that Appellant had just been involved in a car wreck [*Id*. ], and at the time of the telephone call, someone was trying to connect with Appellant to conduct a teleconference regarding her disabled son, Jacob. [*Id*.]  Appellant has urged it was Powell and McIntosh's plan all along to unnecessarily place a call to Appellant, then unreasonably press upon her, and have the call recorded for future plans to sabotage  her—which they accomplished. While enduring the scrutiny and bullying by Powell and her cohort, Ms. Bell maintained her composure, but did disagree with some of the statements made by Powell and McIntosh. Contrary to Appellee's alleged facts, Appellant did not accuse Powell of a violation, but instead, stated

26

a rhetorical question regarding how Powell obtained her son's confidential and undisclosed autism level.  [Aplt. App. Vol. 3, at A564, "RDF 62."]

It is noted in this context that Appellant's actions in complaining about  Powells' conduct also goes to protected activity.  In order to show that the employee engaged in protected activity, the employee need not prove that the employer actually violated Title VII.  Opposition can be protected even where Appellant is wrong about whether the employer had actually violated Title VII. Instead, it is enough that the plaintiff had a good faith belief that the conduct she opposed was unlawful under Title VII. *See Petersen v. Utah Dep't of Corr.,* 301 F.3d 1182, 1188 (10th Cir. 2002). Appellant has provided evidence that she believed, and informed her employer that she believed, that Powell's conduct demonstrated Appellant was being discriminated against based on race, retaliation and for her son's disability. [Aplt. App. Vol. 3, at A564, "RDF 64."] Protected opposition is not satisfied only by the filing of formal charges; informal complaints are sufficient to constitute protected opposition. *Hertz v. Luzenac Am., Inc*., 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors"). The evidence that Appellant engaged in protected opposition, by voicing complaints and writing letters asserting racial discrimination, and retaliation in connection with her son's disability is sufficient to withstand summary judgment as to the protected opposition. *See, e.g., Fassbender v. Correct Care Sols., LLC*, <u>890 F.3d 875, 890</u> (10th Cir. 2018). (need only show a reasonable good-faith belief  he was opposing discrimination.); *Hertz v. Luzenac Am., Inc.*, <u>370 F.3d 1014, 1015-16</u> (10th Cir. 2004); see also, *Lamb v. Montrose Cnty. Sheriff's Office*, No. 19-1275, at *10 (10th Cir. Feb. 17,

2022).

### 2.   Appellee's Intentionally Padded Appellant's Disciplinary File In An Effort To Undermine Her Claims

All of Appellant's performance evaluations, beginning with her hire, until she was unlawfully terminated, described her as a stellar employee and an asset to the City of Tulsa. For illustration, during her review period of January 1, 2019 through June 30, 2019, her performance evaluation stated *" Sondia has contributed towards our team successfully providing our services as committed 100% of the time* despite an increase in service requests of 16% during this period. [Aplt. App. Vol. 3, at A649-A651]; [Aplt. App. Vol. 4, at A723-A740.]

However, after Appellant filed certain grievances against one her supervisors, Chris Berg, and Joyce Powell, of Human Relations, Appellant's agents systematically padded her disciplinary file with two (2) separate and unwarranted actions, to justify her future termination on December 3, 2020. The *first* disciplinary hearing was held on November 21, 2019 and reconvened on December 2, 2019, where Appellee's agents alleged that Appellant violated Work Rule 1, 6, and 7. In that situation, Appellant and another employee, Summer Caughron (W/F) had previously been sharing an area restroom, until Chris Berg instructed that Summer lock Appellant out of the restroom. Surprised by discovering she had been locked from the restroom without explanation, caused a brief verbal dispute between Appellant and Summer. [Aplt. App. Vol. 3, at A631-A634.] Although Summer called Appellant "crazy", and accused Appellant and her autistic son, Jacob,  of having "germs", it was on Appellant that was disciplined as a result of the

28

confrontation.  [Aplt. App. Vol. 3, at A669.] Summer Caughron  did not receive any type of disciplinary action. At Appellant's Pre-Termination hearing for her alleged "bad conduct", the hearing officer stated that he relied on "*actions summarized in memos from Chris Berg and Joyce Powell*." [Aplt. App. Vol. 4, at A720 & A722.]  After the hearing, Appellant was given a 5-day suspension, without pay. [Aplt. App. Vol. 4, at A720.]  After Appellant served her 5-day unpaid suspension, Hearing Officer Clayton Edwards, stated the following, in his recommendation, dated December 9, 2019:

> [G]iven the breakdown of the working relationship between Ms. Bell and Mr. Berg, *it is my suggestion that Ms. Bell be reassigned to another supervisor*.

[Recommendations of Hearing Officer, C. Edwards.](emphasis added) [Aplt. App. Vol. 3, at A670.] However, Chris Berg and Michael Dellinger did not adhere to the Hearing Officer's recommendation, and kept Chris Berg in place as Appellant's supervisor.  Indeed, Appellant received a *second* unjustified disciplinary hearing that took place on August 31, 2020, based on frivolous claims that Ms. Bell violated Work Rule 7, when she clocked out at her scheduled work time of 5:30 p.m. Again, it was Chris Berg who initiated the disciplinary action, even though he was aware that Appellant was working to make up time for FMLA purposes. [Aplt. App. Vol. 3, at A561 "RDF 53".]  As a result, Ms. Bell was unlawfully punished with a 10-day suspension, without pay.  [Aplt. App. Vol. 4, at A721.] Not surprisingly, the failure of Appellee to comply with the Hearing Officer's recommendation of having a different supervisor resulted in unwarranted write-ups, ultimately concluding with her termination. Appellant disputed the allegations pertaining to both incidents of disciplinary actions as being retaliatory. [Aplt. App. Vol. 3, at A561

"RDF 53"] ; [Aplt. App. Vol. 3, at A636, line 1 through A637, line 4]; [Aplt. App. Vol. 3, at A591]; [Aplt. App. Vol. 3, at A693]; [Aplt. App. Vol. 3, at A695.]  Importantly, prior to the disciplinary actions, and Appellant's termination,  she had filed grievances against Chris Berg on July 17, 2019, and Joyce Powell on September 23, 2019 [Aplt. App. Vol. 3, at A642, A703.]  There is evidence from which a reasonable jury could find that Chris Berg and Joyce Powell were successful in padding Appellant's file to justify her termination on December 3, 2020. *Neyman v. United Telecommunications, Inc.*, 1 F.3d 1249 (10th Cir.1993) (Table, text in Westlaw) (unpublished) 1993 WL 279765 at * 4 ("An employer's discriminatory conduct in a retaliation setting may be inferred from circumstantial evidence, including attempts to build a record and disguise discriminatory purpose.") Further, the fact that neither Chris Berg nor Joyce Powell sought discipline against Ms. Bell until *after* she filed grievances against them, shows pretext. *Cantrell v. Knoxville Community Development Corp.*, 60 F.3d 1177 (6th Cir.1995).

### 3.   <u>Similarly Situated And Disparate Treatment Evidence As Pre-text.</u>

"An inference of discrimination can arise from an employer's favoritism toward a similarly situated employee who is not part of the protected class." *Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021). To be similarly situated to the Ms. Bell, the other employee must share the same supervisor or ***decision maker***. *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540 (10th Cir. 2014). Through the unequivocal admission of Michael Dellinger, the Chief Information Officer and department head over the Information Technology ("IT") Department, the record evidence shows that he was the final "decision maker" over the IT employees. [Aplt. App. Vol. 1, at

A115, ¶4]. Appellant's requests to Telecommute were repeatedly rejected, even though two (2) other employees, Jan Buster (W/F) and Paula Stickelber (W/F), who also worked within the IT Department, were freely allowed to Telecommute. Both Jan Buster and Paula Stickelber are subject to the same final decision-maker as Ms. Bell, Michael Dellinger. [Aplt. App. Vol. 4, at A745, "IT" Organizational Chart]; [Aplt. App. Vol. 3, at A591 ¶6.] Appellee's favoritism towards these similarly situated employees is apparent and constitutes pretext.

Additionally, the District Court ignored conflicting evidence with respect to Appellee's "stay at home policies". For example, in Appellee's alleged undisputed material fact No. 5, it alleges:

> 5.       The City of Tulsa had in effect at that time (and is still in effect) a policy addressing telecommuting. The policy states that "telecommuting is not appropriate for all positions, and no employee or job category is entitled to or guaranteed the opportunity to telecommute, except for those hired into designated positions." [Aplt. App. Vol. 3, at A602 "¶826.4".]  The policy states that "telecommuting is a management option and is only available with the approval of an employee's director  supervisor, Department Head, Personnel Director, and IT Security or as otherwise approved in accordance with this policy." [Aplt. App. Vol. 3, at A602 "¶826.43".]

In response, Appellant disputed this alleged material fact:

> RDF 5: DISPUTED to the extent that Defendant cites only a portion of the policy, and omits those portions that are relevant to the issues before the Court.  The policy states that "*jobs that are acceptable for telecommuting are those that can be performed at an alternate worksite without diminishing the quality of work or disrupting productivity".* [Aplt. App. Vol. 3, at A602 "¶826.42".]  Plaintiff's duties can be performed from a laptop, and offsite, [Aplt. App. Vol. 3, A591, ¶ 8.].]  The policy also addresses prolonged use for medical reasons, and can be used as a reasonable accommodation under the American With Disabilities Act (the "ADA") [Aplt. App. Vol. 3, A606,

¶ .18]. Plaintiff's main reason for the request was so that she could accommodate the needs of her Autistic child, Jacob, while still performing her duties and responsibilities of the City of Tulsa. [Aplt. App. Vol. 3, A591, ¶ 8] (emphasis added).

Clearly, improperly tilting his views more favorably towards the Appellee, and basically omitting any consideration that Appellant had pointed out that Appellee had completely left out significant and material portions of the policy, the District Court remarkably "deem[ed] the fact that Berg allowed his employees to work from home only in "exceptional circumstances" undisputed for this Opinion's purposes. [Aplt. App. Vol. 4, A853, fn. 4.]

In another instance on an alleged undisputed fact that was plainly placed at issue by Appellant's response, the Appellee wrote:

7.      In March of 2019 Ms. Bell went on maternity leave. [Ex. 2, p. 17, ln. 10 – 25] She returned July 1, 2019. On July 17, 2019, Mr. Berg responded in writing to her formal request to telecommute. Mr. Berg sent an email which stated that "[a]s discussed during our previous conversations regarding your telecommuting request, I will not be able to approve your request due to the small number of staff I have available in the IT Administration Services Section to adequately cover all of the essential services we provide to our customers." [Ex. 5, p. 7] The email further stated that "[m]any of those services require daily on-site presence by all of our staff to ensure coverage during absences from the work site resulting from vacation and sick leave as well as training, meetings and other offsite job-related activities." [Ex. 5, p. 7].

Citing instances where her supervisor was not concerned about the "daily on-site presence by all of our staff" Appellant noted in her response referring to a personal text message from her Supervisor, Chris Berg:

RDF 7:   DISPUTED as to the credibility of Chris Berg regarding his explanation provided for denying Plaintiff's request for Telecommuting. Chris Berg's explanation that the IT department is "short staffed", conflicts with the evidence.  For example, on her way to work, Chris Berg would ask Plaintiff to run his personal errands.  See the following November 9, 2018 text message:

| | |
|---|---|
| Plaintiff: | Morning, I just left my Appt, and heading to work! |
| Chris: | Ok. Would you mind picking up a card for Patrick? |
| Plaintiff: | No. I'll pick one up! |
| | That's my normal duty, lol |
| Chris: | Awesome! Thank you! It's not your duty, but that's why you're awesome! |

[Aplt. App. Vol. 3, A638.]

The District Court's reaction to this disputed fact is telling.  The District Court defaults to a position of basically demanding that Appellant not use circumstantial evidence since she has not "specifically converted" the Appellee's contention.  The District Court writes *"[r]egardless, by providing evidence that Berg would ask S. Bell to run personal errands, see Response ¶ 7, at 5 (citing Text Messages between Sondia Bell and Chris Berg (dated November 9, 2018), filed January 23, 2023 (Doc. 41-8)("Text Message")), S. Bell has not "specifically controverted" the fact that the IT department has "a small number of staff."* [Aplt. App. Vol. 4, A856, fn. 13.]  Here again, the District Court seems bent on finding the slightest opportunity to contest any circumstantial evidence offered by Appellant to demonstrate that summary judgment is not appropriate. These are perfect examples of how the District Court wrongly applied its summary judgment analysis.

33

**C.** **There Is Sufficient Evidence To Support Appellant's Claim Of Unlawful Retaliation**

To state a Title VII retaliation claim, "a plaintiff must show (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id*. at 1193 (internal quotation marks and brackets omitted). *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). As mentioned above, the District Court has concluded Appellant has made a prima facie case for retaliation (at least to her termination)[2], and Appellee concedes that the second element is undisputed. *See*, Motion, pg. 21 (bottom).] The Appellee City of Tulsa contends that Appellant cannot satisfy the *third* element, that is, that a causal connection exists between the protected activity and the materially adverse action.

"[I]n the context of retaliation claims, [the Tenth Circuit] ha[s] permitted plaintiffs to establish a prima facie case of discrimination by showing only close proximity in time between a protected activity and an adverse action." *Trujillo v. PacifiCorp.*, 528 F.3d 1149, 1157 n.5 (10th Cir. 2008). "A causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.' *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339,343 (10th Cir. 1982)." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248 (10th Cir. 2001).

---

[2] The District Court took the unusual step of bifurcating Appellant's prima facia elements for purposes of her termination verses her two suspensions. [Aplt. App. Vol. 4, A957.] Accordingly, with respect to the suspensions only, the District Court concluded Appellant's prima facie case was not met. *Id.*

34

In this instance, Appellant filed a grievance against her supervisor, Chris Berg, for rejecting her opportunity to Telecommute. As the Mother of an Autistic child, she needed to attend Speech Therapy, Occupational Therapy, Physical Therapy, and Applied Behavioral Analysis therapy, with her son, Jacob. [Aplt. App. Vol. 3, A654]; [Aplt. App. Vol. 3, A655.] In order to perform her duties, Appellant only needed a laptop, Microsoft Word, and an EXCEL spreadsheet.  Her job did *not* call for "physically manipulating certain equipment". [Aplt. App. Vol. 3, A617-A618.]

When Appellant discussed the need to work from home with Chris Berg, he discriminatorily believed that Appellant would not be focused on her work because she had a child with special needs, so he denied her request. [Aplt. App. Vol. 3, A592, ¶ 8.] Under those set of facts, the nexus of Chris Berg's decision to deny the work from home request was clearly related to Appellant having a child with special needs.  On July 17, 2019,  Ms. Bell filed a formal grievance against Chris Berg for his discriminatory denial  [Aplt. App. Vol. 3, A642, (states "oral grievance 07-17-19 to Chris Berg")]. On November 18, 2019, Chris Berg, prepared a notice of pre-Termination for Appellant, which included allegations beginning on *July 19, 2019*, *just two (2) days after Appellant filed a grievance against him*. [Aplt. App. Vol. 4, A741.] The hearing was scheduled by Appellee's agents for a future date of November 21, 2019. The hearing officer ruled that Chris Berg had failed to present sufficient evidence regarding the alleged attendance issues, (Work Rule 6), that consisted of dates from July 19, 2019 through October 16, 2019, and she was exonerated on those allegations.  [Aplt. App. Vol. 4, A720.]  In denying the alleged attendance violations, it would not be unreasonable for a jury to assume that the hearing officer believed that Berg

had approved Appellant's ability to use Flex-Time. However, Appellant received a 5-day suspension on the other alleged violations. [*Id*.] Appellant vigorously disputed that she had violated the Work Rules, which becomes a factual issue for the jury.

Appellant's *5-day suspension* constitutes an adverse action, and although Appellant prevailed on the attendance policy violation claim, it does not change its character. *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998) ("Actions such as suspensions or terminations are by their nature adverse even if subsequently withdrawn.") Additionally, this 2-day period is sufficient to establish a causal connection. *See Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004)("A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient."); *Trujillo v. PacifiCorp.*, 528 F.3d 1149, 1157 n. 5 (10th Cir. 2008). Therefore, Appellant has met her prima facie case that Appellee retaliated against her, resulting in her receiving a 5-day suspension, without pay.

Additionally, the *ten (10) day suspension* was a form of retaliation against Appellant for utilizing the grievance procedures and lodging complaints about discrimination. The 10-day suspension constitutes an adverse action. *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998). The evidence shows that the disciplinary hearing took place on August 31, 2020. Appellee's pushed forward its frivolous claims that Appellant violated (Work Rule 7), when she clocked out at her scheduled work time of 5:30 pm. Again, Chris Berg, initiated the disciplinary action, even though he was aware that Ms. Bell was working to make up time for FMLA purposes. [Aplt. App. Vol. 3, A561,

"RDF 53."] Ms. Bell disputed the allegations as they were retaliatory and unwarranted [*Id.*]

Nonetheless, Appellant was unlawfully punished with a 10-day suspension, without pay.

[Aplt. App. Vol. 4, A721.]

The District Court's attempt to bifurcate the unlawful conduct of Appellee in connection with her suspension versus termination is unwarranted and impractical. The matters are both overlapping and intertwined in such a manner that any separate analysis ignores the casual link between the Appellee's conduct and how such conduct may impact Appellant.  As the Supreme Court reasoned in *Burlington Northern*:

> [T]he significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters.  The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. …
> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.

*Burlington Northern Santa Fe Ry. Co. v. White,* 548 U.S. 53, 69 (internal quotations and citation omitted).

Here, apparently the District Court found ample evidence that the Appellant had made a prima facia case of being terminated, but discounted the lesser included unlawful conduct of retaliatory disciplinary actions by the Appellee that ultimately lead to her termination.  Ignoring the causal connection and linkage between those factors appears to place form over substance. For these reasons, the District Court's September 29, 2023 Order, and later, Memorandum Opinion of March 8, 2024, should be reversed and Appellant, Ms. Bell should be allowed to proceed with her case to trial.

## CONCLUSION

For the reasons stated, Appellant Sondia Bell respectfully requests that this Court reverse the District Court's grant of Summary Judgment, enter judgment in favor of Appellant on her claims of Race Discrimination and Retaliation in violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. §2000e, *et.seq*., Race Discrimination and Retaliation in violation of 42 U.S.C. §1981; and her claims for Discrimination And Retaliation in violation of the 42 U.S.C. § 12112(a)-known as the "Association Provision" of the Americans With Disabilities Act. Appellant further seeks all such other and further relief as may be available in law and equity.

Respectfully submitted,

/s/   Cynthia Rowe D'Antonio
Cynthia Rowe D'Antonio, OBA# 19652
GREEN JOHNSON MUMINA & D'ANTONIO
4101 Perimeter Center Drive, Suite 110
Oklahoma City, Oklahoma 73112
Telephone:    (405) 488-3800
Facsimile:     (405) 488-3802
Email: cynthia@gjmlawyers.com
**ATTORNEY FOR PLAINTIFF/APPELLANT**
**SONDIA BELL**

## STATEMENT REGARDING ORAL ARGUMENT

Appellant's counsel opines that oral argument is not necessary.

/s/  Cynthia Rowe D'Antonio
_____

Cynthia Rowe D'Antonio, OBA# 19652
GREEN JOHNSON MUMINA & D'ANTONIO
4101 Perimeter Center Drive, Suite 110
Oklahoma City, Oklahoma 73112
Telephone:  (405) 488-3800
Facsimile:  (405) 488-3802
Email: cynthia@gjmlawyers.com
**ATTORNEY FOR PLAINTIFF/APPELLANT
SONDIA BELL**

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), this is to certify that this Brief contains 11818 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2021, 13 point font size.

/s/  Cynthia Rowe D'Antonio
_____

Cynthia Rowe D'Antonio, OBA# 19652

39

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that with respect to the foregoing:

    a. all required privacy redactions have been made;

    b. the hard copies submitted to the clerk are exact copies of the ECF submission;

    c. The digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program and according to the program is free of viruses.

/s/   Cynthia Rowe D'Antonio              
Cynthia Rowe D'Antonio, OBA# 19652

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May 2024, I electronically transmitted the foregoing Opening Brief of Plaintiff/Appellant to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the following ECF registrants:

Gerald M. Bender, Esquire
Kristina L. Gray, Esquire
City Hall @ One Technology Center
175 E. Second Street, Suite 685
Tulsa, Oklahoma 74103
***Attorneys for Defendant/Appellee***
***City of Tulsa***

/s/   Cynthia Rowe D'Antonio
Cynthia Rowe D'Antonio

## **ADDENDUM**

**CASE NO. 23-5111**
**INDEX TO DOCUMENT REFERENCES IN ADDENDUM**

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| Memorandum Opinion (03-08-24) | R. 64 | A850 |
| Judgment (03-28-24) | R. 65 | A983 |

# IN THE UNITED STATES DISTRICT COURT FOR

# THE NORTHERN DISTRICT OF OKLAHOMA

SONDIA BELL,

        Plaintiff,

vs.                                       No. CIV 21-0061 JB/CDL

CITY OF TULSA,

        Defendant.

## <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court on Defendant City of Tulsa's Motion for Summary Judgment and Brief in Support, filed December 16, 2022 (Doc. 31)("MSJ"). The Court held a hearing on February 3, 2023. <u>See</u> Clerk's Minutes, filed February 3, 2023 (Doc. 46). The primary issues are: (i) whether Defendant City of Tulsa discriminated against Plaintiff Sondia Bell on the basis of race by suspending her without pay or by terminating her employment with the City of Tulsa; (ii) whether the City of Tulsa retaliated against S. Bell for opposing the City of Tulsa's employment practices and filing complaints against her coworkers and supervisors; and (iii) whether the City of Tulsa violated S. Bell's rights under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12205 ("ADA"), by taking adverse action against her, because of her relationship with her son, Jacob Bell. The Court concludes that: (i) the City of Tulsa did not discriminate against S. Bell on the basis of race; (ii) the City of Tulsa did not retaliate against S.

---

[1]In the Court's Order, filed September 29, 2023 (Doc. 54)("Order"), the Court granted the City of Tulsa's Motion for Summary Judgment and Brief in Support, filed December 16, 2022 (Doc. 31). In the Order, the Court states: "This Order disposes of Defendant City of Tulsa's Motion for Summary Judgment and Brief in Support, filed December 16, 2022 (Doc. 31). The Court will issue at a later date, however, a Memorandum Opinion more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion.

Bell for engaging in protected conduct; and (iii) the City of Tulsa did not violate S. Bell's rights under the ADA.  Accordingly, the Court grants the MSJ.

## FACTUAL BACKGROUND

The Court takes its facts from: (i) the MSJ; (ii) the Plaintiff's Response in Objection to Defendant's Motion for Summary Judgment, filed January 23, 2023 (Doc. 41)("Response"); and (iii) the Defendant City of Tulsa's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, filed February 1, 2023 (Doc. 45)("Reply").  The Court states the undisputed material facts in the text.  See Fed. R. Civ. P. 56.  The Court specifically notes the facts that are disputed, or purportedly disputed, in the footnotes.

### 1.    Background.

S. Bell is an African-American woman.  See MSJ ¶ 1, at 6 (asserting this fact)(citing Employee Information at 4, filed December 16, 2022 (Doc. 31-1)); Response ¶ 1, at 1 (admitting this fact).  The City of Tulsa originally hired S. Bell as a Senior Buyer in the City of Tulsa's finance department in 2014, and S. Bell was later promoted to the position of Senior Information Technology Business Administrator within the City of Tulsa's Information Technology ("IT") department.  See MSJ ¶¶ 1-2, at 1 (asserting this fact)(citing Videotaped Deposition of Sondia O. Bell at 2:18-3:15 (taken April 23, 2022), filed December 16, 2022 (Doc. 31-2)("Tulsa Bell Depo.")); Response ¶¶ 1-2, at 2 (admitting this fact).  S. Bell has a master's degree and substantial experience in her field.  See Response ¶ 2, at 2 (quoting Videotaped Deposition of Sondia Bell at 9:9-12 (taken April 23, 2022), filed January 23, 2023 (Doc. 41-7); Unofficial Graduate Academic

Record, filed January 23, 2023 (Doc. 41-12)).[2]

S. Bell's employment as Senior IT Business Administrator was terminated on December 3, 2020. See MSJ ¶ 2, at 1 (asserting this fact)(citing Tulsa Bell Depo. at 3:2-15); Response ¶ 2, at 2 (admitting this fact). Chris Berg, IT Administration Services Manager, served as S. Bell's direct supervisor during her time as Senior IT Business Administrator. See MSJ ¶ 3, at 1 (asserting this fact); Response ¶ 3, at 3 (admitting this fact). Berg reports directly to Michael Dellinger, the IT Department's head and the City of Tulsa's Chief Information Officer, who serves as the final decisionmaker regarding discipline of IT department employees. See MSJ ¶ 3, at 1 (asserting this fact)(citing Affidavit of Michael Dellinger ¶ 6, at 1-2 (dated December 2022),[3] filed December 16, 2022 (Doc. 31-4)("Dellinger Aff.")); Dellinger Aff. ¶ 4, at 1; Response ¶ 3, at 3 (admitting this fact).

The work group in which S. Bell was employed "is responsible for obtaining, managing and securing various IT hardware and software for the entire City," and is tasked with "receiving deliveries and filling orders" in relation to the City's IT hardware and software. MSJ ¶ 10, at 3

---

[2]The local rules for the United States District Court for the Northern District of Oklahoma require the nonmovant to "state any additional facts the nonmovant contends preclude judgment as a matter of law" "[s]eparately . . . in concise, numbered paragraphs." N.D. Okla. LCvR 56-1(c). Only then "the moving party must respond to the nonmovant's statement of additional material facts." N.D. Okla. LCvR 56-1(d). S. Bell has not included such a section of "additional facts" and the Court need not consider the additional information S. Bell includes in paragraph two of her Response to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law." N.D. Okla. LCvR 56-1(c). Nevertheless, because the City of Tulsa does not dispute this fact, the Court will include it in the text as an additional undisputed fact.

[3]The Affidavit of Michael Dellinger (dated December 2022), filed December 16, 2022 (Doc. 31-4)("Dellinger Aff."), does not indicate the specific date on which the affidavit was executed. See Dellinger Aff. at 7. The Dellinger Aff. indicates, however, that the Dellinger Aff. was executed in December, 2022, and includes the seal of Tammy E. Miller, Notary Public for the State of Oklahoma. See Dellinger Aff. at 7.

(citing Affidavit of Chris Berg (dated December 6, 2022), filed December 16, 2022 (Doc. 31-3)("Berg Aff.")).[4]  As head of the IT Administrative Services Section in which S. Bell worked, Berg "made the decision that no one under his supervision would be allowed to telecommute" unless they demonstrated "exceptional circumstances" necessitated their working from home. MSJ ¶ 11, at 3 (asserting this fact)(citing Berg Aff. ¶ 8, at 2).[5]  Even then, such authorizations were only temporary.  See MSJ ¶ 11, at 3 (citing Berg Aff. ¶ 8, at 2).[6]  S. Bell's "job does not call for her 'physically manipulating certain equipment.'"  Response ¶ 10, at 6-7 (quoting Videotaped Deposition of Sondia O. Bell at 9:25-10:3 (taken April 23, 2022), filed January 23, 2023 (Doc. 41-

---

[4]Despite that S. Bell purports to dispute this fact, she does not specifically contradict it; rather, S. Bell provides additional facts that the Court has included in the text as undisputed facts.  See Response ¶ 10 at 6.  Accordingly, the Court deems the fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c) ("All material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party.").

[5]S. Bell purports to dispute this fact, because she asserts that Dellinger directed her to Paula Stickelber, another City of Tulsa Employee, who he indicated could provide S. Bell with information about how to seek approval to telecommute.  See Response ¶ 11, at 7 (citing no evidence in the record).  See also Bell Depo. at 20:8-22.  In addition, S. Bell points the fact that Berg asked S. Bell to send him the City of Tulsa's telecommuting policy after she first requested to work from home.  See Response ¶ 11, at 7; Email from Sondia Bell to Chris Berg (dated September 13, 2018), filed January 23, 2023 (Doc. 41-3); Declaration of Sondia Bell ¶ 5, at 2 (dated January 23, 2023), filed January 23, 2023 (Doc. 41-2)("Bell Decl.").  Both of these facts, however, are consistent with Berg having a policy of granting requests to work from home only for "exceptional circumstances."  MSJ ¶ 11, at 3.  Accordingly, the Court deems the fact that Berg allowed his employees to work from home only in "exceptional circumstances" undisputed for this Opinion's purposes.  MSJ ¶ 11, at 3.

[6]S. Bell purports to dispute this fact, but does not offer any evidence to contradict directly the fact that authorizations to work from home in the IT Administrative Services Section were only temporary.  See Response ¶ 11, at 7.  Accordingly, the Court deems the fact in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

7)("Bell Depo.)).[7]

**2.    S. Bell's First Work-From-Home Request.**

On January 8, 2019, S. Bell emailed her supervisor, Berg, and made a formal request to work from home. See MSJ ¶ 4, at 1 (asserting this fact)(citing Email from Sondia Bell to Chris Berg at 7-8 (dated January 8, 2019), filed January 23, 2023 (Doc. 41-5)("Formal Email Request")).[8]  S. Bell had previously inquired about working from home on September 13, 2018. Response ¶ 4, at 4-5 (citing Email from Sondia Bell to Chris Berg (dated September 13, 2018), filed January 23, 2023 (Doc. 41-3)).[9]  The Formal Email Request states that S. Bell is "finding it increasingly difficult to address some family issues (Due to my son being on bed-rest for his ACL) while I am working a full-time schedule."  MSJ ¶ 4, at 1 (citing Formal Email Request at 8)(asserting this fact).[10]  At the time that S. Bell requested to work from home, the City of Tulsa

---

[7]S. Bell has not included this fact in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court includes it in the text as an additional undisputed fact for this Opinion's purposes.

[8]S. Bell purports to dispute this fact, because the City of Tulsa "omits pertinent facts" about S. Bell's initial request, but "admits that she sent a . . . request to Telecommute on January 8, 2019."  Response ¶ 4, at 4-5.  S. Bell has not specifically contradicted this fact, but provides additional facts that the Court has included in the text as undisputed facts.  See Response ¶ 10 at 6.  Accordingly, the Court deems the fact in the MSJ admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[9]S. Bell has not included this fact in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court includes it in the text as an additional undisputed fact for this Opinion's purposes.

[10]Despite that S. Bell purports to dispute this fact, she does not specifically contradict it;

had in place a policy that states "telecommuting is not appropriate for all positions, and no employee or job category is entitled to or guaranteed the opportunity to telecommute, except for those hired into designated positions" and that telecommuting is a "management option" that required approval from an employee's supervisor or other higher-ranking personnel.  MSJ ¶ 5, at 2 (citing City of Tulsa Telecommuting Policies at 3, filed January 23, 2023 (Doc. 41-6)("COT Telecommuting Policies")).[11]

_____

rather, S. Bell provides additional facts that the Court has included in the text as undisputed facts. See Response ¶ 10 at 6.  Accordingly, the Court deems the fact in the MSJ admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[11]S. Bell disputes this fact, and asserts that City of Tulsa policy also provides that "jobs that are acceptable for telecommuting are those that can be performed at an alternate worksite without diminishing the quality of work or disrupting productivity."  See Response ¶ 5, at 3 (quoting City of Tulsa Personnel Policies and Procedures at 127, filed December 16, 2022 (Doc. 31-6)("COT Policies")).  S. Bell avers that her job is one that can be performed offsite from a laptop.  See Response ¶ 5, at 3 (citing Videotaped Deposition of Sondia O. Bell at 5 (taken April 23, 2022), filed December 16, 2022 (Doc. 31-2)("Tulsa Bell Depo.")).  At the outset, S. Bell does not attempt to controvert the fact in the MSJ, so the Court deems the fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).  To the extent that S. Bell asserts here a new fact that her job was one that was "acceptable for telecommuting," the Court concludes that her job was not appropriate for telecommuting pursuant to City of Tulsa policy, because the record establishes that S. Bell's team needed to remain in person in order to "avoid diminishing the quality of work or disrupting productivity."  COT Policies at 127.  See Berg Aff. ¶¶ 8-9, at 2-3.

In addition, S. Bell contends that the policy addresses employees' ability to work from home for prolonged periods of time for medical reasons and that the ability to work from home constitutes a reasonable accommodation under the ADA.  See Response ¶ 5, at 3 (citing COT Policies at 130).  The policy that S. Bell cites requires that HR staff be "notified immediately" if an employee's telecommuting request "relates to a reasonable accommodation . . . or prolonged use of leave for medical reasons."  COT Policies at 130.  The policy, therefore, does "address[] prolonged use [of telecommuting] for medical reasons," so the Court will include this fact in the text as an additional undisputed fact.  Response ¶ 5, at 3.  The Court concludes, however, that the policy does not identify working from home as a reasonable accommodation under the ADA.  Rather, the policy requires HR to be notified where a "request for telecommuting relates to a reasonable accommodation."  COT Policies at 130.

Finally, S. Bell also avers that the "main reason for the request was so that she could accommodate the needs of her Autistic child."  Response ¶ 5, at 3 (citing Bell Decl. ¶ 8, at 2).  The City of Tulsa acknowledges this fact in its list of undisputed facts.  See MSJ ¶ 58, at 12 ("In July

The City of Tulsa's work-from-home policy requires telecommuting employees to make arrangements for childcare during the hours that they work from home and that "telecommuting is not a substitute for . . . childcare."  MSJ ¶ 6 (asserting this fact)(citing COT Telecommuting Policies at 5).[12]  On July 17, 2019, Berg denied S. Bell's request to telecommute, explaining that the IT department had a small staff and each member of the team needed to be on-site ensure the IT department could continue providing required services when IT employees were absent for vacation and sick leave.  MSJ ¶ 7, at 2 (quoting Telecommuting Emails at 2)(asserting this fact).[13]

---

2020 Ms. Bell requested to use expanded FMLA leave to care for her children . . . ."); id. ¶ 74, at 15 ("Ms. Bell's complaints regarding ADA accommodations are solely related to care for her autistic child.").  Accordingly, the Court concludes that it is undisputed that S. Bell's primary reason for making her initial work from home request was so that "she could accommodate the needs of her Autistic child."  Response ¶ 5, at 3.

[12]S. Bell purports to dispute this fact as "immaterial."  Response ¶ 6, at 4.  S. Bell's assertion of immateriality does not dispute the City of Tulsa's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., No. CIV 13-0343, 2014 WL 4823841, at *1 n. 2 (D.N.M. September 12, 2014)(Browning, J.)("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[13]S. Bell disputes Berg's reasoning for denying her request to work from home.  Response ¶ 7, at 4.  Specifically, S. Bell disputes the fact, on which Berg relied in his email, that the IT department is *short staffed*."  Response ¶ 7, at 4-5 (emphasis in original)(no citation given for quotation).  As an initial matter, the Court notes that the City of Tulsa never provides that the IT department is short staffed; rather, the MSJ quotes Berg's email denying S. Bell's request to work from home, in which Berg says the IT department has a "small number of staff."  MSJ ¶ 7, at 2 (quoting Telecommuting Emails at 2).  Regardless, by providing evidence that Berg would ask S. Bell to run personal errands, see Response ¶ 7, at 5 (citing Text Messages between Sondia Bell and Chris Berg (dated November 9, 2018), filed January 23, 2023 (Doc. 41-8)("Text Message")), S. Bell has not "specifically controverted" the fact that the IT department has "a small number of staff."  N.D. Okla. LCvR 56-1(c).  S. Bell also contends that Berg "would solely utilize Plaintiff's expertise on important projects, even though Summer Caughron held the same position."  Response ¶ 7, at 5 (citing IT Organizational Chart, filed January 23, 2023 (Doc. 41-9); Email from Chris Berg to Melissa Forrest at 1 (dated January 9, 2018), filed January 23, 2023 (Doc. 41-10)("Forrest Email")).  The Court concludes, however, that S. Bell overstates Berg's reliance on

S. Bell appealed Berg's decision to deny her request to work from home to Dellinger, who, on July 18, 2019, denied S. Bell's appeal.  See MSJ ¶ 8, at 3 (asserting this fact)(citing Email from Michael Dellinger to Sondia Bell at 5 (dated July 18, 2019), filed December 22, 2023 (Doc. 31-5)("Dellinger Appeal Denial Email")); Response ¶ 8, at 5-6 (admitting this fact).  Dellinger explained that the decision to grant a request to work from home was within the discretion of S. Bell's direct supervisor, Berg, and that Berg had denied her request for an "acceptable reason." MSJ ¶ 9, at 3 (asserting this fact)(citing Dellinger Appeal Denial Email at 1).[14]  On August 8, 2019, S. Bell filed an internal grievance related to the denial of her request to work from home, which the

_____

her based on the evidence she supplies, and will not deem S. Bell's fact admitted for this Opinion's purposes, because the email S. Bell cites to provides only one instance in which Berg acknowledged that S. Bell "has been working on the state contract option."  Forrest Email at 1.

[14]S. Bell purports to dispute this fact "as to the credibility of Michael Dillinger's explanation provided for denying Plaintiff's request."  Response ¶ 8, at 5 (citing no evidence in the record).  S. Bell is correct that, at the summary judgment stage, "the court cannot decide any issues of credibility."  J.H. ex rel. J.P. v. Bernalillo Cnty., 61 F. Supp. 3d 1085, 1136 (D.N.M. 2014)(Browning, J.)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  See Fogarty v. Gallegos, 523 F.3d 1147, 1165 (10th Cir. 2008)("On summary judgment, a district court may not weigh the credibility of the witnesses.").  "Practically speaking, this means that the court may not grant summary judgment based on its own perception that one witness is more credible than another. . . ."  Fogarty v. Gallegos, 523 F.3d at 1165.  "But where a nonmoving party (who has the burden of persuasion at trial) fails to provide admissible evidence rebutting testimony offered by the moving party, the question is not one of credibility, but rather the absence of evidence creating a triable issue of fact."  Helget v. City of Hays, 844 F.3d 1216, 1223 n.3 (10th Cir. 2017).  S. Bell must do more, therefore, than "'merely assert that the jury might' disbelieve the testimony of [the City of Tulsa's witnesses]; [s]he must present h[er] own affirmative evidence of those facts which are contradicted by the interested testimony."  Helget v. City of Hays, 844 F.3d at 1223 n.3 (quoting Wood v. Handy & Harman Co., 318 F. App'x at 606-07 (only second and third alterations in the original); Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 742 (10th Cir. 2004)("Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion.").  Because S. Bell has not offered any such evidence here, she does not place into dispute any of the facts that the City of Tulsa offers about the contents of Dellinger's email denying S. Bell's appeal, the Court deems these facts in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

City of Tulsa ultimately denied.  See MSJ ¶ 9, at 3 (asserting this fact); Contract Grievance Form at 2, filed January 23, 2023 (Doc. 41-11)("August 2019 Grievance"); Email from Michael Dellinger to Joshua Powell (dated September 4, 2019), filed December 16, 2022 (Doc. 31-7)("December 16 Email").[15]  S. Bell and Berg had an in-person conversation before Berg responded to her request to work from home in which Berg asked if S. Bell was going to file a grievance about him and that S. Bell responded that she would file a grievance.  Response ¶ 7, at 5 (citing Bell Depo. at 21:2-5; id. at 24:4).[16]  When Dellinger denied S. Bell's grievance regarding Berg's denial of her original request to work from home, he "noted that [Berg] does not currently have any work from home personnel . . . ."  MSJ ¶ 13, at 4 (quoting December 16 Email at 1).[17]

---

[15]S. Bell purports to dispute this fact, because she argues the grievance was not "given full and fair consideration."  Response ¶ 9 at 6 (citing no evidence in the record).  She argues that Dellinger could not have given her grievance full and fair consideration, because the grievance includes "a fair amount of documentation," and Dellinger took only one day to review her grievance after he returned from time spent out of the office.  Response ¶ 9 at 6 (citing Email from Michael Dellinger to Joshua Powell (dated August 13, 2019), filed December 16, 2022 (Doc. 31-7)("August 13 Email"); Email from Michael Dellinger to Joshua Powell (dated September 4, 2019), filed December 16, 2022 (Doc. 31-7)("September 4 Email")).  Dellinger delayed providing his review of S. Bell's grievance, however, until he returned to the office, specifically because he felt that "it wouldn't be fair to [make a determination] without reviewing the documentation that they have gathered."  August 13 Email at 2.  After returning to the office, Dellinger made his determination, which he includes in the September 4 Email.  In the email, Dellinger highlights issues in the documentation included with the grievance and makes note of pertinent information that was not included in the documentation. See September 4 Email at 1.  Because S. Bell does not point to any evidence in the record to contradict the August 13 Email or the September 4 Email, the Court deems the fact that Dellinger gave S. Bell's grievance the proper consideration undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[16]S. Bell has not included this fact in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court includes it in the text as an additional undisputed fact for this Opinion's purposes.

[17]S. Bell purports to dispute this fact on the ground that it is incomplete because the

3.      **S. Bell's 2019 Behavior at Work and Failures to Request Authorization to Change Her Work Schedule.**

S. Bell went on maternity leave from March, 2019, to July, 2019.  See MSJ ¶ 7, at 2 (asserting this fact)(citing Tulsa Bell Depo. at 5:10-14).[18]  After she returned to the office, S. Bell began bringing her two children to work without management approval.  See MSJ ¶ 22, at 5 (asserting this fact)(citing Berg. Decl. ¶ 14, at 4).[19]  On July 17, 2019, the same day that S. Bell

---

quotation the City of Tulsa includes from the email -- "it should be noted that the manager does not currently have any work from home personnel" -- misquotes Dellinger, because it omits the end of the quotation: ". . . . which is not represented in your documents."  Response ¶ 13, at 7-8 (quoting December 16 Email at 1).  The rest of the quotation the City of Tulsa omits refers to what Dellinger notes was missing from the documentation included in S. Bell's grievance regarding the denial of her request to work from home.  It does not place the fact that Berg did not have any employees working from home at the time into dispute.  Accordingly, the Court deems the fact that Dellinger acknowledged that Berg had no employees working from home when he denied S. Bell's grievance undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

   [18]S. Bell purports to dispute this fact, but puts forth no evidence contradicting that she was on maternity leave during these dates.  Response ¶ 7, at 2 (citing no evidence in the record).  Moreover, in the Tulsa Bell Depo., S. Bell confirms that she was out on maternity leave beginning in March.  See Tulsa Bell Depo. at 5:10-14.  Accordingly, the Court deems the fact that S. Bell was on maternity leave from March, 2019, to July, 2019 undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

   [19]S. Bell purports to dispute this fact by arguing that she would occasionally bring only her older son, J. Bell, to work with her.  See Response ¶ 22, at 10 (citing no evidence in the record).  S. Bell avers that Berg "acquiesced and approved" of this arrangement as indicated by a text message exchange between S. Bell and Berg in which S. Bell mentioned that J. Bell was with her at work, and that Berg only objected to this arrangement after she filed her oral grievance with him in July, 2019.  Response ¶ 22, at 10 (citing Text Message from Sondia Bell to Chris Berg (dated November 3, 2018), filed January 23, 2023 (Doc. 41-17)("Jacob shut the door after he left out from using the restroom."); August 2019 Grievance at 2 (indicating that S. Bell filed her oral grievance with Berg on July 17, 2019).  S. Bell does not offer any evidence, however, to dispute that she began bringing both of her children to work with her after she returned from maternity leave.  See Email from Summer Caughron to Chris Berg at 5 (dated September 4, 2019), filed December 16, 2022 (Doc. 31-9)("September 4 Email")(stating that S. Bell told Caughron "as far as me having my kids up here").  Accordingly, the Court deems the fact in the text undisputed for

---

filed her oral grievance against Berg, Berg sent an email to the IT Administration Services Section reminding his employees of the City of Tulsa's policy on visitors and children in the workplace, which states: "The City of Tulsa does not permit continual presence of children in the workplace in lieu of other childcare arrangements."  MSJ ¶ 23, at 5 (asserting this fact)(citing Email from Chris Berg to IT Administration Services (dated July 17, 2019), filed December 16, 2022 (Doc. 31-12), and quoting COT Policies at 125).[20]  Summer Caughron, another IT Department employee who is not African-American, would occasionally bring her cousin's infant child to work.  See Response ¶ 22, at 10-11 (citing September 4 Email at 5)("[T]hat is my cousins [sic] baby and she was 1 year old when I brought her up here an entire two times for which I made Chris aware of beforehand.").[21]  In August, 2019, S. Bell received a performance review that stating that she had "contributed towards our team successfully providing our services as committed 100% of the time despite an increase in service requests of 16% during this period."  Response ¶ 20, at 10 (quoting Performance Review and Planning for Sondia Bell (dated August 30, 2019), filed January 23, 2023

---

this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[20]S. Bell purports to dispute this fact insofar as the City of Tulsa indicates in the MSJ that the email from Berg reminding his employees about the City of Tulsa's policies regarding children in the workplace was sent July 27, 2019, when the email was actually sent on July 17, 2019.  See Response ¶ 23, at 11.  The Court agrees with S. Bell, as the record demonstrates that the email was sent on July 17, 2019.  See Email from Chris Berg to IT Administration Services (dated July 17, 2019), filed December 16, 2022 (Doc. 31-12).  In addition, the Court recognizes that, as S. Bell states, Berg sent the email on the same day as S. Bell filed her oral grievance with Berg.  See Response ¶ 23, at 11; August 2019 Grievance at 2.

[21]S. Bell has not included this fact in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court includes it in the text as an additional undisputed fact for this Opinion's purposes.

(Doc. 41-15)("2019 Performance Review")).[22]

Following Berg's email reminding the IT Administrative Services team about the City of Tulsa's policy on children in the workplace, S. Bell began working "unusual hours without approval including late nights and weekends." MSJ ¶ 24, at 5 (asserting this fact)(citing Berg Aff. ¶ 16, at 4).[23] Because S. Bell worked an hourly position, she was subject to restrictions that limited

---

[22]S. Bell has not included this fact in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law." N.D. Okla. LCvR 56-1(c). Nevertheless, because the City of Tulsa does not dispute this fact, the Court includes it in the text as an additional undisputed fact for this Opinion's purposes.

[23]S. Bell purports to dispute this fact on the ground that she would work "Flex-Time to make up" the hours of work she missed to take her son to his therapy appointments. Response ¶ 24, at 11 (citing Letter from Kathleen Koljack, M.D. to "Whom it May Concern" (dated February 25, 2020), filed January 23, 2023 (Doc. 41-18)(acknowledging that S. Bell's son requires "constant supervision" and requires numerous therapies)). S. Bell argues that Berg was aware that she would need to use flex time to assist with her son's care when Berg hired S. Bell, but that her use of flex time was "practically suspended" after she filed her grievance about Berg's denial of her request to work from home. Response ¶ 24, at 11 (citing Text Message from Sondia Bell to Chris Berg (dated July 13, 2019), filed January 23, 2023)(Doc. 41-20)("July 13 Text Message")(informing Berg that S. Bell was "working for [a] couple hours" on a Saturday); Bell Depo. at 42:9-43:5 ("After I filed a grievance, I was called in the office by Michael Dellinger and Chris Berg and they . . . told me . . . I could no longer flex.")). S. Bell thus points to evidence that, at least on one occasion, she worked hours on a weekend before she filed her grievance about Berg. See July 13 Text Message. S. Bell has not contradicted specifically, however, that she began working unusual hours without authorization after Berg sent his email about the City of Tulsa's policy on children in the workplace. See MSJ ¶ 24, at 5.

Moreover, the record contains substantial evidence indicating that S. Bell began working more flex time without authorization after Berg's email. See Dellinger Aff. ¶ 13, at 3-4; Letter from Chris Berg to Sondia Bell at 2 (dated November 29, 2019), filed December 16, 2022 (Doc. 31-13)("First Pretermination Hearing Notice")("During this period, [from July 19, 2019, to October 16, 2019], a pattern developed whereby Ms. Bell failed multiple times to request approval from, or otherwise communicate to, her manager, Chris Berg, regarding her . . . overtime."); id. at 3 (describing S. Bell's "refusals to leave work" after her supervisors informed her that she had worked over her allotted hours and, therefore, needed to "punch out" because she had not been approved to work overtime). In addition, the record demonstrates that, before this period, S. Bell regularly had sought authorization regarding "deviations from her normal work schedule." First Pretermination Hearing Notice at 2. Accordingly, S. Bell has not met her "burden of designat[ing]

- 12 -

her overtime and the number of hours she could work per week.  See MSJ ¶ 24, at 5 (asserting this

fact)(citing Dellinger Aff. ¶ 13, at 3-4).[24]  City of Tulsa policy requires employees to make written

requests for flex time and requires that the department head approve such requests.  MSJ ¶ 25, at

6 (asserting this fact)(citing COT Policies at 22; Dellinger Aff. ¶ 14, at 4).[25]  After it was brought

to Dellinger's attention that S. Bell was using flex time without prior authorization, see MSJ ¶ 25,

at 6 (asserting this fact)(citing COT Policies at 22; Dellinger Aff. ¶ 14, at 4),[26] Dellinger scheduled

a meeting with Berg and S. Bell for October 4, 2019, at 4:00 p.m., to discuss S. Bell's work hours

and the City of Tulsa's policies, see MSJ ¶ 26, at 6 (asserting this fact)(citing Berg Aff. ¶ 17, at 5;

Dellinger Aff. ¶ 15, at 4; Automated Email Meeting Notification at 51, filed December 16, 2022

(Doc. 31-13)(indicating that a meeting including Dellinger, Berg, and S. Bell was scheduled for

October 4, 2019, from 4:00 p.m. to 5:00 pm, to "Discuss Work Hours")).[27]  S. Bell only received

---

specific facts showing that there is a genuine issue for trial."  Bromberg v. Hildebrandt, No. CIV
21-0707, 2023 WL 3625007, at *21 (D.N.M. Mar. 31, 2023)(Browning, J.).

   [24]S. Bell purports to dispute this fact, but puts forth no evidence contradicting that her
position was hourly and, as a result, subject to the City of Tulsa's overtime and hourly restrictions.
See Response ¶ 24, at 11. Accordingly, the Court deems the fact in the text undisputed for this
Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

   [25]S. Bell purports to dispute this fact on the ground that the Dellinger Aff. cites to an
"Exhibit C," which he fails to include.  Response ¶ 25, at 11 (citing no evidence in the record).
The flex-time policy that Dellinger quotes is attached, however, to the Dellinger Aff.  See Dellinger
Aff. at 23.  Accordingly, the Court deems the fact in the text undisputed for this Opinion's
purposes.  See N.D. Okla. LCvR 56-1(c).

   [26]S. Bell purports to dispute this fact on the ground that the Dellinger Aff. cites to a "Exhibit
C," which he fails to include.  Response ¶ 25, at 11 (citing no evidence in the record).  For the
same reasons discussed in above, see supra n.25, at 12-13, the Court deems the fact in the text
undisputed for this Opinion's purposes.

   [27]S. Bell admits the meeting was scheduled and provides additional facts that the Court has
included in the text as undisputed facts.  See Response ¶ 10 at 6.  Accordingly, the Court deems

thirty-minutes' notice that the meeting would be taking place.  See Response ¶ 26, at 12 (citing Tulsa Bell Depo. at 87:3-16).[28] S. Bell did not attend the meeting, and, instead, left work early at 3:38 p.m. despite her work hours requiring her to work until 5:30 pm.  See MSJ ¶ 26, at 6 (asserting this fact)(citing Berg Aff. ¶ 17, at 5; Dellinger Aff. ¶ 15; Tulsa Bell Depo at 25:3-17; Time Records for Sondia Bell at 48, filed December 16, 2022 (Doc. 31-13)("Time Records")).[29]

The meeting between Dellinger, Berg, and S. Bell to discuss S. Bell's work hours eventually took place on October 8, 2019.  See MSJ ¶ 27, at 6 (asserting this fact)(citing Dellinger Aff. ¶ 16, at 4); Tulsa Bell Depo at 48:3-6.[30]  At the meeting, Dellinger and Berg reminded S. Bell of the City of Tulsa's policies regarding flex time, and informed S. Bell that "she would no longer be able to work late nights or Saturdays without prior approval from management."  MSJ ¶ 27, at

---

the fact in the MSJ admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[28]S. Bell has not included the fact that she only received thirty-minutes' notice ahead of the meeting in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, and because the record makes clear that Dellinger scheduled a meeting on October 4, 2019, to be held at 4:00 pm that same day, see Berg Aff. ¶ 17, at 4-5, the Court will include in the text as an additional undisputed fact the fact that S. Bell received only 30-minutes notice for the meeting.

[29]S. Bell purports to dispute this fact by providing the additional fact presented above, see supra n. 28, at 13.  See Response ¶ 26, at 12.  For the reasons discussed supra n. 28, at 13-14, the Court will include in the text as an additional undisputed fact the fact that S. Bell received only thirty-minutes notice for the meeting, see Response ¶ 26, at 12 (citing Tulsa Bell Depo. at 87:3-16), and will deem the fact that S. Bell did not attend the meeting admitted for this Opinion's purposes, see N.D. Okla. LCvR 56-1(c).

[30]S. Bell purports to dispute this fact, but points to no evidence in the record contradicting that the meeting eventually took place on October 8, 2019.  See Response ¶ 27, at 12 (citing no evidence in the record).  Accordingly, the Court deems the fact in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

- 14 -

6 (asserting this fact)(citing Dellinger Aff. ¶ 16, at 4); Berg Aff. ¶ 18, at 5.[31]  Berg enforced the policy requiring employees to acquire prior authorization to work "flex" hours during the evenings and on Saturdays for all of his employees.  MSJ ¶ 27, at 6 (asserting this fact)(citing Dellinger Aff. ¶ 16, at 14; Affidavit of Summer Caughron ¶ 14, at 3 (dated December 6, 2022), filed December 16, 2022 (Doc. 9)("Caughron Aff.")("Chris is adamant with all his employees about following the policies requiring advanced approval of flex time.")); Berg Aff. ¶ 18, at 5.[32]

On October 16, 2019, S. Bell worked an unauthorized ten-hour shift, and, as a result, it became a concern that, if S. Bell were to work normal hours for the rest of the week, she would incur unauthorized overtime.  See MSJ ¶ 28, at 6 (asserting this fact)(citing Berg Aff. ¶ 20, at 5; Time Records at 49).[33]  At 5:00 p.m. on October 17, 2019, Berg told S. Bell that she needed to

---

[31]S. Bell purports to dispute this fact, but points to no evidence in the record contradicting that she was reminded of the City of Tulsa's policies and informed that she would no longer be able to work late nights or on Saturdays.  See Response ¶ 27, at 12 (citing no evidence in the record).  Accordingly, the Court deems the fact in the text undisputed for this Opinion's purposes. See N.D. Okla. LCvR 56-1(c).

[32]S. Bell disputes "that the policy was enforced upon all employees."  Response ¶ 27, at 12 (citing Email from Chris Berg to Sondia Bell (dated October 9, 2019), filed January 23, 2023 (Doc. 41-21)("October 9 Email")).  To support her argument that this fact is in dispute, S. Bell points to an email from Berg indicating that "the IT department policy regarding hours of work and flex-time are currently under review to determine if any revisions are necessary to define any exceptions which may be required due to the business needs of the department."  Response ¶ 27, at 12 (quoting October 9 Email).  The email also stated, however, that "HR policy regarding hours of work and flex-time are applicable to all employees in the IT department."  October 9 Email at 1.  In addition, that the policies were "under review to determine if any revisions are necessary to define any exceptions," indicates that there were no exceptions to the policy before the review took place.  October 9 Email at 1.  Accordingly, the Court deems the fact in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[33]S. Bell purports to dispute this fact and argues that Berg knew that she had taken her son to a therapy appointment earlier in the week, and, as a result, needed to work an additional two hours on October 16, 2019, to have a full forty-hour work week.  Response ¶ 28, at 12 (citing Tulsa Bell Depo.).  The record indicates, however, that Berg did not need the additional two hours she

clock out and go home, because of the two extra hours that S. Bell worked the prior day, but S.

Bell did not clock out.  See MSJ ¶ 29, at 6 (asserting this fact)(citing Berg Aff. ¶ 21, at 5; Tulsa

Bell Depo. at 25:19-27:5).[34]  Berg followed up his request by sending an email to S. Bell directing

her to clock out, and, when she continued to refuse to leave, Berg called security to escort her out

of the building.  See  MSJ ¶ 30, at 7 (asserting this fact)(citing Berg Aff. ¶ 22, at 6; Email from

Chris Berg to Sondia Bell at 53 (dated October 17, 2019), filed December 16, 2022 (Doc. 31-

13)).[35]  S. Bell was confused why Berg wanted her to clock out at 5:07 p.m. when her shift ended

at 5:30 p.m. and was worried that if she followed Berg's instructions and clocked out before 5:30

---

worked on October 16, 2019, to work a full forty-hour week.  See Time Records for Sondia Bell
at 49, filed December 16, 2022 (Doc.31-13)("Time Records").  S. Bell worked for seven hours
and fifty-five minutes on October 14, 2019, and then worked for seven hours and forty-one minutes
on October 15, 2019.  See Time Records at 49.  After working for ten hours and eighteen minutes
on October 16, 2019, therefore, S. Bell would have been at risk of working over forty hours for
the week if she worked her regular schedule for the rest of the week. Accordingly, S. Bell has not
met her "burden of designat[ing] specific facts showing that there is a genuine issue for trial."
Bromberg v. Hildebrandt, 2023 WL 3625007, at *21.

[34]S. Bell purports to dispute this fact, in part, because Berg's "intentions
were . . . retaliation."  Response ¶ 29, at 13 (citing no evidence in the record).  S. Bell, however,
"does not dispute that Chris Berg acted in this manner."  Response ¶ 29, at 13 (citing no evidence
in the record).  Accordingly, because S. Bell does not "specifically controvert[]" that Berg asked
her to clock out, the Court deems this fact admitted for this Opinion's purposes.  N.D. Okla. LCvR
56-1(c).

[35]S. Bell purports to dispute this fact to the extent that the City of Tulsa states that S. Bell
"'continued to refuse' to leave."  Response ¶ 30, at 13 (quoting MSJ ¶ 30, at 7).  S. Bell argues
that she was confused why Berg wanted her to clock out at 5:07 p.m. when her shift ended at 5:30
p.m. and was worried that, if she followed Berg's instructions and clocked out before 5:30 p.m.,
"she could get disciplined."  Response ¶ 30, at 13 (citing Tulsa Bel Depo at 91:8-21).  Accordingly,
because S. Bell does not "specifically controvert[]" that she refused to leave after Berg requested
she clock out or that Berg called security, the Court deems these facts admitted for this Opinion's
purposes.  See N.D. Okla. LCvR 56-1(c).

pm, "she could get disciplined." Response ¶ 30, at 13 (citing Tulsa Bel Depo at 91:8-21).[36]   S.

Bell continued to work until 5:30 p.m. and left the office before security arrived.  See  MSJ ¶ 30,

at 7 (asserting this fact)(citing Berg Aff. ¶ 22, at 6).[37]

On October 22, 2019, S. Bell requested to work until 6:00 p.m., but Berg denied her

request, because she had not sought pre-approval.  See MSJ ¶ 32, at 7 (asserting this fact)(citing

Berg Aff. ¶ 23, at 6).[38]  Despite that Berg informed S. Bell that she would have to clock out at 5:30

p.m., S. Bell continued to work until 6:00 p.m.  MSJ ¶ 32, at 7 (asserting this fact)(citing Time

Records at 49).[39]   Where S. Bell had, in the past, "properly and timely" submitted requests to

---

[36]S. Bell has not included this fact in a separate section of "additional facts," and the Court
is not required to consider this additional information to be "additional facts [S. Bell] contends
preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the
City of Tulsa does not dispute this fact, the Court includes it in the text as an additional undisputed
fact for this Opinion's purposes.

[37]S. Bell purports to dispute this fact to the extent that the City of Tulsa states that S. Bell
"'continued to refuse' to leave."  Response ¶ 30, at 13 (quoting MSJ ¶ 30, at 7)(citing Tulsa Bell
Depo.).  S. Bell admits, however, that she "clocked out at her regular shift time at 5:30 p.m." on
October 17, 2019.  Response ¶ 30, at 13.  Accordingly, because S. Bell does not "specifically
controvert[]" that she refused to leave after Berg requested she clock out or that Berg called
security, the Court deems these facts admitted for this Opinion's purposes.  See N.D. Okla. LCvR
56-1(c).

[38]S. Bell disputes this fact on the grounds that Berg addressed her in an "angry and
unprofessional tone" when he spoke with her on October 22, 2019.  Response ¶ 32, at 14 (citing
Audio Recording of October 22, 2019, Discussion Between Plaintiff and Chris Berg, filed January
23, 2023 (Doc. 41-24).  Because S. Bell does not "specifically controvert[]" that Berg denied her
request because she had not sought pre-approval, the court deems this fact admitted for this
Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[39]S. Bell purports to dispute this fact because she argues the time records showing when
she clocked in and out of work are hearsay.  Response ¶ 32, at 13-14.  The time records do not
meet the definition of hearsay, however, because they are electronically generated and are,
therefore, not statements made by a "person."  Fed. R. Evid. 801(b).  See United States v. Channon,
881 F.3d 806, 810-11 (10th Cir. 2018)(holding that summary exhibits consisting of Excel
spreadsheets reflecting "machine-generated transaction records," in which "data was created at the

"flex" her schedule and work outside of her regular hours, these requests were approved.  MSJ ¶

33, at 7 (asserting this fact)(citing Flex Time Approvals at 2-3, filed December 16, 2022 (Doc. 31-

14)); Response ¶ 33, at 14 (admitting this fact).[40]

### 4.    The Incident Concerning S. Bell's Use of Caughron's Bathroom.

In the building in which Caughron and S. Bell worked, Caughron's office contained a

bathroom and a sink.  See MSJ ¶ 39, at 8 (asserting this fact)(citing Berg Aff. ¶ 27, at 6; Caughron

Aff. ¶ 4-5, at 1); Berg Aff. ¶ 28, at 6.[41]  S. Bell would often use the restroom in Caughron's office

instead of the public restroom which was located down the hall.  MSJ ¶ 40, at 8 (asserting this

fact)(citing Berg Aff. ¶ 29, at 7; Caughron Aff. ¶ 6 at ).[42]  Berg informed Caughron that she could

---

point of sale, transferred to OfficeMax servers, and then passed to the third-party database maintained by SHC" were records "produced by machines," so they fell "outside the purview of Rule 801, as the declarant is not a person").  Accordingly, the Court considers the time records in resolving the MSJ.

[40]S. Bell states that this fact is "[n]ot contested, but Immaterial."  Response ¶ 33, at 14.  S. Bell's assertion of immateriality does not dispute the City of Tulsa's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 2014 WL 4823841, at *1 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[41]S. Bell purports to dispute this fact as "immaterial."  Response ¶ 39, at 15.  S. Bell's assertion of immateriality does not dispute the City of Tulsa's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 2014 WL 4823841, at *1 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[42]S. Bell purports to dispute this fact, but states that "she had been allowed to utilize the restroom attached to Summer Caughron's office, without issue, for approximately two (2) years."  Response ¶ 40 at 15.  Consequently, because S. Bell does not "specifically controvert[]" that she used Caughron's bathroom, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

lock her office door.  See Response ¶ 40, at 16 (asserting this fact)(citing Email from Michael

Dellinger to Joshua Hall (dated September 4, 2019), filed January 23, 2023 (Doc. 41-25)("Chris

[Berg] instructed [Caughron] to lock her door. . . .").[43]  When she left the office on Friday, August

30, 2019, Caughron locked her office door.  MSJ ¶ 41, at 8 (asserting this fact)(citing Berg Aff. ¶

29, at 7); Caughron Aff. ¶ 7 ("I began shutting my door to prevent Sondia's children from creating

a mess in my office.").[44]  When S. Bell returned to the office on Monday, September 4, 2019, S.

Bell confronted Caughron about the locked door, and an argument ensued.  See MSJ ¶ 41, at 8

---

[43]S. Bell has not included this fact in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court includes it in the text as an additional undisputed fact for this Opinion's purposes.

[44]S. Bell purports to dispute this fact, because the Caughron Aff. and Berg Aff. are untruthful in that they do not disclose that "it was *Chris Berg* who instigated the whole matter by telling Summer Caughron to lock Plaintiff out from using the restroom."  Response ¶ 41, at 16 (emphasis in original)(citing Email from Michael Dellinger to Joshua Hall (dated September 4, 2019), filed January 23, 2023 (Doc. 41-25)("Chris [Berg] instructed [Caughron] to lock her door. . . .")).  Because S. Bell does not, however, "specifically controvert[]" that Caughron locked the door to her office on August 30, 2019, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

Furthermore, to the extent that S. Bell argues that summary judgment is precluded, because this omission "goes to the credibility of Caughron and Berg," the Court concludes that S. Bell has only "'assert[ed] that the jury might' disbelieve" Berg and Caughron's testimony, and has not presented her own "affirmative evidence of those facts which are contradicted by the interested testimony."  Helget v. City of Hays, 844 F.3d at 1223 n.3 (quoting Wood v. Handy & Harman Co., 318 F. App'x 602, 606-07 (10th Cir. 2008); Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 742 (10th Cir. 2004)("Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion.").  See Trujillo v. Bd. of Educ. of Albuquerque Pub. Sch., 410 F. Supp. 2d 1033, 1035 (D.N.M. 2005)(Browning, J.)(declining to consider whether a witness "lied" in their affidavit at the summary judgment stage).  Consequentially, S. Bell has not met her "burden of designat[ing] specific facts showing that there is a genuine issue for trial."  Bromberg v. Hildebrandt, 2023 WL 3625007, at *21.

(asserting this fact)(citing Berg Aff. ¶ 29, at 7; Caughron Aff. ¶¶ 7-8).[45]

Berg was notified of the argument between S. Bell and Caughron, and the City of Tulsa's

Human Resources Office ("HR") requested that all employees provide written statements of what

happened.  MSJ ¶ 41, at 8 (asserting this fact)(citing Berg Aff. ¶¶ 29-30, at 7; Caughron Aff. ¶ 8,

at 2).[46]  S. Bell was the only employee in the IT Administration Services section that did not

provide a written statement.  See MSJ ¶ 41, at 9 (asserting this fact)(citing Berg Aff. ¶ 31; Written

Statements from IT Staff, filed December 16, 2022 (Doc. 31-17)).[47]  During the argument, S. Bell

referenced Caughron's "damn latchkey kids," Caughron Aff. at 5, and Caughron called S. Bell

"crazy," Response ¶ 43, at 17 (asserting this fact)(citing Email from Donna Colbert to Chris Berg

at 1 (dated September 4, 2019), filed January 23, 2023 (Doc. 41-17)("Colbert Statement")).[48]  S.

---

[45]S. Bell purports to dispute this fact because the Caughron Aff. and Berg Aff. are untruthful.  See Response ¶ 41, at 16.  Because S. Bell does not, however, "specifically controvert[]" that she confronted Caughron and argued with her about the locked door on Monday September 4, 2019, the Court deems the fact admitted for this Opinion's purposes.  N.D. Okla. LCvR 56-1(c).  See Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d at 742.

[46]S. Bell purports to dispute this fact, because the Caughron Aff. and Berg Aff. are untruthful.  See Response ¶ 41, at 16 (citing no evidence in the record).  Because S. Bell does not "specifically controvert[]" that all employees were required to supply written statements about the argument, the Court deems the fact admitted for this Opinion's purposes.  N.D. Okla. LCvR 56-1(c).  See Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d at 742.

[47]S. Bell purports to dispute this fact, because the Caughron Aff. and Berg Aff. are untruthful.  See Response ¶ 41, at 16 (citing no evidence in the record).  Because S. Bell does not "specifically controvert[]" that she was the only IT Administration Services employee who did not provide a written statement about the incident, the Court deems this fact admitted for this Opinion's purposes.  N.D. Okla. LCvR 56-1(c).

[48]S. Bell has not included the fact that Caughron called her crazy in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court will include this fact in the text as an additional undisputed fact for this Opinion's purposes.

Bell and Caughron each filed complaints against each other regarding the argument, and HR

initiated an investigation.  See MSJ ¶ 42, at 9 (asserting this fact)(citing Berg Aff. ¶ 33, at 7); Berg

Aff. ¶ 34, at 7 (discussing "the HR investigation into these complaints").[49]

During the investigation, Joyce Powell, a HR department investigator, also requested that

S. Bell provide a written statement, but S. Bell stated that she did not remember what was said

during the argument.  See MSJ ¶ 43, at 9 (asserting this fact)(citing Tulsa Bell Depo. at 28:8-9 ("I

don't know, no one can remember the specifics.")).[50]  S. Bell recorded "at least a portion of the

---

[49]S. Bell purports to dispute this fact.  See Response ¶ 42, at 16.  S. Bell does not dispute
that S. Bell and Caughron each filed a grievance against each other, but she disputes that HR
investigated the matter.  See Response ¶ 42, at 16 (citing no evidence in the record).  S. Bell does
not point, however, to any competent evidence demonstrating that no investigation was conducted.
See Response ¶ 42, at 16.  Accordingly, the Court deems the fact that HR opened an investigation
into the argument between S. Bell and Caughron and their corresponding grievances admitted for
this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c); Berg Aff. ¶ 34, at 7 (discussing "the HR
investigation into these complaints").

[50]S. Bell purports to dispute this fact, and argues that the City of Tulsa "misrepresents the
statements" that she and Powell made.  See Response ¶ 43, at 16 (citing no evidence in the record).
Specifically, S. Bell states that the City of Tulsa, by quoting her statement that she does not know
what she said during the argument with Caughron, "ignores the entirety of the 30-page transcript
[of Powell's interview of S. Bell] where Plaintiff describes the layout of the restroom and how the
dispute ensued."  Response ¶ 42, at 16-17 (citing Tulsa Bell Depo. at 19:25-26:25).  Even viewed
in the context of the additional sections of the interview, however, the record establishes that S.
Bell told Powell she could not provide a written statement about what she said during the argument
with Caughron because she could not remember exactly what was said.  See Tulsa Bell Depo. at
26:21-24 (Powell)("[D]id you give [Berg] a statement that says this is what happened -- this is
what I said, this is a detailed statement on what occurred in your conversation."); id. at 26:25 ("No,
what I remember as a discussion that me and Summer had.").

S. Bell also argues that she provided a written statement by pointing to an email exchange
between her and Berg.  See Email from Sondia Bell to Chris Berg (dated September 4, 2019), filed
January 23, 2023 (Doc. 41-26)("Bell Common Space Conflict Email").  In this email, S. Bell
acknowledges that she and Caughron had a "discussion" about their "misunderstanding regarding
the sharing of common spaces in our building."  Bell Common Space Conflict Email at 1.  Berg
responds to S. Bell's email and states: "I need a statement from you providing your side of the
story regarding what was said, how it was said and any other details from your perspective."  Email
from Chris Berg to Sondia Bell (dated September 4, 2019), filed January 23, 2023 (Doc. 41-

argument" she had with Caughron, but, despite repeated requests from HR, S. Bell never provided the recording so HR could thoroughly investigate S. Bell's claim that Caughron discriminated against her or Caughron's corresponding grievance.  MSJ ¶ 44, at 9 (asserting this fact (citing Tulsa Bell Depo. at 73:20-74:4)).[51]  S. Bell could not provide the recording because she lost the "pink tablet" that the recording was on.  Response ¶ 44, at 17 (asserting this fact)(citing Bell Depo. at 25:20-26:8).[52]

On September 4, 2019, after the argument between S. Bell and Caughron, Berg sent an email notifying his employees that "a policy regarding use of restrooms, located within a single-occupancy office, will need to be developed," and advising that, "until that time, use by anyone of the restroom in Summer's office is suspended until further notice."  MSJ ¶ 45, at 9 (asserting this

_____

26)("Berg Common Space Conflict Email").  As Berg's email suggests, S. Bell's acknowledgment that she and Caughron had a "discussion," Bell Common Space Conflict Email at 1, does not constitute the kind of detailed statement that Berg and Powell requested that she provide, see Written Statements from IT Staff (providing detailed recollections of what transpired between S. Bell and Caughron on the morning of Monday September 4, 2019).  Consequently, the Court deems the fact that S. Bell did not provide a written statement after Berg and Powell requested that she prepare one because she stated she could not remember the details of the argument admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[51]S. Bell purports to dispute this fact as immaterial and avers that she told Powell that Caughron did not make a statement about S. Bell's race during the argument, so the recording would not be necessary.  See Response ¶ 44, at 17.  S. Bell's assertion of immateriality does not dispute the City of Tulsa's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 2014 WL 4823841, at *1 n. 2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Accordingly, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[52]S. Bell has not included the fact that she lost the recording of her argument with Caughron in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law." N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact the Court will include this fact in the text as an additional undisputed fact for this Opinion's purposes.

- 22 -

fact)(citing Email from Chris Berg to Sondia Bell at 37 (dated September 4, 2019), filed December 16, 2022 (Doc. 31-13)("September 4, 2019, Email")).[53]   While the new bathroom policy was developed, no employee, including Caughron, was allowed to use the restroom in Caughron's office.  See MSJ ¶ 46, at 9 (asserting this fact)(citing Caughron Aff. ¶ 9, at 2; Berg Aff. ¶ 32, at 7).[54]   On October 2, 2019, S. Bell emailed HR department members, the Mayor of the City of Tulsa, the Deputy Mayor of the City of Tulsa, and others asserting that she was the only employee excluded from the restroom in Caughron's office.  See MSJ ¶ 47, at 9; Email from Sondia Bell to Joyce Powell at 36 (dated October 2, 2019), filed December 22, 2019 (Doc. 31-13)("October 2, 2019, Email").[55]   In the email, S. Bell purports to quote from Berg's September 4, 2019, email

---

[53]Although S. Bell's response indicates that she does not contest this fact, see Response ¶ 45, at 17, she later purports to dispute this fact on the grounds that the email was only sent to her, see Response ¶ 46, at 17 n.7.  S. Bell does not supply, however, any competent evidence to support this assertion, and the record establishes that the email was sent to the rest of the IT Administration Services team and that they were made aware of the new policy.  See Caughron Aff. ¶ 9, at 2 ("[N]o one, including myself was allowed to use the restroom in my office until the department worked out a policy to handle in-office bathrooms.").

S. Bell objects that the email, as included in the First Pretermination Hearing Packet, is inadmissible hearsay.  See infra n.57, at 24.  The statement the City of Tulsa offers -- "use by anyone of the restroom in Summer's office is suspended until further notice" -- is hearsay, because Berg did not make the statement "while testifying at the current trial or hearing," Fed. R. Evid. 801(c)(1), and the City of Tulsa relies on the statement for the truth of what it asserts -- that Berg said that use of Caughron's bathroom was suspended.  As discussed in greater detail infra n.57, at 24-28, the City of Tulsa can establish this fact with evidence admissible at trial, however, as Berg describes suspending the use of Caughron's bathroom in the Berg Aff. ¶ 32, at 7.

[54]S. Bell purports to dispute this fact, because Berg's email did not notify her effectively that Caughron was not allowed to use the bathroom in her office.  See Response ¶ 46, at 17-18.  By asserting that she was not provided sufficient notice that Caughron was not allowed to use the bathroom in her office, S. Bell does not dispute that Caughron was not allowed to use the bathroom in her office.  As a result, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[55]While S. Bell "admits she sent an email to Tulsa officials seeking assistance," she avers that the "ambiguity" Berg's email about the use of Caughron's bathroom "lead [sic] her to form

informing staff that the "use by anyone of the restroom in Summer's office is suspended," September 4, 2019, Email at 37, "but changes the language from the original email," MSJ ¶ 47, at 9 (asserting this fact)(citing September 4, 2019, Email at 37; October 2, 2019, Email at 36).[56]

### 5. **S. Bell's First Pretermination Hearing and Suspension.**

A pretermination hearing for S. Bell was held on November 1, 2019, and continued on December 2, 2019, to address, among other issues, S. Bell's alleged unauthorized use of flex time, making false statements, and impeding the HR investigation about the bathroom dispute.  See MSJ ¶ 48, at 10 (asserting this fact); Letter from Chris Berg to Sondia Bell at 1-2 (dated November 29, 2019), filed December 16, 2022 (Doc. 31-13)("First Pretermination Hearing Notice")(requesting S. Bell's presence at a pretermination hearing and listing the issues the hearing will address).[57]

---

her own reasonable interpretation."  Response ¶ 47, at 18 (citing no evidence in the record). Although S. Bell does not clarify what this interpretation was, the Court understands her to mean that she was unsure whether Caughron was excluded from using the bathroom in her office.  See Response ¶ 46, at 17-18 (citing no evidence in the record).  Nevertheless, because S. Bell does not "specifically controvert[]" that she sent the October 2, 2019, email, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[56]While S. Bell "admits she sent an email to Tulsa officials seeking assistance," she avers that the "ambiguity" in Berg's email about the use of Caughron's bathroom "lead [sic] her to form her own reasonable interpretation."  Response ¶ 47, at 18 (citing no evidence in the record). Because S. Bell does not "specifically controvert[]" that she changed the wording of Berg's original email in her October 2, 2019, email, and, having reviewed the emails, the Court concludes that she did change the wording of the September 4, 2019, Email, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[57]S. Bell purports to dispute this fact, because she asserts that the First Pretermination Hearing Packet, filed December 22, 2022 (Doc. 31-13), is unauthenticated hearsay.  See Response ¶ 48, at 18.  The First Pretermination Hearing Packet is eighty-six pages long and contains the First Pretermination Hearing Notice, followed by the City of Tulsa's evidence of S. Bell's alleged violations of City of Tulsa work rules.  The First Pretermination Hearing Packet was provided to S. Bell ahead of her first Pretermination Hearing, and S. Bell signed the First Pretermination Hearing Notice, indicating her "receipt of the pre-termination hearing notice" and the evidence included therein.  First Pretermination Hearing Packet at 4.  The evidence attached to the First

Pretermination Hearing Notice includes: (i) a Memorandum from Joyce Powell to Michael Dellinger (dated October 23, 2019), filed December 16, 2022 (Doc. 31-13)("Powell Memo."); (ii) a Transcript of September 6, 2019, Interview (taken September 6, 2019), filed December 16, 2022 (Doc. 31-13)("Interview Transcript"); (iii) a Work Schedule Deviation Summary, filed December 16, 2022 (Doc. 31-13), and Work Schedule Deviation Summary (Amended), filed December 16, 2022 (Doc. 31-13) (together, "Deviation Summaries"); (iv) the Time Records; (v) "relevant HR policies, IT policies, and CBA provisions" ("Policies"), First Pretermination Hearing Notice at 4; and (vi) numerous "email chains," First Pretermination Hearing Notice at 4.

      Hearsay is a statement, other than one the declarant made while testifying at the trial or hearing, offered for the truth of the matter asserted. See Fed. R. Evid. 801. "Hearsay testimony is generally inadmissible," unless it meets the requirements for an exception that the Federal Rules of Evidence define. United States v. Christy, No. CR 10-1534, 2011 WL 5223024, at *5 (D.N.M. September 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). Courts may not rely on inadmissible hearsay when considering a motion for summary judgment. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Rivero v. Bd. of Regents of Univ. of N.M., No. CIV 16-0318, 2019 WL 1085179, *3 at 16 (D.N.M. March 7, 2019)(Browning, J.)("The Court recognizes that it cannot rely on evidence that will not be admissible at trial."), aff'd, 950 F.3d 754 (10th Cir. 2020). Pursuant to S. Bell's objection that the First Pretermination Hearing Packet constitutes hearsay, the Court makes determinations whether the evidence contained therein is inadmissible hearsay.

      The Court already has determined that the Time Records are not hearsay, because they are machine-generated, and, therefore, are not statements made by a "person." Fed. R. Evid. 801(b). See United States v. Channon, 881 F.3d at 810-11. An unidentified City of Tulsa employee, on the other hand, compiled the Deviation Summaries out of court, and therefore the Deviation Summaries constitute hearsay where the City of Tulsa offers them for the truth of what the Deviation Summaries assert, i.e., the dates and times of S. Bell's work schedule deviations. See Fed. R. Evid. 801(c)(1). Accordingly, the Court will not consider the Deviation Summaries for that purpose. The Court takes judicial notice of the Policies, because they are readily available on the City of Tulsa's website. See Personnel Policies and Procedures, City of Tulsa, available at https://www.cityoftulsa.org/media/9337/200.pdf. "[A] district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial." St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979). See O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1225 (10th Cir. 2007)("It is not uncommon for courts to take judicial notice of factual information found on the world wide web."); Simon v. Taylor, 252 F. Supp. 3d 1196, 1238 (D.N.M. 2017)(Browning, J.), aff'd, 794 F. App'x 703 (10th Cir. 2019).

      The Powell Memo and the First Pretermination Hearing Notice are both admissible under rule 803(8) as "[a] record or statement of a public office" that "sets out . . . in a civil case . . . factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii). The Powell Memo and the First Pretermination Hearing Notice outline the City of Tulsa's "factual findings" resulting from the HR department's investigations into the issues regarding Bell's conduct. Fed. R. Evid. 803(8)(A)(iii). See Perrin v. Anderson, 784 F.2d 1040, 1046-47 (10th Cir. 1986)(admitting a Shooting Review Board report that "concluded that there was 'no doubt that [Anderson] acted within the guidelines set forth in the Policies and Procedures Manual,'" and

explaining that the "[c]ourts have construed [factual findings] broadly, . . . and regularly have admitted conclusions and opinions found in evaluative reports of public agencies . . . ." (first alteration in original)(no citation provided for quotation)).  The First Pretermination Hearing Notice contain the "conclusions and opinions," Perrin v. Anderson, 784 F.2d at 1047, of the HR department's legally authorized investigation into S. Bell's work rule violations, see Wilson v. Beebe, 770 F.2d 578, 590 (6th Cir. 1985)(admitting pursuant to rule 803(8) a report by police captain, which was "an official inter-office communication," which found that a police officer's conduct was contrary to department training).  Furthermore, Bell has not demonstrated that "the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(B).  To the contrary, S. Bell signed the First Pretermination Hearing Notice, "acknowledge[ing] the receipt" of the packet's contents.  First Pretermination Hearing Notice at 4.  The Court recognizes, however, that while rule 803(8) allows for the admission of the Powell Memo and the First Pretermination Hearing Notice, it does not provide automatically for the admission of the evidence appended to the Powell Memo and the First Pretermination Hearing Notice to support the factual findings included therein.  See Hook v. Regents of Univ. of Cal., No. CIV. 05-356, 2007 WL 9705919, at *4 (D.N.M. March 29, 2007)(Herrera, J.)(acknowledging that rule 803(8) "applies only to those factual findings resulting from a government investigation, and not to the investigation as a whole").

Certain assertions in the Interview Transcript are hearsay where a party relies on the statements for their truth, because the declarants did not make the statements in the Interview Transcript "while testifying at the current trial or hearing."  Fed. R. Evid. 801(c)(1).  See United States v. Dalton, 918 F.3d 1117, 1133 (10th Cir. 2019)(upholding the district court's exclusion of an "interview transcript as hearsay").  The City of Tulsa can seek the admission of statements S. Bell made during the interview as opposing party statements under rule 801(d)(2)(A).  See New Mexico ex rel. Balderas v. Real Est. L. Ctr., P.C., 401 F. Supp. 3d 1229, 1292 (D.N.M. 2019)(Browning, J.)("An opposing party's statement is not hearsay." (citing Fed. R. Evid. 801(d)(2)(A))).  Concomitantly, S. Bell can offer the statements Powell made during the interview under rule, because Powell made her statements while she was a City of Tulsa "employee" and her statements concern "a matter within the scope of that relationship."  Fed. R. Evid. 801(d)(2)(D).  The parties cannot offer, however, their own statements from the Interview Transcript.  See United States v. Baca, 409 F. Supp. 3d 1041, 1079 (D.N.M. 2019)(Browning, J.)("Hearsay bars a party from presenting its own statements . . . .").

Bell is correct that certain of the emails included in the First Pretermination Packet are hearsay where they are offered for the truth of the statements made therein, and the Court will not rely on them in resolving the Motion.  See McInnis v. Fairfield Communities, Inc., 458 F.3d 1129, 1142 (10th Cir. 2006)(concluding that the district court properly "refused to admit the emails on the ground that they were inadmissible hearsay").  Many statements in the emails, however, do not qualify as hearsay, because they are commands or questions that offer no implicit assertion.  See United States v. Diaz, 670 F.3d 332, 346 (1st Cir. 2012)("Out-of-court statements providing directions from one individual to another do not constitute hearsay."); United States v. Summers, 414 F.3d 1287, 1300 (10th Cir. 2005)(recognizing "that a declaration in the form of a question" ordinarily will be non-hearsay).  As with the statements in the Interview Transcript, many of the statements in the emails are not hearsay where they are offered against an opposing party.  See

Kieffaber v. Ethicon, Inc., 529 F. Supp. 3d 1219, 1222 (D. Kan. 2021)(Vratil, J.)("The email is not hearsay, however, because it is a statement by an opposing party under Rule 801(d)(2)(D) . . . ."). Other emails are automated notifications, which do not qualify as statements made by a "person" under rule 801(b).  See, e.g., Automated Email Meeting Notification at 51, filed December 16, 2022 (Doc. 31-13).  Moreover, the City of Tulsa offers certain emails, not for their truth, but to show the effect the statements had on S. Bell, i.e., to show that S. Bell was on "notice" that she had to clock out of work.  Email from Chris Berg to Sondia Bell at 53 (dated October 17, 2019), filed December 16, 2022 (Doc. 31-13)("I am directing you to punch out of Kronos immediately upon receipt of this e-mail and leave work for the day."); Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993)("Statements offered for the effect on the listener . . . are generally not hearsay.").  Some emails, such as those that Berg sent describing actions taken and policies adopted by the City of Tulsa qualify as "statement[s] of a public office. . . [that] set[] out . . . the office's activities . . . " and therefore are admissible under rule 803(8).  Fed. R. Evid. 803(8)(i).  See Phillips v. Oosterbaan, 508 F. Supp. 3d at 1114 (holding admissible a "letter" under rule 803(8) as a "statement" that "sets forth the office's activities" where the letter details the work being done by one of the office's employees).

The Court also recognizes that it can rely on evidence submitted in a form that would be inadmissible at trial as long as the Court determines that the evidence will be presented in an admissible form:

> This does not mean that evidence must be submitted "in a form that would be admissible at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Indeed, parties may submit affidavits even though affidavits are often inadmissible hearsay at trial on the theory that the same facts may ultimately be presented at trial in an admissible form.  Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1122 (10th Cir. 2005).  However, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury" in some form.  Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d 1193, 1199 (10th Cir. 2006) . . . .

Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006)(alterations in original).  The Court has considered evidence at the summary judgment stage that a party offers in an inadmissible form, because the party "can establish this fact with evidence admissible at trial."  Rivero v. Bd. of Regents of Univ. of N.M., 2019 WL 1085179, at *3 n.16.  Many of the statements in the email chains included in the First Pretermination Hearing Packet are offered to describe events and actions that the Berg Aff., Dellinger Aff., Caughron Aff., and Tulsa Bell Depo expound in detail.  See, e.g., Rivero v. Bd. of Regents of Univ. of N.M., 2019 WL 1085179, at *3 n.18 (deeming a fact admitted despite the plaintiff's "object[ion] to the cited exhibit as inadmissible hearsay," and where the Court concluded the exhibit was, in fact, inadmissible hearsay, because the defendant "can establish this fact with evidence admissible at trial," i.e., the plaintiff's deposition testimony).

Finally, Bell asserts that the First Pretermination Hearing Packet is "unauthenticated."  Response ¶ 48, at 18.  "Documentary evidence submitted in support of summary judgment must either be properly authenticated or self-authenticating under the Federal Rules of Evidence."

After the hearing, the hearing officer, Clayton Edwards, wrote an email finding that S. Bell violated Work Rule One, concerning honesty and loyalty, and Work Rule Seven, concerning respect for authority, but not Work Rule Six, concerning attendance and punctuality. See MSJ ¶ 49, at 10 (asserting this fact)(citing Email from Clayton Edwards to Michael Dellinger (dated December 9, 2019), filed December 16, 2022 (Doc. 31-18)("First Hearing Findings Email")).[58]

_____

Turner v. Metro. Prop. & Cas. Ins. Co., 601 F. Supp. 3d 1066, 1071 (N.D. Okla. 2022)(Jayne, J.). See N.M. Consol. Constr., LLC v. City Council of Santa Fe, 97 F. Supp. 3d 1287, 1294 n.6 (D.N.M. 2015)(Browning, J.)(declining to use unauthenticated document in ruling on summary judgment but noting that proponent could still seek to authenticate document at trial). The United States Court of Appeals for the Tenth Circuit, however, does "not require an affidavit to authenticate every document submitted for consideration at summary judgment." L. Co. v. Mohawk Const. & Supply Co., 577 F.3d 1164, 1170 (10th Cir. 2009). "[D]ocuments produced during discovery that are on the letterhead of the opposing, producing party are authentic per se for purposes of Federal Rule of Evidence 901." L. Co. v. Mohawk Const. & Supply Co., 577 F.3d at 1170. Accordingly, the Court concludes that the City of Tulsa "produce[s] evidence sufficient to support a finding that the item is what the proponent claims it is," Fed. R. Evid. 901(a), because the First Pretermination Packet is on the City of Tulsa's "letterhead," L. Co. v. Mohawk Const. & Supply Co., 577 F.3d at 1170. Moreover, the First Pretermination Hearing Packet bears both S. Bell and Berg's signature, both of whom signed the First Pretermination Hearing Notice, acknowledging the contents included therein. See First Pretermination Hearing Notice at 4; L. Co. v. Mohawk Const. & Supply Co., 577 F.3d at 1170 ("Mohawk's submitted exhibits might be sufficiently authenticated taking into consideration the '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances,' even if they do not appear on Law letterhead." (quoting Fed. R. Evid. 901(b)(4))).

Here, the First Pretermination Hearing Notice, which the Court has concluded is admissible under rule 803(8)(iii), establishes the fact to which S. Bell objects, i.e., the dates and subject matter of S. Bell's first pretermination hearing. See First Pretermination Hearing Notice at 1. Moreover, the City of Tulsa may offer the evidence in another form admissible at trial, namely Berg can testify live. See Berg Decl. ¶¶ 38-39, at 8 (stating the dates of S. Bell's first pretermination hearing and describing the subject matter of the hearing). In conclusion, the Court deems the fact in the text admitted for this Opinion's purposes.

[58]Although S. Bell does not contest that Crawford made the findings he did, she purports to dispute the version of events on which Crawford relied at the hearing. See Response ¶ 49, at 18 (citing Bell Decl. at ¶ 11, at 2). Specifically, S. Bell avers that Crawford ignored "the multiple acts of retaliation that were casted upon Plaintiff after she filed the grievance against Chris Berg," and ignored the statement Donna Colbert made after the argument between S. Bell and Caughron, in which Colbert stated that she overheard Caughron call S. Bell "crazy." Response ¶ 49, at 18-

Edwards recommended that S. Bell receive a five-day suspension in light of the seriousness of S. Bell's actions, and the "numerous examples of impeding an investigation and not following her supervisor's directives."  MSJ ¶ 49, at 10 (asserting this fact)(citing First Hearing Findings Email at 1).[59]  Dellinger agreed that the suspension was warranted, and S. Bell received a five-day suspension without pay.  See MSJ ¶ 49, at 10 (asserting this fact)(citing First Hearing Findings Email at 1; Disciplinary Action Report (dated December 11, 2019), filed December 16, 2022 (Doc. 31-19)).[60]  Caughron was not disciplined for her actions during the argument with S. Bell.  See Response ¶ 49, at 18-19 (asserting this fact)(citing Bell Decl. ¶ 11, at 2).[61]

---

19 (quoting Email from Donna Colbert to Chris Berg at 1 (dated September 4, 2019), filed January 23, 2023 (Doc. 41-17)("Colbert Statement")("Summer said, Sondia was crazy.")).  S. Bell does not adduce, however, any specific evidence supporting her argument that Crawford failed to address these facts at the hearing.  Instead, the First Pretermination Hearing Packet that Crawford considered at the hearing includes statements from S. Bell detailing how Caughron called her "crazy," Colbert Statement at 1, and describing Berg's responses to her requests to her post-grievance work requests -- the actions that S. Bell has previously described as retaliatory, see Pretermination Hearing Letter at 4; Response ¶¶ 26-28, at 12-13 (describing as "retaliation" Berg's responses to S. Bell's unauthorized schedule).  In addition, the Court already has included as an undisputed fact that Caughron called S. Bell "crazy."  Supra n.48, at 20.  Accordingly, the Court deems the fact that Crawford found S. Bell violated Work Rules One and Seven, but not Work Rule Six, admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[59]Although S. Bell does not contest that she was suspended, she purports to dispute the fact by arguing that Caughron was not disciplined for her actions during the argument.  See Response ¶ 49, at 18-19 (citing no evidence in the record).  Because S. Bell does not "specifically controvert[]" that she received a five-day suspension following the hearing, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[60]Although S. Bell does not contest that she was suspended, she purports to dispute the fact by arguing that Caughron was not disciplined for her actions during the argument.  See Response ¶ 49, at 18-19 (citing Colbert Statement at 1).  Because S. Bell does not "specifically controvert[]" that she received a five-day suspension following the hearing, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[61]S. Bell has not included the fact that Caughron was not disciplined in a separate section of "additional facts," and the Court is not required to consider this additional information to be

- 29 -

S. Bell appealed her suspension to the Civil Service Commission.  See MSJ ¶ 51, at 11 (asserting this fact)(citing City of Tulsa Charter, filed December 22, 2019 (Doc. 31-21)).[62]  After hearing evidence that S. Bell and the City of Tulsa supplied, the Civil Service Commission "unanimously voted that the City had just cause to discipline Ms. Bell and the five-day suspension was upheld."  MSJ ¶ 52, at 11 (asserting this fact)(citing Final Order at 1-2, filed December 16, 2022 (Doc. 31-22)("First Civil Service Commission Final Order")).[63]   In the First Hearing Findings Email, Edwards recommended that "Bell be reassigned to another supervisor"; however, Berg remained S. Bell's supervisor  after she served her suspension.  Response ¶ 50, at 19 (asserting this fact)(citing First Hearing Findings Email at 1 ("[G]iven the breakdown of the working relationship between Ms. Bell and Mr. Berg, it is my suggestion that Ms. Bell be reassigned to another supervisor.")).[64]

---

"additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, and acknowledges it in the Reply at 6, the Court will include this fact in the text as an additional undisputed fact for this Opinion's purposes.

[62]Although S. Bell "does not dispute that the City of Tulsa Charter, Art X., is attached as Defendant's Exhibit 21," she purports to dispute "the remainder of the allegation" that she appealed her suspension.  Response ¶ 51, at 11.  The record establishes, however, that S. Bell appealed her suspension.  See Final Order at 1, filed December 16, 2022 (Doc. 31-22)("First Civil Service Commission Final Order")("[T]he Civil Service Commission hear[d] the appeal of Sondia Bell . . . .").  Accordingly, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[63]S. Bell purports to dispute this fact as "immaterial."  Response ¶ 39, at 15.  S. Bell's assertion of immateriality does not dispute the City of Tulsa's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 2014 WL 4823841, at *1 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[64]S. Bell has not included the fact that Edwards recommended a new supervisor or that

6.     __Issues Related to S. Bell's Insurance Coverage__.

In October, 2019, S. Bell enrolled in health insurance for 2020 during the City of Tulsa's open enrollment period and received an "Enrollment Confirmation" email that indicated S. Bell's "benefit elections have been confirmed."  Response ¶ 70, at 25 (asserting this fact)(quoting Email from donotreply@goempyrean.com to Sondia Bell (dated October 28, 2019), filed January 23, 2023 (Doc. 41-42), and citing Email from Jamie Cowan to Sondia Bell (dated October 25, 2019), filed January 23, 2023 (Doc. 41-44)("Sondia, I show that you enrolled in benefits for 2020.")("October Cowen Email").[65]  Despite that she enrolled in insurance coverage for 2020 and received confirmation that she had done so, S. Bell's coverage was terminated on December 31, 2019, and S. Bell was not enrolled in new coverage for 2020.  See MSJ ¶ 70, at 14 (asserting this fact)(citing Affidavit of Kathleen Underwood ¶¶ 4-5, at 1 (dated December 2022[66]), filed

---

Berg remained her supervisor after she returned from her suspension  in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court will include this fact in the text as an additional undisputed fact for this Opinion's purposes.

[65]S. Bell has not included that she received email confirmation that she had successfully enrolled in insurance for 2020 in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court will include it in the text as an additional undisputed fact for this Opinion's purposes.

[66]The Affidavit of Kathleen Underwood (dated December 2022), filed December 16, 2022 (Doc. 31-32)("Underwood Aff."), does not indicate the specific date on which the affidavit was executed.  See Underwood Aff. at 3.  The Underwood Aff. indicates, however, that the affidavit was executed in December, 2022, and includes the seal of Mayo L. Baugher, Notary Public for the State of Oklahoma.  See Underwood Aff. at 3.

December 16, 2022 (Doc. 31-32)("Underwood Aff.")).[67]   Thirty-two City of Tulsa employees from different departments, and of different "genders, races, and backgrounds," including S. Bell, had their insurance coverage terminated.  MSJ ¶ 70, at 14 (asserting this fact)(citing Underwood Aff. ¶¶ 4-5, at 1).[68]

On January 16, 2020, Jamie Cowan, a benefits analyst for the City of Tulsa, informed S. Bell that she was not enrolled in health insurance coverage for 2020 and that the City of Tulsa was providing a "one-time exception" for S. Bell and the thirty-two other affected employees to log back into the system and complete enrollment.  MSJ ¶ 71, at 14 (asserting this fact)(citing Underwood Aff. ¶ 6, at 1-2).  See Email from Jamie Cowan to Sondia Bell at 9 (dated January 16, 2020), filed December 16, 2022 (Doc. 31-33)("January Cowan Email").[69]  Following the January Cowan Email, S. Bell completed her enrollment "and her benefits were reinstated on January 27,

---

[67]S. Bell disputes that she "failed to submit [her] final enrollment selections through the online system," MSJ ¶ 70, at 14, by providing evidence that "she properly enrolled, and had confirmation in support of the same . . . ," Response ¶ 70, at 25.  Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true S. Bell's version of the asserted fact.  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999); Clayton v. Vanguard Car Rental U.S.A., Inc., 761 F. Supp. 2d 1210, 1234 n.35 (D.N.M. 2010)(Browning, J.)(accepting as true the plaintiff's version of the defendant's asserted fact, "[b]ecause the Court must construe the evidence in the light most favorable to the non-moving party").  The Court admits, therefore, the fact that S. Bell enrolled in health insurance for 2020 for this Opinion's purposes.

[68]S. Bell purports to dispute this fact, but does not "specifically controvert" that a total of thirty-two City of Tulsa employees had their insurance terminated when she did.   N.D. Okla. LCvR 56-1(c).  See Response ¶ 70, at 25.  Consequentially, the Court deems this fact admitted for this Opinion's purposes.

[69]S. Bell purports to dispute this fact, but does not "specifically controvert" that she received the Email from Jamie Cowan to Sondia Bell (dated July 13, 2020), filed December 16, 2022 (Doc. 31-32)("January Cowan Email"), nor that she was instructed to log back in and complete her enrollment.  N.D. Okla. LCvR 56-1(c).  See Response ¶ 70, at 25.  Accordingly, the Court deems this fact admitted for this Opinion's purposes.

2020, and backdated for an effective date of January 1, 2020."  MSJ ¶ 71, at 14 (asserting this

fact)(citing Underwood Aff. ¶ 6, at 1-2; Letter from Kathleen Underwood to Sondia Bell at 1-2

(dated July 13, 2020), filed December 16, 2022 (Doc. 31-34)("July Underwood Letter").[70]

Although S. Bell was able to enroll successfully in coverage shortly after Cowan informed her that

her coverage had been terminated, her coverage did not become active until over a week later on

January 27, 2020, and it took an additional four days, until January 31, 2023, before S. Bell

received authorization from the insurance company for her son J. Bell's therapy sessions.

Response ¶ 70, at 25 (asserting this fact);  Email from Susan Xiong to Sondia Bell at 4-5 (dated

January 27, 2020), filed December 16, 2022 (Doc. 31-33)("We were able to check and it does

show that the policy is now active."); Email from Susan Xiong to Sondia Bell at 3 (dated January

31, 2020), filed December 16, 2022 (Doc. 31-33)("I checked with the billing team and we still

haven't received authorization yet. I asked them to update as soon as they receive it so that we can

---

[70]S. Bell purports to dispute this fact, but does not "specifically controvert" that she was able to complete enrollment and that her insurance coverage was backdated to January 1, 2020. N.D. Okla. LCvR 56-1(c).  See Response ¶ 71, at 25.  As a result, the Court deems this fact admitted for this Opinion's purposes.

S. Bell disputes that she "experienced no lapse in coverage," MSJ ¶ 71, at 14, by providing evidence that J. Bell's therapy providers would not schedule him for treatment until the treatments were authorized by S. Bell's insurance provider, see Response ¶ 71, at 25 (citing Email from Susan Xiong to Sondia Bell at 4-5 (dated January 27, 2020), filed December 16, 2022 (Doc. 31-33)). Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept as true S. Bell's version of the asserted fact.  See Hunt v. Cromartie, 526 U.S. at 551; Clayton v. Vanguard Car Rental U.S.A., Inc., 761 F. Supp. 2d at 1234 n.35 (accepting as true the plaintiff's version of the defendant's asserted fact, "[b]ecause the Court must construe the evidence in the light most favorable to the non-moving party").  The Court admits, therefore, the fact that, despite that S. Bell's insurance coverage was backdated, J. Bell was unable to attend therapy sessions until S. Bell's insurance became active on January 31, 2023, for this Opinion's purposes.

schedule for [J. Bell's] return.").[71]   During the time her insurance was inactive and before she received authorization from the insurance company, J. Bell was unable to attend therapy.  See Response ¶ 70, at 25 (asserting this fact)(citing Email from Susan Xiong to Sondia Bell (dated January 31, 2020), filed January 23, 2023 (Doc. 41-43)).[72]

### 7.    The IT Department's Telecommuting Policies During the COVID-19 Pandemic.

From March 26, 2020, through June 1, 2020, four of the six employees in S. Bell's work group, including S. Bell, were allowed to work from home because of safety concerns related to the COVID-19 pandemic.  See MSJ ¶ 11, at 3 (citing Email from Chris Berg to Sondia Bell (dated March 25, 2020), filed December 16, 2022 (Doc. 31-8)).[73]  This temporary arrangement was possible only because two members of the IT Administrative Services Section "continued to report on site each day," but this "solution would not have been sustainable over the long term and some

---

[71]S. Bell has not included the fact that it took over a week for her insurance to become active after she enrolled in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court includes it in the text as an additional undisputed fact for this Opinion's purposes.

[72]S. Bell has not included the fact that Jacob went without therapy in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, the Court includes it in the text as an additional undisputed fact for this Opinion's the purposes.

[73]S. Bell purports to dispute this fact, but does not offer any evidence to contradict directly the fact that the majority of her team was allowed to work from home temporarily during the COVID-19 pandemic.  See Response ¶ 11, at 7 (citing no evidence in the record).  Accordingly, the Court deems the fact in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

- 34 -

essential services during that time were delayed." MSJ ¶ 12, at 3-4 (citing Berg Aff. ¶ 9, at 2-3).[74]

S. Bell notes that two other IT department employees received authorization to work from home: Paula Stickelber and Jan Buster. See MSJ ¶ 14, at 4 (asserting this fact); Bell Depo. at 6:3-9:19; id. at 9:20-12:3; Response ¶ 14, at 8 (admitting this fact). Stickelber, who worked in a different division of the IT department and had job duties that were different from S. Bell's, was approved to telecommute by her direct supervisor in 2019. MSJ ¶ 15, at 4 (citing Dellinger Aff. ¶ 10, at 3)(asserting this fact).[75] Stickelber did not report to Berg. See MSJ ¶ 16, at 4 (citing Bell

---

[74]S. Bell purports to dispute this fact on the ground that it "suffers from vagueness, and speculation, and lacks the evidence necessary to establish an undisputed, material fact for purposes of summary adjudication." Response ¶ 12, at 7 (citing no evidence in the record). By stating generally that she believes the City of Tulsa's undisputed fact is insufficient, S. Bell has not met her "burden of designat[ing] specific facts showing that there is a genuine issue for trial." Bromberg v. Hildebrandt, 2023 WL 3625007, at *21. Accordingly, the Court deems the fact that the temporary telecommuting arrangement during the COVID-19 pandemic was possible only because of the efforts of S. Bell's two coworkers and would not have been sustainable over the long-term undisputed for this Opinion's purposes. See N.D. Okla. LCvR 56-1(c).

[75]S. Bell purports to dispute this fact, because she alleges the evidence relied upon by the City of Tulsa is inadmissible hearsay. Response ¶ 15, at 8 (citing no evidence in the record). While S. Bell is correct that "Rule 56 precludes the use of inadmissible hearsay testimony in depositions submitted in support of, or in opposition to, summary judgment" the portions of the Dellinger Aff. on which the City of Tulsa relies do not contain inadmissible hearsay. Starr v. Pearle Vision, Inc., 54 F.3d at 1555. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. See Fed. R. Evid. 801(c). Here, Dellinger does not offer in his affidavit any out-of-court statements another declarant made. Rather, he testifies to matters reasonably within his knowledge as the head of the IT department.
      S. Bell also purports to dispute this fact insofar as the City of Tulsa has "failed to submit sufficient evidence in support of its allegations that Paula Stickelber's circumstances justified her approval to Telecommute." Response ¶ 15, at 8 (citing no evidence in the record). By generally asserting that she believes the City of Tulsa has not supported sufficiently this fact, but not pointing to any evidence that places into dispute the City of Tulsa's facts, S. Bell has not met her "burden of designat[ing] specific facts showing that there is a genuine issue for trial." Bromberg v. Hildebrandt, 2023 WL 3625007, at *21. Finally, S. Bell avers that the fact that "Dellinger admits that he is the final decision-maker over all IT employees" places this fact into dispute. Response ¶ 15, at 8 (citing Dellinger Aff. at 4)(italics in Response). While Dellinger is the final decision

---

Depo. at 8:15-17)(asserting this fact); Response ¶ 16, at 8 (admitting this fact).  Buster, who

worked in a different division of the IT department and reported to Mark Temple, received

approval to telecommute in March of 2020 during the COVID-19 pandemic.  See MSJ ¶ 17, at 4-

5 (citing Dellinger Aff. ¶ 11, at 3)(asserting this fact).[76]  S. Bell does not know of any employee

working under Berg was allowed to telework when she was not.  See MSJ ¶ 18, at 5 (citing Bell

---

maker over all IT employees "with respect to disciplinary actions," Dellinger Aff. at 4, this fact
does not contradict anything that the City of Tulsa proffers about Stickelber's job responsibilities
or the facts regarding her authorization to telecommute.  Accordingly, the Court deems the facts
that Stickelber was authorized to telecommute in March, 2020, that Stickelber's job
responsibilities were different from S. Bell's, and that Stickelber had a different supervisor and
worked in a different division than S. Bell undisputed for this Opinion's purposes.  See N.D. Okla.
LCvR 56-1(c).

[76]S. Bell purports to dispute this fact, because she alleges the evidence relied upon by the
City of Tulsa is inadmissible hearsay.  Response ¶ 17, at 9 (citing no evidence in the record).  While
S. Bell is correct that "Rule 56 precludes the use of inadmissible hearsay testimony in depositions
submitted in support of, or in opposition to, summary judgment" the portions of the Dellinger Aff.
on which the City of Tulsa relies do not contain inadmissible hearsay.  Starr v. Pearle Vision, Inc.,
54 F.3d at 1555.  Hearsay is a statement, other than one made by the declarant while testifying at
the trial or hearing, offered in evidence to prove the truth of the matter asserted.  See Fed. R. Evid.
801(c).  Here, Dellinger does not offer in his affidavit any out-of-court statements another declarant
made.  Rather, he testifies to matters reasonably within his knowledge as the head of the IT
department.
        S. Bell also purports to dispute this fact insofar as the City of Tulsa has "failed to submit
sufficient evidence in support of its allegations that Jan Buster's circumstances justified her
approval to Telecommute."  Response ¶ 17, at 9 (citing no evidence in the record).  By generally
asserting that she believes the City of Tulsa has not supported sufficiently this fact, but not pointing
to any evidence that places into dispute the City of Tulsa's facts, S. Bell has not met her "burden
of designat[ing] specific facts showing that there is a genuine issue for trial."  Bromberg v.
Hildebrandt, 2023 WL 3625007, at *21.  Finally, S. Bell avers that the fact that "Dellinger admits
that he is the final decision-maker over all IT employees" places this fact into dispute.  Response
¶ 15, at 8 (citing Dellinger Aff. at 4)(italics in Response).  While Dellinger is the final decision
maker over all IT employees "with respect to disciplinary actions," Dellinger Aff. at 4, this fact
does not contradict anything that the City of Tulsa proffers about Buster's job responsibilities or
the facts regarding her authorization to telecommute.  Accordingly, the facts that Buster first was
authorized to telecommute in March, 2020, and that Buster had a different supervisor and worked
in a different division than S. Bell undisputed for this Opinion's purposes.  See N.D. Okla. LCvR
56-1(c).

Depo. at 12:20-22).[77]

> **8.    S. Bell's Second Request to Work from Home and S. Bell's Subsequent Change in Behavior.**

In June, 2020, after the IT Department returned to the office following the temporary COVID-19 telecommuting arrangement, S. Bell made a second request to work from home.  See MSJ ¶ 19, at 5 (asserting this fact)(citing Telecommuting Acknowledgment, filed December 16, 2022 (Doc. 31-10)); Response ¶ 19, at 9 (admitting this fact).  After this request was denied, other divisions within the IT department were authorized to go back to remote work, but the IT Administrative Services Section continued to work in person.  See MSJ ¶ 20, at 5 (asserting this fact)(citing Email from Service Desk to Sondia Bell (dated November 13, 2020), filed December 16, 2022 (Doc. 31-11)); Bell Depo. 14:3-8 (acknowledging that S. Bell's second request to work from home was denied "for the same reason [S. Bell's supervisors] said in several emails: Your supervisor does not allow it").[78]  After the denial of S. Bell's second request to work from home,

----

[77]S. Bell purports to dispute this fact as immaterial.  Response ¶ 18, at 9 (citing Bell Depo. at 12:19-24.  S. Bell's assertion of immateriality does not dispute the City of Tulsa's asserted fact. If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. New Mexico State Land Office, 2014 WL 4823841, at *1 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[78]S. Bell purports to dispute the fact "that her June 2020 request to Telecommute was denied for the same reasons as her previous requests," because the Berg Aff. and Caughron Aff., upon which the City of Tulsa rely, are not credible owing to the fact that S. Bell has filed grievances against both Berg and Caughron.  Response ¶ 20, at 9-10.  Here, because S. Bell does not offer any evidence contradicting Berg or Caughron's testimony, the Court need not make a determination that "one witness is more credible than another," Fogarty v. Gallegos, 523 F.3d at 1165, and concludes that there is no "triable issue of fact" regarding the fact that S. Bell's second request to work from home was denied for the same reasons as her first request, Helget v. City of Hays, 844 F.3d at 1223 n.3.  See Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d at 742 ("Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant

Dellinger and Berg "noticed a change in the way Ms. Bell interacted with her co-workers and other

City of Tulsa employees." MSJ ¶ 21, at 5 (asserting this fact); Berg Aff. ¶ 13, at 4; Dellinger Aff.

---

denial of a summary judgment motion.").

 S. Bell also argues that the Email from Service Desk to Sondia Bell (dated November 13, 2020), filed December 16, 2022 (Doc. 31-11)("Service Desk Email"), is inadmissible hearsay, "with no identifiers of the author of the document." Response ¶ 20, at 10 (citing no evidence from the record). The Court agrees that the email meets the definition of hearsay, because the declarant, the "Service Desk," is an out-of-court declarant, and the email is offered for its truth: that much of the IT department worked from home from November, 2020, to January, 2021, whereas the IT Administration Services division continued to work in person. See Fed. R. Evid. 801(c); Stephen A. Saltzburg , Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual § 801.02[1][e] (2023)(discussing that hearsay statements must be offered in "regard to the underlying truth of the statements").

 The Court concludes, however, that the email is admissible, and thus may be considered by the Court in resolving the MSJ, because it qualifies as a public record under Federal Rule of Evidence 803(8). Under rule 803(8)(a)(i), the public-records exception to the hearsay rule, "[a] record or statement of a public office" is admissible if "it sets out . . . the office's activities . . . and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8).

 Here, the IT department's service desk email account set out, in a "statement," the IT department's "activities," namely which divisions would be working remotely and which would be working in person. Fed. R. Evid. 803(8)(a)(i). Cf. United States v. Iverson, 818 F.3d 1015, 1021 (10th Cir. 2016)(holding that a webpage maintained by the Federal Deposit Insurance Corporation ("FDIC") listing which banks were insured by the FDIC was a public record because it "'set out . . . the office's activities' related to deposit insurance." (quoting Fed. R. Evid. 803(8)(a)(i))); Phillips v. Oosterbaan, 508 F. Supp. 3d 1103, 1114 (D. Utah 2020)(Waddoups, J.)(holding admissible a "letter" under rule 803(8) as a "statement" that "sets forth the office's activities" where the letter detailed the "work being done by one of the [office's] employee's). Furthermore, S. Bell has not demonstrated that "the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8). To the contrary, the Court presumes the trustworthiness of an email conveying important information about which IT services would be available during the COVID-19 pandemic, and recognizes the necessity of relying on the email where it is unlikely that an IT employee would "be able to remember the details" of the dates and divisions that were authorized to work from home. Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual § 803.02[9][a] (2023)(identifying the "strong presumption of reliability accorded to public reports" and that a report fails the trustworthiness requirement only where "[t]he non-offering party . . . make[s] an affirmative and particularized showing that the preparation of the report was contrary to the general standard of public service that makes such reports reliable"). Accordingly, the Court considers the Service Desk Email in resolving the MSJ.

¶ 12, at 3.[79]

**9.  S. Bell's Actions Upon Her Return to Work Following Her First Suspension and the Second Pretermination Hearing.**

When S. Bell returned from work following her first five-day suspension, Berg provided her with a letter that made several points of clarification related to work practices and policies, and established "clear expectations and guidelines moving forward after the hearing."  MSJ ¶ 50, at 10 (asserting this fact)(citing Letter from Chris Berg to Sondia Bell (dated December 11, 2019), filed December 16, 2022 (Doc. 31-20)("Expectations Letter")).  See Response ¶ 50, at 19 (admitting this fact).[80]  Specifically, the Expectations Letter sets out the following expectations:

- Work your approved work schedule and request prior approval with any variations (flexing);

- Do not work overtime without prior approval;

- Do not be insubordinate and improve your attitude and work relationships with me and your co-workers;

- Do not make false or inflammatory accusations that cause drama and disrupt our work environment;

- Do not record conversations with me and others without prior consent;

- Observe the chain of command and consult me for questions or concerns on

---

[79]S. Bell purports to dispute this fact by demonstrating that she made multiple requests to work from home, each of which were denied, and providing that she received "a glowing Performance Evaluation" on August 30, 2019, even after her first request to telecommute, made in January of 2019, had been denied.  Response ¶ 20, at 10 (citing Performance Review and Planning for Sondia Bell (dated August 30, 2019), filed January 23, 2023 (Doc. 41-15)("2019 Performance Review")).  In doing so, S. Bell does not contradict the fact that Berg and Dellinger noticed a change in the way S. Bell interacted with her co-workers.  Accordingly, the Court deems the fact in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[80]S. Bell does not contest this fact but provides additional facts about the positive performance review she received in 2019, which the Court has includes in the text as undisputed facts.  See Factual Background, supra at 11.

work and policy issues unless it is appropriate under policy to discuss with Michael first.

MSJ ¶ 50, at 10 (asserting this fact)(citing Expectations Letter at 2); Response ¶ 50, at 19.[81]

On June 8, 2020, S. Bell emailed Berg that she would be "late to work this morning" and did not arrive at work until 1:43 p.m.  MSJ ¶ 54, at 11 (asserting this fact)(quoting Email from Sondia Bell to Chris Berg at 24 (dated June 8, 2020), filed December 16, 2022 (Doc. 31-23), and citing Time Sheet for June 7, 2020, to June 20, 2020, at 27, filed December 16, 2022 (Doc. 31-23)).[82]  Berg advised her that, because she had not been approved for flex time for the day, she would have to clock out at her regular time, as opposed to working late, and submit leave.  See MSJ ¶ 54, at 11 (asserting this fact)(citing Email from Chris Berg to Sondia Bell at 25 (dated June 8, 2020), filed December 16, 2022 (Doc. 31-23)("June 8, 2020, Email Summarizing Conversation")).[83]  S. Bell refused to leave, asserting  that "HR had called me yesterday about approved [Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601]," and did not clock out until 5:30 p.m., despite that her shift ended at 4:30 p.m., which resulted in S. Bell "working an unauthorized alternate schedule against the instructions of her supervisory."  MSJ ¶ 54, at 11

---

[81]S. Bell does not contest this fact but provides additional facts about the positive performance review she received in 2019, which the Court has includes in the text as undisputed facts.  See Factual Background, supra at 11.

[82]S. Bell does not refute that she indicated that she would be in late and did not arrive until 1:43 p.m. on June 8, 2020.  See Response ¶ 54, at 20.  Consequentially, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[83]S. Bell does not refute that Berg informed her that she needed to clock out and submit leave for the time that she missed.  See Response ¶ 54, at 20.  Accordingly, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

(asserting this fact).  See June 8, 2020, Email Summarizing Conversation at 1.[84]

In August, 2020, the City of Tulsa provided S. Bell with notice that a second pretermination hearing would be conducted for her violations of Work Rule Seven, concerning respect for authority.  See MSJ ¶ 53, at 11 (asserting this fact)(citing Letter from Chris Berg to Sondia Bell at 1 (dated August 24, 2020), filed December 16, 2022 (Doc. 31-23)("Second Pretermination Hearing Notification Letter"); Response ¶ 53, at 20.[85]  The second pretermination hearing was held on August 31, 2020, and addressed primarily the June 8, 2020, events in which S. Bell refused to clock out when her shift ended, and similar events that occurred on March 13, 2020, in which "Bell once again ignored direct orders of her supervisor regarding entering her time and taking leave." MSJ ¶ 53, at 11 (asserting this fact)(citing Second Pretermination Hearing Notification Letter at 1-4; Affidavit of Clayton Edwards (dated December 5, 2022), filed December 22, 2022 (Doc. 31-

---

[84]S. Bell purports to dispute this fact and argues that her shift ended at 5:30 p.m., and that Berg "argued with Plaintiff that [FMLA] was not involved."  Response ¶ 54, at 20 (citing Email from Chris Berg to Joyce Powell (dated June 8, 2020), filed January 23, 2023 (Doc. 41-34)("Berg FMLA Inquiry Email")).  The record establishes that S. Bell's shift ended at 4:30 p.m. on June 8, 2019, not at 5:30 p.m., and S. Bell has not provided any evidence suggesting otherwise.  See Time Sheet for June 7, 2020, to June 20, 2020, at 27; Berg FMLA Inquiry Email at 1 ("At 4:45 pm, I observed that [S. Bell] was still working and had not punched out at 4:30 pm, the end of her scheduled shift.").  In addition, while the record establishes that S. Bell represented that she was "approved" in an email from HR to make up the time she missed pursuant to the FMLA, S. Bell does not provide the alleged email from HR nor any other competent evidence establishing that she had received authorization to work late on June 8, 2020.  June 8, 2020, Email Summarizing Conversation at 1.  Accordingly, the Court deems the fact that S. Bell refused to clock out when her shift ended and worked unauthorized flex time undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[85]Although S. Bell "does not dispute that Chris Berg, [sic] initiated another pre-termination action against her on August 24, 2020," she asserts "that Berg's actions are nothing more than retaliation, rubber stamped by the City."  See Response ¶ 54, at 20 (citing no evidence in the record).  Because S. Bell "does not dispute that Chris Berg, [sic] initiated another pre-termination action against her on August 24, 2020," the Court deems the fact in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

24)("Edwards Aff.")).[86]

At the conclusion of the hearing, Edwards, who once again served as hearing officer, recommended that S. Bell's "employment be terminated based on her pattern of insubordinate behavior." MSJ ¶ 55, at 11 (asserting this fact)(citing Edwards Aff. ¶ 7, at 2 ("After the second hearing I recommended termination of [S. Bell's] employment.")); Dellinger Aff. ¶ 21, at 5.[87] Despite this recommendation, Dellinger decided to give S. Bell "one more chance to change her behavior" and suspended her for ten days without pay. MSJ ¶ 55, at 11 (asserting this fact)(citing Dellinger Aff. ¶ 21, at 5; Disciplinary Action Report (dated September 3, 2020), filed December 16, 2022 (Doc. 31-25)).[88] Dellinger prepared a letter for S. Bell outlining expectations for S. Bell

---

[86]S. Bell also purports to dispute this fact on the basis "that Berg's actions are nothing more than retaliation, rubber stamped by the City." See Response ¶ 54, at 20. Because S. Bell does not refute what issues were addressed at the August 31, 2020, pretermination hearing, the Court deems the fact in the text undisputed for this Opinion's purposes. See N.D. Okla. LCvR 56-1(c).

[87]S. Bell "does not contest that the Hearing Officer, Clayton Edwards, issued its recommendation in the manner that it states." Response ¶ 55, at 21. Instead, S. Bell "disputes the fairness of the hearing process," because Edwards did not discuss his earlier recommendation that S. Bell be reassigned to a new supervisor in the Edwards Aff. Response ¶ 55, at 21 (citing Edwards Aff.). Accordingly, because S. Bell does not dispute the findings of the second hearing, and because the Court has already included that Edwards recommended a new supervisor in the text as an undisputed fact, the Court deems the fact in the text undisputed for this Opinion's purposes. See N.D. Okla. LCvR 56-1(c).

[88]S. Bell "does not contest that she was not terminated as a result of the August 31, 2020 pre-Termination hearing." Response ¶ 56, at 21. Instead, S. Bell "disputes the veracity of Michael Dellinger's reasons for not doing so, as stated in his declaration" and argues that "[a] jury could find that Dellinger declined termination based on weak evidence." Response ¶ 56, at 21. The summary judgment stage is not the appropriate stage for the Court to determine a witness' credibility, and thus the Court will not consider whether Dellinger lied. See Plotke v. White, 405 F.3d at 1094 ("Credibility determinations [and] the weighing of the evidence . . . are jury functions, not those of a judge.'" (quoting Stinnett v. Safeway, Inc., 337 F.3d at 1216)); Trujillo v. Bd. of Educ. of Albuquerque Pub. Sch., 410 F. Supp. 2d at 1035 (declining to consider whether a witness "lied" in their affidavit at the summary judgment stage). Consequentially, because S. Bell does not dispute that she was not terminated and received, instead, a ten-day suspension, the

going forward.  MSJ ¶ 57, at 12 (asserting this fact)(citing Letter from Michael Dellinger to Sondia

Bell at 17 (dated September 3, 2020), filed December 16, 2022 (Doc. 31-26)("September 3, 2020,

Letter")); Response ¶ 57, at 21 (admitting this fact).  The September 3, 2020, Letter included many

instructions that "were identical to those given to Ms. Bell after her first disciplinary hearing," and

the September 3, 2020, Letter stated that, "if you fail or refuse to follow these instructions,

disciplinary action may result up to and including termination."  MSJ ¶ 57, at 12 (asserting this

fact)(quoting September 3, 2020, Letter at 17-18); Response ¶ 57, at 21 (admitting this fact).

> **10.    S. Bell's FMLA Request.**

In July 2020, S. Bell requested expanded leave under the FMLA to care for her children,

because of school closures related to COVID-19.  See MSJ ¶ 58, at 12 (asserting this fact); Email

from Tina McIntosh to Sondia Bell (dated July 15, 2020), filed January 23, 2023 (Doc. 41-

37)("FMLA Request"); Letter from Chris Berg to Sondia Bell at 2 (dated November 23, 2020),

filed December 16, 2022 (Doc. 31-26)("Third Pretermination Hearing Notice").[89]   Under the

---

Court deems the fact in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-
1(c).

[89]S. Bell does not contest that she filed for expanded leave under the FMLA, but provides
additional communications between herself, Powell, and Trina McIntosh, an employee in the City
of Tulsa's HR department, that S. Bell avers demonstrates her FMLA requests were "being over
scrutinized."  Response ¶ 58, at 21-22 (citing no evidence in the record).  Because S. Bell does not
dispute that she requested FMLA leave, the Court deems the fact in the text undisputed for this
Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).  In addition, the Court concludes that S. Bell's
FMLA requests were not being "over scrutinized," because the record establishes that the meetings
and telephone calls that S. Bell had with HR staff were necessary to ensure that S. Bell was
receiving the appropriate amount of leave and sort through the complex nature of S. Bell's
requests.  See Transcript of September 25, 2020, Phone Call Between Sondia Bell and Joyce
Powell, filed December 16, 2022 at 2-8 (Doc. 31-28)("September 25, 2020, Conversation
Transcript"); Email from Joyce Powell to Sondia Bell at 12-13 (dated November 17, 2020), filed
December 16, 2022 (Doc. 31-26)("November 17, 2020, Email").

FMLA and the Families First Coronavirus Act ("FFCA"), Pub. L. 116-127, employees affected by the pandemic were afforded fourteen days of paid leave. See Response ¶ 58, at 21-22 (asserting this fact)(citing FMLA Request at 1).[90] After receiving S. Bell's request, HR employees scheduled a call with S. Bell to obtain "clarification on the specifics" of S. Bell's request. MSJ ¶ 58, at 12 (asserting this fact)(citing Email from Tina McIntosh to Sondia Bell (dated September 22, 2020), filed December 16, 2022 (Doc. 31-26)).[91] Leading up to the call to discuss S. Bell's FMLA request, HR communicated with S. Bell indicating that they were finalizing review of her request and seeking additional verification of S. Bell's circumstances. Response ¶ 58, at 22 (citing Email from Tina McIntosh to Sondia Bell (dated September 18, 2020), filed January 23, 2023 (Doc. 41-38)(notifying S. Bell that HR was "completing the final [approvals] of your FFCRA requests," and requesting that S. Bell "verify if [her] children will be attending in-person school OR virtual learning for Covid-19 related reasons")).[92]

---

[90]S. Bell has not included this fact in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law." N.D. Okla. LCvR 56-1(c). Nevertheless, because the City of Tulsa does not appear to dispute this fact, the Court will include this fact in the text as an additional undisputed fact for this Opinion's purposes.

[91]S. Bell does not contest that the meeting to discuss her FMLA request was scheduled, but provides additional communications between herself, Powell, and Trina McIntosh, an employee in the City of Tulsa's HR department, that S. Bell avers demonstrates that her FMLA requests were "being over scrutinized." Response ¶ 58, at 21-22 (citing no evidence in the record). Because S. Bell does not dispute that the meeting was scheduled, the Court deems the fact in the text undisputed for this Opinion's purposes. See N.D. Okla. LCvR 56-1(c).

[92]S. Bell has not included this fact in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law." N.D. Okla. LCvR 56-1(c). Nevertheless, because the City of Tulsa does not dispute this fact, the Court will include this fact in the text as an additional undisputed fact for this Opinion's purposes.

During the call, which took place on September 25, 2020, between S. Bell, McIntosh, and

Powell, and lasted for fifty-three minutes, S. Bell "becomes frustrated with the questions and tells

Ms. Powell she is not going to answer the questions asked."  MSJ ¶ 59-60, at 12 (citing Audio

Recording of Interview (recorded September 25, 2020) filed December 16, 2022 (Doc. 31-27)).[93]

---

[93]S. Bell first purports to dispute that the conversation took place on September 25, 2020, as "immaterial."  Response ¶ 59, at 22.  S. Bell's assertion of immateriality does not dispute the City of Tulsa's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 2014 WL 4823841, at *1 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

S. Bell also disputes that she refused to answer questions during the conversation.  See Response ¶ 60, at 22-23 (citing September 25, 2020, Conversation Transcript).  Rather than refuse to answer questions, S. Bell argues, she "simply requested that they put everything 'in writing.'"  MSJ ¶ 60, at 22 (quoting September 25, 2020, Conversation Transcript at 8).  During the conversation, S. Bell made clear that she would not answer Powell's questions unless Powell put them in writing, and Powell responded that she was not required to put the questions in writing.

Powell: [I]s Jacob participating in that?

S. Bell: Put that in writing and I will answer that.

Powell: I am asking it now, Sondia.

S. Bell: And I said for you to put it in writing. You are not going to keep bullying me, Joyce. It is not nice.

Powell: Sondia , we have to figure --

S. Bell: When I first met with you -- you are not going to keep bullying me. So, please I am requesting to put it in writing. And I will respond in writing what Jacob is doing.

. . .

Powell: Sondia --

S. Bell: You put it in writing. You put it in writing, and I will respond to you in writing.  Everything that we talked about, you put it in writing, and I am going to

S. Bell also explained during the conversation that she felt "Powell and McIntosh had been giving her the run around regarding her FFCRA requests, and that she was in need of the assistance." Response ¶ 60, at 22 (asserting this fact)(citing September 25, 2020, Conversation Transcript at 6)("So, every day while you guys were denying me care for the CARES Act . . . I was looking for care to try to figure out what time I could make it to work.").[94]  S. Bell further stated:

> "So, while you are trying to find things to change things and change my wording and change to make it seem like I am a liar -- I am going to make sure that everything goes national. And when I tell you this -- just so you go do some homework -- I -- my family is very known. It may not be in Oklahoma, but they are known somewhere. And believe me I have ties to high connections. So, what you think is you work for the Mayor and the Mayor is connected to everybody, I just want you to know -- be sure that the Mayor gets your back. Because I am going to make sure the world knows about how Joyce Powell and the HR Department goes around and tries to make everything changed around when all I wanted to do was apply for a benefit that should be available to every parent with an exceptional student that could take work in writing the states August 31st -- that the school is closed, and I need to take advantage of the CARES Act. So, with you coming back and trying to say it is so many options and so much to do -- okay, Joyce all I can do is sign this up . . . ."

definitely respond to you with an answer in writing today.

Powell: And --

S. Bell: Put it in writing and I will do that as well.

Powell: I am asking a question now. I am not obligated to put it in writing.

September 25, 2020, Conversation Transcript at 8.  See id. at 12 (Powell)("So, I am going to close out because I have been saying the same thing over and over. . . .").  Accordingly, despite that S. Bell requested the questions be put in writing, the Court concludes that it is undisputed for this Opinion's purposes that S. Bell refused to answer some of the questions Powell asked her during the telephone conversation. See N.D. Okla. LCvR 56-1(c).

[94]S. Bell has not included this fact in a separate section of "additional facts," and the Court is not required to consider this additional information to be "additional facts [S. Bell] contends preclude[s] judgment as a matter of law."  N.D. Okla. LCvR 56-1(c).  Nevertheless, because the City of Tulsa does not dispute this fact, and because the record establishes the fact, the Court will include this fact in the text as an additional undisputed fact for this Opinion's purposes.

MSJ ¶ 61, at 12 (asserting this fact)(quoting September 25, 2020, Conversation Transcript at 11).[95]

On October 12, 2020, S. Bell sent an email addressed to Powell, the Deputy City Attorney

Jean Ann Hudson, Mayor G.T. Bynum, and Personnel Director Erica Felix-Warick alleging:

> I am still being harassed by Joyce Powell and the FMLA team inquiring if my child
> is attending in-person school or virtual learning.  I was told by Joyce Powell via a
> recorded telephone call on 9/25/2020, my child is level 3.  Joyce then explained to
> me the definition of a Level 3 and sent me the link to access the Tulsa Public
> Schools website showing where I can find information regarding Level 3.  I found
> this to be yet another violation of the HIPAA Laws by Joyce Powell.  How does
> Joyce Powell know what level my child is on?  Joyce did not read Level 1, 2, 4,
> only read Level 3 as if she has access to my child's file.  I never informed her of
> my son, J. Bell's level.  So how can Joyce Powell tell me what Level 3 is within
> TPS when she could not even tell me what full-time hours are within Tulsa Public
> schools.  There is another behavior of harassment and violation of HIPAA Laws
> with my child.

MSJ ¶ 62, at 13 (asserting this fact)(quoting Email from Sondia Bell to Joyce Powell at 10-11

(dated October 12, 2020), filed December 22, 2022 (Doc. 31-26)("October 12, 2020, Email")).[96]

In the email, S. Bell also described the difficulty she was having "trying to get her special needs

son the care he needs," Response ¶ 62, at 23 (asserting this fact); October 12, 2020, Email at 10

("I am trying to follow the new rules you and your staff have implemented regarding my case."),

---

[95]S. Bell purports to dispute this fact, because she objects to the City of Tulsa "cherry-picking statements from an 18-page, single spaced document."  Response ¶ 61, at 23.  Each side "cherry picks" material in their brief rather than taking up valuable brief space quoting an eighteen-page, single spaced document in its entirety; this process of highlighting what each party feels is most pertinent to their argument is what lawyers do.  In any case, because S. Bell does not refute the quote the City of Tulsa provides nor provide any evidence of her own, however, the Court deems this fact admitted for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[96]S. Bell purports to dispute this fact "to the extent that Defendant omits pertinent details." Response ¶ 62, at 23.  S. Bell summarizes some of the claims she made in her October 12, 2020, email.  Response ¶ 62, at 23.  Because S. Bell does not dispute the language of her email, the Court deems the fact in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c). The Court also includes the additional facts that S. Bell supplies in the text as undisputed facts.

explained that she felt the "over scrutinization" of her requests resulted from the fact that Powell

thought she was "not telling the truth about her child's needs," Response ¶ 62, at 23 (asserting this

fact); October 12, 2020, Email at 10 ("I have been asked the same question over and over as if I'm

lying regarding my child."), and expressed that she felt it was odd that Powell knew the "specific

level of Autism" her son has, Response ¶ 62, at 23 (asserting this fact); October 12, 2020, Email

at 11.[97]   On November 17, 2020, Powell responded to S. Bell's email and referred S. Bell's

concerns to the IT department for review.   See MSJ ¶ 64, at 13 (asserting this fact)(citing Email

from Joyce Powell to Sondia Bell at 12 (dated November 17, 2020), filed December 16, 2022

(Doc. 31-26)("November 17, 2020, Email")).[98]

### 11.   S. Bell's Third Pretermination Hearing and Termination.

On November 23, 2020, Bell received notice that a third pretermination hearing would take

place on December 2, 2020.   MSJ ¶ 65, at 13 (asserting this fact)(citing Third Pretermination

Hearing Notice at 1).[99]   At the hearing, Edwards, who once again served as hearing officer, "heard

---

[97]S. Bell has not included this fact in a separate section of "additional facts," and the Court
is not required to consider this additional information to be "additional facts [S. Bell] contends
preclude[s] judgment as a matter of law."   N.D. Okla. LCvR 56-1(c).   Nevertheless, because the
City of Tulsa does not dispute that S. Bell made these statements in her email, and because the
record establishes that she made the statements, the Court includes this fact in the text as an
additional undisputed fact for this Opinion's purposes.

[98]S. Bell purports to dispute this fact "to the extent that Defendant omits relevant
information."   Response ¶ 64, at 23.   Because S. Bell does not refute that Powell replied to her
email and referred her concerns to IT, however, the Court deems this fact admitted for this
Opinion's purposes.   See N.D. Okla. LCvR 56-1(c).

[99]S. Bell "does not dispute that a third pre-Termination was served upon her," but objects
to "remaining statements" in the City of Tulsa's proposed undisputed fact.   Response ¶ 65, at 24.
The Court addresses S. Bell's objections infra n.100, at 49.   Because S. Bell does not refute that
she received notice of the third pretermination hearing, however, the Court deems this fact
admitted for this Opinion's purposes.   See N.D. Okla. LCvR 56-1(c).

evidence regarding [S. Bell's] interactions with Human Resources employees as well as the email

sent by [S. Bell] afterwards." MSJ ¶ 65, at 13 (asserting this fact). See Email from Clayton

Edwards to Michael Dellinger (dated December 3, 2020), filed December 16, 2022 (Doc. 31-

29)("Termination Recommendation Email"); Third Pretermination Hearing Notice at 2-3.[100] After

the hearing, Edwards recommended S. Bell's employment be terminated based on her "continued

unprofessional behavior and her disrespectful, condescending, and threatening actions." MSJ ¶ 66,

at 13 (asserting this fact)(quoting Termination Recommendation Email at 1).[101] Dellinger agreed

---

[100]S. Bell "objects" to the City of Tulsa's "conclusory statements" and argues that the statements are "supported by inadmissible hearsay." Response ¶ 65, at 24. Although S. Bell does not specify to which statements she objects, the Court understands her to refute the City of Tulsa's fact about what evidence Edwards considered at the hearing. See MSJ ¶ 65, at 13. The Email from Clayton Edwards to Michael Dellinger (dated December 3, 2020), filed December 16, 2022 (Doc. 31-29)("Termination Recommendation Email"), establishes this fact. S. Bell is correct that the Termination Recommendation Email constitutes hearsay because Edwards wrote it out of court and the Termination Recommendation Email is offered for its truth -- i.e., its contents describing what evidence Edwards considered at the third pretermination hearing. See Termination Recommendation Email at 1; Fed. R. Evid 801. The Court concludes, however, that the Termination Recommendation Email is admissible, and thus the Court may consider it in resolving the MSJ, because it qualifies as a public record under Federal Rule of Evidence 803(8).

Under rule 803(8), the public-records exception to the hearsay rule, "[a] record or statement of a public office" is admissible if "it sets out . . . in a civil case . . . factual findings from a legally authorized investigation . . . and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A). Here, the email sets out the City of Tulsa's "factual findings" from the hearing to consider S. Bell's termination. See Fed. R. Evid. 803(8)(A)(iii). See Termination Recommendation Email at 1 ("Based on the information presented, the testimony given and the recording of the September 25, 2020 phone call between Ms. Bell and Joyce Powell and Tina McIntosh, I find Ms. Bell to have violated the aforementioned work rules."); 5 Jones Evid. § 34:22 (7th ed. 2023)("It is not required that a factual finding be explicit, in order [f]or it to be admissible . . . ."). Furthermore, S. Bell has not demonstrated that "the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). Accordingly, the Court considers the Termination Recommendation Email in resolving the MSJ, and deems the fact that Edwards heard evidence regarding S. Bell's interactions with HR employees undisputed for this Opinion's purposes. See N.D. Okla. LCvR 56-1(c).

[101]S. Bell "does not dispute that the termination occurred," but purports to dispute "that the

with the recommendation and terminated S. Bell's employment effective December 3, 2020.  MSJ

¶ 66, at 13 (asserting this fact)(citing Disciplinary Action Report (dated December 3, 2020), filed

December 16, 2022 (Doc. 31-40)(("Termination Report")).[102]  S. Bell appealed her termination to

the Civil Service Commission, which, after a hearing on February 11, 2021, concluded that the

City of Tulsa had just cause for the termination.  See MSJ ¶ 67, at 14 (asserting this fact)(citing

Final Order, filed December 16, 2022 (Doc. 31-31)).[103]

## PROCEDURAL BACKGROUND

S. Bell initiated this action on February 16, 2021.  See Complaint, filed February 16, 2021

(Doc. 2)("Complaint").  In the Complaint, S. Bell argues that the City of Tulsa discriminated and

---

allegations were true."  Response ¶ 66, at 24. See Bell Depo. ¶ 13, at 3.  In support of her claim, S. Bell provides that Edwards was the hearing officer at all of her pretermination hearings and, therefore, may have harbored "unintentional bias" from his "over exposure" to the allegations made against S. Bell.  Response ¶ 66, at 24.  That Edwards was the hearing officer at all of S. Bell's pretermination is not sufficient to specifically controvert Edwards allegations.  See N.D. Okla. LCvR 56-1(c).  Rather, the record establishes that Edwards' "recommendations to terminate [S. Bell's] employment was made solely based on the documented evidence of her repeated insubordination and ongoing behavior which was disrespectful, condescending, and threatening even after she had received written guidance from her department head outlining his expectations of her." Edwards Aff. ¶ 8, at 2.  See Third Pretermination Hearing Notice at 1-3.  Accordingly, the Court deems the fact that the City of Tulsa terminated S. Bell because of her "continued unprofessional behavior and her disrespectful, condescending, and threatening actions" undisputed for this Opinion's purposes.  MSJ ¶ 66, at 13 (quoting Termination Recommendation Email at 1).

[102]S. Bell "does not dispute that the termination occurred," but purports to dispute "that the allegations were true."  Response ¶ 66, at 24. See Bell Depo. ¶ 13, at 3.  Because S. Bell does not controvert that Dellinger terminated her employment, the Court deems the fact in the text undisputed for this Opinion's purposes.  See N.D. Okla. LCvR 56-1(c).

[103]S. Bell purports to dispute this fact as "immaterial."  Response ¶ 67, at 24.  S. Bell's assertion of immateriality does not refute the City of Tulsa's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. Land Off., 2014 WL 4823841, at *1 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.  See N.D. Okla. LCvR 56-1(c).

retaliated against her by bringing disciplinary actions against her and terminating her employment. Complaint ¶¶ 8-34, at 2-6.  S. Bell brings six claims against the City of Tulsa: (i) status-based race discrimination, in violation of 42 U.S.C. § 1981; (ii) retaliation, in violation of 42 U.S.C. § 1981; (iii) status-based race discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); (iv) retaliation, in violation of Title VII; (v) disability association discrimination, in violation of the ADA; and (vi) retaliation, in violation of the ADA.  Complaint ¶¶ 35-49, at 6-7.

### 1.     The MSJ.

The City of Tulsa moved for summary judgment on December 16, 2022.  See MSJ at 1.  The City of Tulsa requests that the Court grant summary judgment in its favor as to each of S. Bell's claims.  See MSJ at 21.  Specifically, the City of Tulsa contends that there are no genuine disputes of material facts regarding S. Bell's claims of discrimination and retaliation, as well as her claims under the ADA.  See MSJ at 21.

### a.     The City of Tulsa Argues That S. Bell's Discrimination Claims Fail as a Matter of Law.

The City of Tulsa begins by clarifying that S. Bell's discrimination claims under 42 U.S.C. § 1981 and Title VII are analyzed under the same framework in McDonnell Douglas v. Green, 411 U.S. 792 (1973)("McDonnell Douglas").  See MSJ at 21.  The City of Tulsa argues that: (i) S. Bell cannot establish a prima facie case for discrimination; (ii) the City of Tulsa has established nondiscriminatory reasons for its actions; and (iii) S. Bell cannot show that the City of Tulsa's explanation for its actions were pretext.  See MSJ at 21-26.

Turning to S. Bell's prima facie case, although the City of Tulsa admits that S. Bell is a member of a protected class -- the first prong S. Bell that must show to establish a prima facie case of discrimination -- the City of Tulsa argues that S. Bell's claim fails on the second and third

prongs, which, according to the City of Tulsa, require S. Bell to demonstrate that she was (i) "qualified and satisfactorily performing her job"; and (ii) "terminated under circumstances giving rise to an inference of discrimination."  MSJ at 22-23 (citing Salguero v. City of Clovis, 366 F.3d 1168, 1175 (10th Cir. 2004)).  As to the second prong, the City of Tulsa contends that S. Bell's "repeated, documented violations of City work rules and policies" undermine her case that she was performing her job in a satisfactory manner.  MSJ at 23.  The City of Tulsa provides next that S. Bell can meet the third prong by showing that a similarly situated employee, who did not belong to S. Bell's protected class, was treated differently despite violating the same work rules.  See MSJ at 23 (citing Throupe v. Univ. of Denver, 988 F.3d 1243, 1252 (10th Cir. 2021)).  The City of Tulsa argues that because S. Bell cannot point to any such "comparator employees," S. Bell "cannot meet the elements to establish a prima facie case."  MSJ at 23.

The City of Tulsa argues next that it "has presented ample evidence of a legitimate non-discriminatory reason for its actions."  MSJ at 24.  Specifically, the City of Tulsa points to the fact that S. Bell: (i) "ignored the express instructions of her supervisor"; (ii) "refused to cooperate with the HR Department"; (iii) acted in a "rude and disrespectful [manner] to other City of Tulsa employees"; and provided information that was "untruthful," despite repeated warnings and the City of Tulsa's utilization of "progressive discipline."  MSJ at 24.  Finally, the City of Tulsa contends that S. Bell cannot show that the City of Tulsa's explanations for its actions are pretextual. See MSJ at 24-26.  For example, the City of Tulsa argues that the denial of S. Bell's request to telecommute was made for nondiscriminatory reasons, because Berg did not allow any of his employees to telecommute.  See MSJ at 25.  For these reasons, the City of Tulsa contends that S. Bell's "disparate treatment claims" fail as a matter of law.  MSJ at 26.

**b.    The City of Tulsa Argues That it is Entitled to Judgment on S. Bell's Retaliation Claims.**

The City of Tulsa supplies that S. Bell's claims of retaliation under 42 U.S.C. § 1981 and Title VII also are analyzed under the McDonnell Douglas framework.  See MSJ at 26 (citing Hansen v. SkyWest Airlines, 844 F.3d 914, 924 (10th Cir. 2016)).  To establish a prima facie case of retaliation, the City of Tulsa provides that S. Bell must demonstrate that: (i) she "engaged in protected opposition to discrimination"; (ii) "a reasonable employee would have found the challenged action materially adverse"; and (iii) "a causal connection exists between the protected activity and the materially adverse action."  MSJ at 26 (citing Hansen v. SkyWest Airlines, 844 F.3d at 924).  The City of Tulsa does not dispute that "Bell filed various discrimination complaints" nor that employment termination was a sufficiently adverse employment action to establish the second prong of the analysis.  MSJ at 26.  The City of Tulsa argues, however, that S. Bell has not provided sufficient evidence of a "causal connection between her grievances and her disciplinary actions."  MSJ at 27.

Even if the Court concludes that S. Bell makes out a prima facie case of retaliation, the City of Tulsa argues, that the disciplinary actions it took regarding S. Bell were justified defeat her retaliation claim.  See MSJ at 27.  Finally, the City of Tulsa contends that, because S. Bell has presented no evidence that these actions are pretextual, her retaliation claim also fails at the third prong of the McDonnell Douglas framework.  MSJ at 27.  Specifically, the City of Tulsa provides that S. Bell's argument that her pretermination hearings were biased does not establish sufficiently that the City's asserted reasons for taking disciplinary action against S. Bell are "unworthy of belief."  MSJ at 27-28.

c.    **The City of Tulsa Argues That S. Bell Cannot Establish a Claim Under the ADA.**

The City of Tulsa contends that S. Bell's disability association and retaliation claims under the ADA fail as a matter of law.  See MSJ at 28.  First, the City of Tulsa argues that "there is no requirement under the law that an employer provide reasonable accommodations to an employee for the disability of a family member."  MSJ at 28.  Accordingly, the City of Tulsa argues, S. Bell's claims that the City of Tulsa violated her rights under the ADA by denying "her work from home request, or other requested 'accommodations,'" are baseless.  MSJ at 28-29 (no citation given for quotation).  Second, the City of Tulsa contends that S. Bell's retaliation claim under the ADA fails as a matter of law, because the grievances S. Bell filed were not related to her opposition to an act or practice made unlawful by the ADA.  See MSJ at 29-30 (citing Krouse v. American Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997)).  Finally, even if S. Bell were able to establish a claim of retaliation under the ADA, the City of Tulsa argues, the claim ultimately fails because "the City has provided sufficient evidence to show its actions were done for legitimate, nondiscriminatory reasons and the Plaintiff has no evidence that those reasons were pretextual."  MSJ at 30.

2.    **The Response.**

S. Bell asserts that the City of Tulsa does not demonstrate that it is entitled to summary judgment as a matter of law.  See Response at 6-7.  S. Bell argues that "significant material facts remain in dispute" and S. Bell's evidence regarding the City of Tulsa's "pretext for discrimination and retaliation [] precludes summary adjudication."  MSJ at 6.  Specifically, S. Bell contends that: (i) she has established her discrimination claims, because the evidence S. Bell provides satisfies the McDonnell Douglas framework, see Response at 32-43; (ii) she has established her retaliation claim, because the evidence shows a causal connection between a protected action and a materially adverse action, see Response at 43-47; and (iii) she has established her ADA claims, because the

evidence demonstrates that the City of Tulsa took adverse actions against her on the basis of her relationship with her son, J. Bell, see Response at 47-51.

      a.      **S. Bell Responds that the Evidence Supports Her Title VII and 42 U.S.C. § 1981 Discrimination Claims.**

S. Bell first contends that she establishes a prima facie case for discrimination under the McDonnell Douglas framework. See Response at 33-34. S. Bell disputes the test the City of Tulsa provides for determining whether a prima facie case has been established. See Response at 33. Specifically, S. Bell contends that -- in addition to showing her protected-class-status, qualifications, and termination -- she need establish only that her "job was not eliminated after her discharge," Response at 33 (quoting Kendrick v. Penske Transp. Servs. Inc., 220 F.3d 1220, 1229 (10th Cir. 2000)), as opposed to demonstrating that "she was terminated under circumstances giving rise to an inference of discrimination," Response at 33. Accordingly, S. Bell argues that she establishes a prima facie case, because the City of Tulsa does not dispute her protected-class status, qualifications, and termination, or that her former position of "Senior IT Business Support Administrator" remained in existence after her termination. Response at 33-35.

S. Bell next argues that the nondiscriminatory reasons that the City of Tulsa provides for her termination are unworthy and pretextual. See Response at 36. First, S. Bell contends that false allegations made by the City of Tulsa and its employees -- in addition to credibility issues concerning City of Tulsa employees on whose statements the City of Tulsa relies -- precludes summary judgment. See Response at 36-39. S. Bell supports her claim that the City of Tulsa's witnesses lack credibility by arguing that "there is a direct conflict" between her and "Chris Berg, Joyce Powell, and Michael Dellinger," because she filed grievances against them. Response at 36. S. Bell next supplies evidence that City of Tulsa employees: (i) requested "additional and unnecessary information" from S. Bell in response to her request to take leave under the FMLA,

which "caused her hardship," Response at 36-37; (ii) intentionally provoked S. Bell by questioning whether she met the requirements for taking leave under the FMLA and bullying her during a telephone conversation, see Response at 37; and (iii) delayed in responding to an email that S. Bell sent about her concern that she was suffered discrimination before subjecting her to a pre-termination hearing, see Response at 38-39. S. Bell "emphasize[s] that she is not required to prove pretext," because she can survive a motion for summary judgment by simply "pointing to contested facts and inferences." Response at 30-31.

S. Bell further disputes the City of Tulsa's proffered reasons for terminating her by arguing that the City of Tulsa "padded [her] disciplinary file" to justify her termination. Response 39. S. Bell points to the fact that "every one of [her] performance evaluations, beginning with her hire, until she was unlawfully terminated, described her as a stellar employee and an asset to the City of Tulsa." Response at 39-40. After she filed grievances against Berg, however, S. Bell argues, her supervisors brought "unwarranted" disciplinary actions against her "to justify her future termination." Response at 40. S. Bell also provides that, despite the hearing officer's recommendation that she be assigned a new supervisor, Berg continued to act as her supervisor. See Response at 41. Moreover, S. Bell contends, that the same individual, Edwards, served as hearing officer at each of her three pre-termination hearings and that the City of Tulsa brought no disciplinary actions against S. Bell until after she filed her grievances, demonstrates that City of Tulsa employees sought to pad her disciplinary record. See Response at 41. Finally, S. Bell argues that an inference of discrimination can be made, because other employees who shared the same "supervisor or decision maker" that S. Bell had were allowed to telecommute when S. Bell was not allowed to telecommute. Response at 42-43 (citing Smothers v. Solvay Chemicals, Inc., 740 F.3d 530, 540 (10th Cir. 2014)). S. Bell contends that this difference in treatment demonstrates

the City of Tulsa's "favoritism" and "constitutes pretext."  Response at 43.

      **b.**     **S. Bell Responds That She Has Made out a Prima Facie Case for Retaliation.**

S. Bell argues that she has established a prima facie case of retaliation, because she has demonstrated that a causal connection existed between the grievances she filed and her subsequent disciplinary actions, namely, her five-day suspension, ten-day suspension, and termination.  See Response at 43-46.  S. Bell contends that, as an initial matter, the City of Tulsa does not dispute that S. Bell has met the first two requirements for a prima facie case of retaliation: (i) filing a grievance is a protected activity; and (ii) her suspensions and termination are adverse actions.  See Response at 43.  S. Bell further provides that, as to the third requirement, she need only show "close proximity in time between a protected activity and an adverse action" to establish a causal connection.  Response at 43 (quoting Trujillo v. PacifiCorp., 524 F.3d 1149, 1157 n.5 (10th Cir. 2008)).

Regarding her first suspension, S. Bell contends that the temporal proximity requirement is established by the fact that instances of alleged misconduct which occurred only two days after she filed her grievance against Berg were listed as reasons for the disciplinary actions taken against her.  See Response at 44.  Furthermore, S. Bell argues, because the hearing officer concluded that "Berg had failed to present sufficient evidence regarding the alleged attendance issues" -- one of the instances of alleged misconduct that occurred shortly after S. Bell filed her grievance -- an assumption can be made that the hearing officer believed S. Bell had been approved to use flex time.  Response at 44.  Regarding her second suspension, S. Bell provides that her second suspension was "a form of retaliation" for filing additional grievances and complaints against her coworkers "about discrimination."  Response at 45.  Finally, regarding her termination, S. Bell argues that, because only six weeks passed between her "email complaint against Joyce Powell"

and her termination, the causal connection requirement was met in this instance as well.  Response at 45-46.[104]

### c.  S. Bell Responds That the Evidence Supports That the City of Tulsa Violated her ADA Rights.

S. Bell provides that an employer violates the ADA's "'association provision,'" Response at 47 (quoting 42 U.S.C. § 12112(b)(4)), by "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association," Response at 47 (quoting Trujillo v. PacifiCorp, 524 F.3d at 1154).  S. Bell's relationship with her son, J. Bell, S. Bell argues, "is protected by the association provision."  Response at 47.  S. Bell contends further that her termination constitutes an "adverse employment action [that] occurred under circumstances raising a reasonable inference that J. Bell's disability was a determining factor" in violation of the ADA.  Response at 48.  Specifically, S. Bell avers that the additional scrutiny the City of Tulsa put her through when she applied for leave under the FMLA to care for J. Bell and the HR department's suspicion that S. Bell was being untruthful about her need to take leave establishes that J. Bell's disability played a role in her termination.  See Response at 48-50.   Finally, as to her ADA retaliation claim, S. Bell argues that the temporal proximity between S. Bell's complaints that she was being singled out based on her son's disability and her termination -- a one-and-a-half month period -- proves the requisite element of causation.  See Response at 50.

### 3.  The Reply.

The City of Tulsa replies and argues that S. Bell has not produced any evidence that "she

---

[104]S. Bell does not discuss directly the issue of "pretext" for the purposes of her retaliation claim, but "adopts her argument on pretext" made in support her claim of discrimination.  Response at 46.

suffered any adverse employment action for any reason related to her race" or that her ADA rights were violated.  Reply at 1.  The City of Tulsa first argues that the Court should not consider S. Bell's "newly created documents."  Reply at 1-2.  Next, the City of Tulsa contends that S. Bell has not established her claims of discrimination and retaliation, nor asserted a viable claim under the ADA.  Reply at 2-10.

> **a.**   **The City of Tulsa Argues that the Court Should Not Consider S. Bell's Newly Created Documents.**

The City of Tulsa contends that the Court should not consider the Bell Decl., because S. Bell previously has been deposed, which raises a risk that the Court will rely on a "sham affidavit" if it considers the Bell Decl.  Reply at 1-2.  During the Bell Depo., the City of Tulsa provides, S. Bell made clear that she described fully the reasons that she believes the City of Tulsa discriminated against her.  See Reply at 1-2.  For this reason, the City of Tulsa requests that the Court consider the Bell Depo. only to the extent the statements therein are undisputed or clarify statements S. Bell made in her deposition testimony.  See Reply at 2.  Furthermore, the City of Tulsa argues that the Court should not consider a photograph that S. Bell includes as an exhibit in the Response, because "a party may not ordinarily defeat a summary judgment motion using information that was not disclosed during discovery."  Reply at 2 (quoting Woodworth v. Erie, Ins. Co., 743 F. Supp. 2d 201, 214 (W.D.N.Y. 2010)).

> **b.**   **The City of Tulsa Argues that S. Bell has Failed to Establish Her Substantive Claims.**

The City of Tulsa contends that S. Bell has not presented sufficient evidence to support her disparate treatment, retaliation, or ADA claims.  See Reply at 2-10.  The City of Tulsa begins by identifying three flaws in S. Bell's disparate treatment claims under Title VII and § 1981.  See Reply at 2-8.  First, the City of Tulsa argues that the only adverse employment actions that S. Bell

suffered were her disciplinary actions. See Reply at 2-3. The denial of S. Bell's remote work request, S. Bell's inability to use the bathroom located in Caughron's office, and S. Bell being prevented from bringing her child into work, the City of Tulsa avers, cannot be considered adverse employment actions for the purposes of establishing a prima facie case of discrimination. See Reply at 3-4.

Second, that S. Bell has not identified any "similarly situated comparator employees," the City of Tulsa argues, is fatal to S. Bell's prima facie case. Reply at 4-6. The City of Tulsa contends that similarly situated employees must "deal with the same supervisor" as the plaintiff, and, for the purposes of S. Bell's claims, her supervisor is Berg. Reply at 4-5 (quoting Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997)). Because S. Bell has not identified any other employees under Berg's supervision "who engaged in similar conduct as her but received lesser or no discipline," according to the City of Tulsa, her claim must fail. Reply at 6. Third, the City of Tulsa argues that S. Bell has provided no evidence of pretext in response to the City of Tulsa's proffered "legitimate, non-discriminatory reason for the termination and disciplinary actions." Reply at 6. Specifically, the City of Tulsa contends that S. Bell has not provided specific evidence that the City of Tulsa's actions are pretextual, but rather has offered only "conjecture" that the factual basis for her disciplinary actions is lacking. Reply at 5-6 (quoting Branson v. Price River Coal Co., 853 F.2d 786, 772 (10th Cir. 1988)).

The City of Tulsa proceeds to argue that S. Bell has not established her claim of retaliation. The City of Tulsa notes that S. Bell, in her Response, "rel[ies] heavily on the temporal proximity of her grievance to her discipline," but that the case law is clear that more than temporal proximity is needed to establish causation for the purposes of a retaliation claim. Reply at 8-9. To the contrary, the City of Tulsa contends that, because Edwards did not know about the grievances

S. Bell filed and because Dellinger gave S. Bell a second chance despite a recommendation that she should be terminated, S. Bell's disciplinary actions were not taken in retaliation for engaging in protected conduct.  See Reply at 9.  Finally, the City of Tulsa avers that S. Bell's ADA disability association discrimination claim must fail, because the fact that the telephone call discussing S. Bell's FMLA request played a role in her termination does not support the conclusion that S. Bell was fired because of her relationship with J. Bell.  See Reply at 10.  Rather, the City of Tulsa argues, the record is replete with evidence that S. Bell was terminated for other reasons, including her rudeness and untruthfulness during the telephone call that S. Bell cites.  See Reply at 10.

4.     **The Hearing**.

The Court held a hearing on the MSJ on February 3, 2023.  See Clerk's Minutes at 1.  At the hearing, the parties argued S. Bell's discrimination, retaliation, and ADA claims in turn.  The City of Tulsa began its argument in support of the MSJ by arguing that S. Bell is unable to meet "the second two elements" of the prima facie case that S. Bell must establish as part of her "disparate treatment claim for discrimination related to her race."  Draft Transcript of February 3, 2023, Hearing at 5:5-6:6 (taken February 3, 2023)(Gray)("Tr.").[105]  As to the second element of the prima facie case, the City of Tulsa argued that the only adverse employment actions the Court should consider are S. Bell's disciplinary actions, see Tr. at 6:7-7:4 (Gray), and, as to the third element, there are no "comparator employees" to whom S. Bell can point to establish causation, Tr. at 7:4-8:14 (Gray).  The City of Tulsa proceeded to provide examples of non-discriminatory

---

[105]The Court's citations to the draft transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

reasons for S. Bell's disciplinary actions, see Tr. at 9:2-12:20 (Gray), and argued that S. Bell has

not met her burden of showing pretext, see Tr. at 12:21-13:8 (Gray), both of which, according to

the City of Tulsa, would preclude S. Bell from establishing her discrimination claims even if the

Court determined S. Bell had made out a prima facie case.

In response to the City of Tulsa's arguments about her discrimination claims, S. Bell began

by urging the Court to rely on the test for a prima facie case that the United States Court of Appeals

for the Tenth Circuit established in Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1226,

which requires S. Bell to show only that she was "qualified for her position" and that "her job was

not eliminated after she was terminated" to establish an inference of discrimination.  Tr. at 15:7-9

(D'Antonio).  As to the City of Tulsa's argument that non-discriminatory reasons for S. Bell's

termination exist, S. Bell argued that credibility issues should preclude summary judgment.  See

Tr. at 15:21-16:8 (D'Antonio).  At this point, the Court asked S. Bell which facts she believed

were in dispute, see Tr. at 16:10-16 (Court), and S. Bell explained that "the manner in which each

of [S. Bell's] suspensions" took place, Tr. at 16:17-20 (D'Antonio), including the facts surrounding

the instance in which Berg requested S. Bell to clock out before 5:30 p.m. and the fact that the City

of Tulsa disciplined S. Bell for violating policies while also giving her positive personnel

evaluations remained in dispute.  Tr. at 18:14-19:8 (D'Antonio).  The Court next explained that it

was "struggling to see what the factual disputes are," because S. Bell generally had purported to

dispute facts by indicating that additional facts existed, rather than specifically controverting the

City of Tulsa's facts.  Tr. at 19:25-20:6 (Court).  S. Bell responded that "RDF 4" is specifically

controverted, because the City of Tulsa is not providing the Court with "the whole story," given

that Berg told S. Bell that she could not telecommute on the assumption that he believed S. Bell

would have her "child running around."  Tr. 20:7-18 (D'Antonio).  S. Bell also pointed to the fact

that there were seventy-four alleged undisputed facts, and, therefore, there must "be a material disputed fact," Tr. at 19:13-14 (D'Antonio), but the Court indicated it was reluctant to presume a factual dispute existed merely because the City of Tulsa offered a substantial number of undisputed facts, see Tr. at 15-21 (Court).

S. Bell next turned to her argument "that the nondiscriminatory reasons by the defendant are nothing more than pretext."  Tr. at 21:17-18 (D'Antonio).  Specifically, S. Bell argued that the City of Tulsa's reasons are pretextual, because: (i) the accusations against S. Bell are false, see Tr. at 21:24-22:1 (D'Antonio); (ii) the City of Tulsa padded S. Bell's file, see Tr. at 22:5-13 (D'Antonio); and (iii) the City of Tulsa treated S. Bell differently than other employees, towards whom the City of Tulsa exhibited "favoritism," Tr. at 22:14-18 (D'Antonio).  S. Bell clarified that these employees could be considered similarly situated to S. Bell, because they shared Dellinger as a "decision maker."  Tr. at 22:19-24:14 (Court, D'Antonio).  S. Bell concluded her argument regarding her discrimination claim by contending that Edwards may have been "unintentionally biased" towards S. Bell at her pretermination hearings, Tr. at 25:2-9 (D'Antonio), arguing that S. Bell's pretermination hearings did not "address the harassment and retaliation" S. Bell was experiencing,  Tr. at 25:12-13 (D'Antonio), and averring that S. Bell's termination was a "ruse by Joyce Powell and Tina McIntosh," Tr. at 26:4-6 (D'Antonio).

In response, the City of Tulsa argued that Kendrick v. Penske Transp. Servs., Inc. is inapplicable, because the case sets the standard only for "failure to hire" claims, so "whether the position remained open has no bearing on whether or not there is a race discrimination issue here." Tr. at 28:13-23 (Gray).  The City of Tulsa responded to S. Bell, arguing specifically: (i) that S. Bell cannot establish pretext merely by "simply disbelieving the City's reason," Tr. at 29:1-5 (Gray); (ii) that the City of Tulsa simultaneously could recognize that S. Bell performed well at

her job and discipline her for insubordination, see Tr. at 29:21-30:3 (Gray); and (iii) that S. Bell "made misstatements of fact" in her email regarding the FMLA telephone call, despite S. Bell's argument to the contrary, Tr. 30:22-31:8 (Gray).  Although the City of Tulsa acknowledged that S. Bell's suspensions and termination are adverse employment actions, see Tr. at 31:17-32:6 (Court, Gray), the City of Tulsa reiterated that there is "no comparator employee that would establish that any of [the City of Tulsa's actions were] motivated by race," a fact that prevents S. Bell from establishing a prima facie case of discrimination, Tr. at 32:19-33:10 (Court, Gray).

S. Bell asserted that she is arguing that her suspensions and termination are adverse employment actions and acknowledged that she is not arguing that the "other incidents that are in this case" are adverse employment actions.  Tr. at 36:13-21 (Court, D'Antonio).  S. Bell disputed that demonstrating the existence of differently treated comparator employees is required to establish a prima facie case, see 34:11-36:4 (Court, D'Antonio), although The City of Tulsa provided in response that, even if S. Bell can demonstrate a prima facie case, S. Bell had not met the analysis' other two prongs, because the City of Tulsa "has clearly established a legitimate nondiscriminatory reason for the termination" and because S. Bell "has established no evidence of pretext." Tr. at 38:13-16 (Gray).  While the Court instructed the parties that it would read Kendrick v. Penske Transp. Servs., Inc. and clarify the appropriate standards for S. Bell's discrimination claims, the Court indicated that it was inclined to grant the MSJ as to these claims, because S. Bell had not shown that comparator employees exist nor demonstrated sufficiently pretext, and because the City of Tulsa had non-discriminatory reasons for terminating S. Bell.  See Tr. at 39:14-40:21 (Court).

The parties turned next to S. Bell's retaliation claim.  The City of Tulsa began by stating that it did not dispute that S. Bell had met the first two prongs of her prima facie case: (i) S. Bell

"engaged in protected opposition to discrimination by filing grievances"; and (ii) S. Bell's suspensions and termination constituted materially adverse employment actions. Tr. at 41:11-14 (Gray). The City of Tulsa asserted, however, that S. Bell's argument faltered, because there is no causal connection between S. Bell's grievances and adverse employment actions, despite that case law establishes that temporal proximity can lead to a presumption of a causal connection. See Tr. at 41:23-42:10 (Gray). The City of Tulsa provided further that, even if a prima facie case was established, the City of Tulsa had non-discriminatory reasons for taking its actions -- as evidenced by the fact that a neutral factfinder who did not know about S. Bell's grievances conducted the pretermination hearings -- and that S. Bell could not establish pretext, because the evidence demonstrates that S. Bell was terminated as a result of her "inability to follow the rules and regulations repeatedly." Tr. at 42:11-43:18 (Gray).

S. Bell responded that she believed that the City of Tulsa had acknowledged there "was no issue" with S. Bell's prima facie case of retaliation, Tr. at 44:20-45:10 (D'Antonio), and clarified that the temporal proximity between S. Bell's grievances and subsequent suspensions establishes the requisite causal connection, see Tr. at 45:10-47:19 (D'Antonio). S. Bell clarified that she could establish pretext through the "[f]alsity of the allegations," Tr. at 47:20-25 (D'Antonio), and, as a result, it is not necessary to show comparator employees exist, see Tr. at 49:2-6 (D'Antonio). S. Bell also argued that the Dellinger Aff. and Berg Aff. should be considered "sham affidavits," because S. Bell filed grievances against both Dellinger and Berg, and the City of Tulsa is seeking summary judgment by relying primarily on the affidavits' veracity. Tr. at 48:1-19 (D'Antonio)

In response, the City of Tulsa clarified that, while it agrees there is temporal proximity between S. Bell's complaints and disciplinary actions, this proximity helps S. Bell establish her prima facie case but is insufficient to demonstrate pretext. See Tr. 48:18- 50:9 (Gray). In addition,

the City of Tulsa argued that there is no basis on which the Court may decline to consider the Dellinger Aff. and the Berg Aff.  See Tr. at 50:10-22 (Gray).  Because S. Bell chose not to depose Dellinger and Berg, the City of Tulsa contended, "the only way to submit their testimony was to do so by affidavit . . . ."  Tr. at 50:16-19 (Gray).  In contrast, the City of Tulsa averred, the Bell Decl. more closely resembles a sham affidavit, because it conflicts with "information she gave in her deposition."  Tr. at 50:23-51:1 (Gray).  The City of Tulsa concluded its argument by clarifying that, because Powell did not have decision-making authority over S. Bell, she could not have retaliated against S. Bell.  See Tr. at 51:17-52:7 (Gray).  The Court indicated that it is inclined to conclude that S. Bell had not established a prima facie case, because she had shown only temporal proximity, and, in any case, S. Bell had not shown that the City of Tulsa's nondiscriminatory reasons are pretextual.  See Tr. at 52:9-21 (Court).

Last, the parties turned to S. Bell's contention that the City of Tulsa violated her rights under the ADA.  The Court began by asking the City of Tulsa whether it agreed that an ADA claim could be premised on a plaintiff's relationship with someone with a disability, see Tr. at 53:3-10 (Court), and the City of Tulsa agreed that such an argument was legally valid, see Tr. at 53:11-12 (Gray).  The City of Tulsa argued, however, that S. Bell's argument had "somewhat shifted" in her Response and that the City of Tulsa had responded to S. Bell's "disability association" claim in the Reply.  Tr. at 53:12-54:4 (Gray).

After clarifying that the McDonnell Douglas framework also applied to S. Bell's ADA claims, the City of Tulsa conceded that the first three elements of S. Bell's prima facie case had been met, because S. Bell: (i) was "qualified for her job"; (ii) suffered an adverse employment action; and (iii) established that the City of Tulsa "knew that she had a son with a disability."  Tr. at 54:5-23 (Gray).  The City of Tulsa argued, however, that S. Bell has not established the final

element of her claims: that "the adverse employment action occurred under circumstances raising

is a reasonable inference that the disability of the relative or associate was a determining factor in

the employer's decision," because there were no comparator employees that had a "relative with

a disability who were treated differently." Tr. at 54:24-55:9 (Gray). The Court queried whether

the ADA mandated the City of Tulsa make an accommodation for individuals associated with

someone with a disability, <u>see</u> Tr. at 55:10-13 (Court), to which the City of Tulsa responded that

Tenth Circuit case law as well as language from the United States Equal Employment Opportunity

Commission ("EEOC") confirms that employers need to provide an accommodation only where

the employee has a disability, <u>see</u> Tr. at 55:14-25 (Gray). The City of Tulsa summarized that, for

the same reasons discussed in regard to S. Bell's race discrimination and retaliation claims, S. Bell

has not demonstrated sufficiently that the City of Tulsa took disciplinary action against her because

of her relationship with her son. <u>See</u> Tr. at 56:7-58:9 (Court, Gray).

S. Bell responded by clarifying that the City of Tulsa "did not even address the ADA

association" claim in the MSJ, and that the City of Tulsa's claim that it misunderstood the nature

of S. Bell's claim makes little sense, because the Complaint specifically identifies her fifth claim

as being based on "ADA disability association discrimination." Tr. at 58:13-60:2 (Court,

D'Antonio)(quoting Complaint at 7). S. Bell argued further that, despite that the City of Tulsa

addresses the disability association claim in the Reply, it is improper for the City of Tulsa to

address this argument for the "first time in the reply." Tr. at 60:3-16 (Court, D'Antonio). The

Court next asked S. Bell whether she agreed: (i) that the <u>McDonnell Douglas</u> framework also

applies to the ADA association claim, Tr. at 61:10-11 (Court); and (ii) that "the association claim

does not require an accommodation," Tr. at 62:4-5 (Court). S. Bell responded that she agreed that

<u>McDonnell Douglas</u> framework applies, <u>see</u> Tr. at 62:1 (D'Antonio), and that the ADA requires

that an employer "not discriminate because an employee is asking for an accommodation," Tr. at 62:6-8 (D'Antonio).

Proceeding to the merits of her association claim under the ADA, S. Bell averred that she sought the ability to flex work, an accommodation, to take care of her son, but that the City of Tulsa prevented her from adjusting her work schedule after she filed her grievance. See Tr. at 62:9-18 (D'Antonio). S. Bell further contended that Powell's "threat" to S. Bell in response to S. Bell's email about J. Bell's disability gives rise to a reasonable inference that J. Bell's disability was a determining factor in the decision to discipline S. Bell. See Tr. at 62:24-63:25 (D'Antonio). S. Bell concluded by arguing that the email interaction between Powell and McIntosh, in which Powell and McIntosh questioned the veracity of S. Bell's representation that her son could not attend school because of the COVID-19 pandemic, was a "sinister . . . conspiracy to try to find something to punish Ms. Bell for." Tr. at 64:9-17 (D'Antonio). All of the retaliation she endured, S. Bell contended, is based on her trying "to get rights because of her son." Tr. at 64:18-25 (D'Antonio).

The City of Tulsa responded that, contrary to S. Bell's contentions, it addresses S. Bell's ADA claims in the MSJ. See Tr. at 65:6-11 (Gray). The City of Tulsa contended that, based on the fact that S. Bell's ADA claim in the Complaint is ambiguous, it "had legitimate basis to believe that the basis for her disability association complaint related to not being able to work from home." Tr. at 65:12-66:12 (Gray). Because refusing to permit S. Bell to "[w]ork[] from home . . . is not an adverse employment action," the City of Tulsa proceeded, "Bell should not be able to claim that her termination is now somehow a disability discrimination issue." Tr. at 66:13-67:2 (Gray). The City of Tulsa concluded that, because the City of Tulsa did not "terminate or discipline [S. Bell] because [she has] a spouse or a relative with a disability," but rather disciplined S. Bell for

non-discriminatory and non-pretextual reasons, S. Bell's ADA claims should be dismissed.  Tr. at 67:11-68:3 (Gray).

S. Bell responded by clarifying that the Complaint puts the City of Tulsa on notice that S. Bell is making a disability discrimination claim, but the City of Tulsa had not responded to the argument, see Tr. at 68:6-20 (D'Antonio)(citing Complaint ¶ 29, at 4); id. at 69:7-13 (D'Antonio), and expressing that S. Bell also alleges a retaliation claim under the ADA, which finds support in the fact that S. Bell was disciplined after she complained that City of Tulsa employees were "treating her differently because of her child," Tr. at 68:21-69:6 (D'Antonio).  The City of Tulsa responded briefly by reiterating that there was no evidence that any of the actions taken by the City of Tulsa were motivated by "discriminatory or retaliatory motives based on . . . race or disability association."  Tr. at 69:24-70:6 (Gray).  Based on the Court's belief that a claim of disability association under the ADA is "narrow," the Court indicated that it is inclined to grant the MSJ as to the ADA claims.  Tr. at 70:7-23 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"   Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Schs.)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting

evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[106]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by pointing out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d 1030, 1075 (D.N.M.

---

[106]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

2016)(Browning, J.)(granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor).   A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.   See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).   See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.   First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.   See Liberty Lobby, 477 U.S. at 249.   Second, the ultimate standard of proof is relevant at the summary judgment stage, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."   Liberty Lobby, 477 U.S. at 254.   Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.   See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970))).   Fourth, the court cannot decide any credibility issues.   See Liberty Lobby, 477 U.S. at 255.

1.    **The Genuine Dispute Standard.**

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).

Likewise, "[i]n responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)). To deny a motion for

summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.

> "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat'l Bank of Ariz. v.] Cities Service.[] 391 U.S. [253], 288-[89 (1968)("Cities Service")] . . . . If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . [(1967)](per curiam), or is not significantly probative, Cities Service, [391 U.S.] . . . at 290, . . . summary judgment may be granted."

Liberty Lobby, 477 U.S. at 249. Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

## 2. **Material Facts**.

The summary judgment "standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Liberty Lobby, Inc., 477 U.S. at 247-48. A fact is "material" if it "might affect the outcome of the suit under governing law." Liberty Lobby, Inc., 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, Inc., 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." Liberty Lobby, Inc., 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to

find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. at 586-587 (footnote omitted).

### 3.   The Sham-Affidavit Rule.

The Tenth Circuit has stated that "[t]here is authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)(citing 10B Wright & Miller § 2738, at 473-74; 6 James W. Moore, Moore's Federal Practice ¶ 56.22[1], at 56-1325 to 56-1326 (1985 ed.)). There are situations, however, where courts "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." Franks v. Nimmo, 796 F.2d at 1237 (citing Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1462 (9th Cir. 1985); Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984); Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657-58 (11th Cir. 1984); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1364 (8th Cir. 1983); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)). The policy underlying these decisions is the "conclusion that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." Franks v. Nimmo, 796 F.2d at 1237.

> To determine whether a contradicting affidavit seeks to create a sham fact issue, [the Tenth Circuit] ha[s] looked to three factors: whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."

Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001)(quoting Rios v. Bigler, 67 F.3d 1543, 1551 (10th Cir. 1995)). In Ralston v. Smith & Nephew Richards, Inc., the Tenth Circuit found that the district court did not abuse its discretion in excluding later

contradictory declarations in rendering its summary judgment ruling.  See 275 F.3d at 973.  The Tenth Circuit noted that there was no question that the declarant was cross-examined in his deposition, "that he had access to the pertinent evidence at the time of his deposition," and "that there was nothing in the earlier deposition testimony reflecting any level of confusion or uncertainty concerning" the declarant's testimony "requiring clarification or explanation."  275 F.3d at 973.

## LAW REGARDING EMPLOYMENT DISCRIMINATION CLAIMS

To prevail on an employment discrimination claim, the plaintiff must establish that his or her employer intentionally discriminated against him or her.  See Jaramillo v. Colo. Jud. Dep't, 427 F.3d 1303, 1306 (10th Cir. 2005), as modified on denial of reh'g (Dec. 20, 2005).  Where a plaintiff seeks to establish his or her claim using circumstantial evidence, courts employ the three-part "burden-shifting" approach established in McDonnell Douglas.  At the first step of the McDonnell Douglas framework, the plaintiff must establish a prima facie case of employment discrimination, the "articulation" of which "might vary somewhat depending on the context of the claim and the nature of the adverse employment action alleged."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1227 (10th Cir. 2000).  See McDonnell Douglas, 411 U.S. at 802. "[T]he prima facie stage in the McDonnell Douglas test is not onerous . . . ."  Orr v. City of Albuquerque, 417 F.3d 1144, 1152 (10th Cir. 2005).  The "essential purpose served by a prima facie test is '[to] eliminate[ ] the most common nondiscriminatory reasons'" for the adverse employment action, and, thus, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  Kendrick v. Penske Transp. Servs., Inc., 220

F.3d at 1227 (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 252-53 (1981))(alterations in Kendrick v. Penske Transp. Servs., Inc.).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate legitimate, nondiscriminatory reasons for the adverse employment decision.  See McDonnell Douglas, 411 U.S. at 802.  If the defendant offers such reasons, the burden then reverts back to the plaintiff to show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. at 252-53. A plaintiff typically may show pretext in one of three ways: (i) by providing evidence that the defendant's stated reason for the adverse employment action was false; (ii) by demonstrating that the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (iii) by establishing that he or she was "treated differently from other similarly-situated employees who violated work rules of comparable seriousness." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1230.  The  McDonnell Douglas framework properly is applied to: (i) race discrimination claims under Title VII and 42 U.S.C. § 1981, see Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1225-26 ("While McDonnell Douglas involved a Title VII claim for failure to hire, the analytical framework it pioneered applies equally to claims brought pursuant to section 1981."); (ii) retaliation claims under Title VII, see Hansen v. SkyWest Airlines, 844 F.3d 914, 925 (10th Cir. 2016), and the ADA, see Foster v. Mountain Coal Co., LLC, 830 F.3d 1178, 1186-87 (10th Cir. 2016); and (iii) disability association claims under the ADA, see Trujillo v. PacifiCorp, 524 F.3d 1149, 1154-55 (10th Cir. 2008).

**1.    Requirements for a Prima Facie Case of Race Discrimination Under Title VII and 42 U.S.C. § 1981.**

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin."  Brown v. Gen. Servs. Admin., 425 U.S. 820, 825

(1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3).   The Court has noted that Title VII generally protects individuals from employers' improperly motivated adverse treatment in the workplace: "Title VII of the Civil Rights Act of 1964 prohibits an employer from 'failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"   Farley v. Leavitt, No. CIV 05-1219, 2007 WL 6364329, at *6 (D.N.M. Dec. 31, 2007)(Browning, J.)(quoting 42 U.S.C. § 2000e-2(a)(1)).   With the 1972 amendments to the statute, Title VII's protections apply to federal and private employees. See Brown v. Gen. Servs. Admin., 425 U.S. at 825-26 (citing 42 U.S.C. § 2000e(b)); Walton v. N.M. State Land Off., 113 F. Supp. 3d 1178, 1184 (D.N.M. 2015)(Browning, J.); Gerald v. Locksley, 785 F. Supp. 2d 1074, 1098 (D.N.M. 2011)(Browning, J.).

To establish a prima facie case of race discrimination, the plaintiff must show: (i) he or she belongs to a protected class; (ii) he or she was qualified and satisfactorily performing her job; and (iii) he or she was terminated under circumstances giving rise to an inference of discrimination. See Salguero v. City of Clovis, 366 F.3d at 1175; Ibrahim v. All. for Sustainable Energy, LLC, 994 F.3d 1193, 1196 (10th Cir. 2021).   In Kendrick v. Penske Transp. Servs., Inc., the Tenth Circuit clarified that, in cases involving termination, the fact that a plaintiff was terminated "despite her qualifications" and "the job was not eliminated after her discharge" affords an inference of racial discrimination.   220 F.3d at 1229.   See Perry v. Woodward, 199 F.3d 1126, 1138 (10th Cir. 1999)("The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement."), cert. denied, 529 U.S. 1110 (2000); Essary v. Fed. Express Corp., No. CIV 03-0961, 2005 WL

8163743 (D.N.M. June 1, 2005)(Vázquez, J.).   The plaintiff need not show that the employer

"treated similarly-situated non-minority employees differently" to establish a prima facie case.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1229.   "[A]n employer's favoritism toward a

similarly situated employee who is not part of the protected class," however, can give rise to an

inference of discrimination.   Ibrahim v. All. for Sustainable Energy, LLC, 994 F.3d at 1196

("Employees are similarly situated when they share a supervisor or decision-maker, must follow

the same standards, and engage in comparable conduct.").

### 2.   Requirements for a Prima Facie Case of Title VII and ADA Retaliation.

"A claim of retaliation is a distinct allegation of an unlawful employment practice."

Duncan v. Mgr., Dep't of Safety, City & Co. of Denver, 397 F.3d 1300, 1314 (10th Cir. 2005).

"To succeed on a claim of retaliation, a plaintiff must show: (i) she engaged in protected opposition

to discrimination; (ii) she suffered an adverse employment action; and (iii) there was a causal

connection between the protected activity and the adverse action."   Bias v. Wilkie, No. CIV 20-

0173, 2022 WL 3019734, at *14 (D.N.M. July 29, 2022)(Browning, J.)(citing O'Neal v. Ferguson

Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001)).   See Proctor v. United Parcel Serv., 502 F.3d

1200, 1208 (10th Cir. 2007).

"The Tenth Circuit liberally defines what constitutes an adverse employment action," and

"take[s] a case-by-case approach, examining the unique factors relevant to the situation at hand"

in making the determination whether an employment action is adverse.   Bias v. Wilkie, 2022 WL

3019734, at *15 (quoting Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998)).   To

establish a causal connection, a plaintiff "may proffer 'evidence of circumstances that justify an

inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"

Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Haynes v. Level 3 Commc'ns, LLC, 456

F.3d 1215, 1228 (10th Cir. 2006)).  Generally, if the temporal proximity between the protected

activity and the adverse action is not "'very close in time,'" the plaintiff "'must offer additional

evidence to establish causation.'"  <u>Proctor v. United Parcel Serv.</u>, 502 F.3d at 1209 (quoting

<u>Haynes v. Level 3 Commc'ns, LLC</u>, 456 F.3d at 1228).  Finally, "the absence of a reference to

unlawful discrimination . . . can preclude a retaliation claim because an employer cannot engage

in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation

of Title VII."  <u>Petersen v. Utah Dep't of Corr.</u>, 301 F.3d 1182, 1188 (10th Cir. 2002).

**3.**      **<u>Requirements for a Prima Facie Case of a Disability Association Claim Under
the ADA.</u>**

Title I of the ADA provides that covered employers shall not "discriminate against a

qualified individual with a disability because of the disability of such individual in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.

§ 12112(a).  The ADA further allows for a claim for association discrimination by defining

"discriminate" to include "excluding or otherwise denying equal jobs or benefits to a qualified

individual because of the known disability of an individual with whom the qualified individual is

known to have a relationship or association." 42 U.S.C. § 12112(b)(4).  <u>See</u> <u>Trujillo v. PacifiCorp</u>,

524 F.3d at 1154 ("This prohibition is known as the 'association provision' of the ADA." (quoting

<u>Den Hartog v. Wasatch Acad.</u>, 129 F.3d 1076, 1082 (10th Cir.1997))).  "A family relationship is

the paradigmatic example of a 'relationship' under the association provision of the ADA."  <u>Den

Hartog v. Wasatch Acad.</u>, 129 F.3d at 1082.  To establish a prima facie case for an ADA

association claim, a plaintiff must establish that: he or she was "'qualified' for the job at the time

of the adverse employment action"; (ii) he or she "was subjected to adverse employment action";

(iii) he or she "was known by his [or her] employer at the time to have a relative or associate with

a disability"; and (iv) "the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision."  Den Hartog v. Wasatch Acad., 129 F.3d at 1085.

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, 2011 WL 5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802).  Under rule 801(c) of the Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Hearsay evidence is generally inadmissible, "because it is considered unreliable." United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)(citing Williamson v. United States, 512 U.S. 594, 598 (1994)).  Courts view hearsay evidence as unreliable, because it is not subject to three devices relied upon to illuminate inaccuracies and evaluate the credibility of testimonial evidence: an oath, personal presence in court, and cross examination.  See United States v. Console, 13 F.3d 641, 656 (3d. Cir. 1993).

To constitute hearsay, a statement must be made by a "person"; machine output, accordingly, is not hearsay.  Fed. R. Evid. 801(a).  See United States v. Channon, 881 F.3d 806, 810-11 (10th Cir. 2018)(holding that summary exhibits consisting of Excel spreadsheets reflecting "machine-generated transaction records," in which "data was created at the point of sale, transferred to OfficeMax servers, and then passed to the third-party database maintained by SHC" were records "produced by machines," so they fell "outside the purview of Rule 801, as the declarant is not a person").  For hearsay purposes, a "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."  Fed. R. Evid. 801(a).  Non-assertions, therefore, such as "questions or requests," will often not be excluded as

hearsay.  United States v. Alcorta, 853 F.3d 1123, 1141 (10th Cir. 2017).  See Echo Acceptance

Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001)("If the significance

of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of

anything asserted, and the statement is not hearsay." (quoting Fed. R. Evid. 801 advisory

committee's note)).  The determination of whether something constitutes a statement turns on "the

declarant's intent."  30B Charles Allen Wright & Arthur R. Miller, Federal Practice & Procedure

§ 6714 (3d ed. 2023).  See Richard A. Lloret, Assertion and Hearsay, 125 Dick. L. Rev. 347, 356

(2021).

A statement that is otherwise hearsay may be offered for a permissible purpose other than

to prove the truth of the matter asserted, including impeaching a witness.  See United States v.

Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of

the statement, if used substantively, would be inadmissible hearsay.  If admitted for impeachment

purposes, however, it is not hearsay.").  Where the jury may use a statement for both a permissible

and impermissible hearsay purpose, the Court may give a limiting instruction.  See Fed. R. Evid.

105; United States v. DeLeon, No. CR 15-4268 JB, 2021 WL 4171506, at *6 (D.N.M. September

14, 2021)(Browning, J.)(giving a limiting instruction where a co-conspirator statement was "not

offered to prove the truth of the matter asserted").  Finally, Rule 805 of the Federal Rules of

Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -

- may be admissible "if each part of the combined statements conforms with an exception to the

rule."  Fed. R. Evid. 805.

### 1.  Law Regarding Rule 803(8).

Rule 803(8) of the Federal Rules of Evidence, often referenced as the public records

exception, provides that "[a] record or statement of a public office" is not excluded by the rule

against hearsay.  Fed. R. Evid 803(8).  The rule allows for the admission of three distinct categories of public records, namely, records which "set out"

>    **(i)**      the office's activities;
>
>    **(ii)**      a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>
>    **(iii)**      in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation . . . .

Fed. R. Evid 803(8)(A)(i)-(iii).

For rule 803(8) purposes, public officials need not make a public record.  <u>Upky v. Lindsey</u>, No. CIV 13-0553, 2015 WL 1918229, at *22 (D.N.M. April 7, 2015)(Browning, J.)(recognizing that a panel comprised of "private doctors and lawyers" is a "quasi-public entit[y]" that can create 803(8) public records).  The Court has recognized a legally authorized investigation is conducted where a public office has the "authority to conduct an evidentiary hearing, to request evidence and witnesses, and to make a decision."  <u>Upky v. Lindsey</u>, 2015 WL 1918229, at *22.

A court need not admit a public record under 803(8), however, if "the opponent" shows "that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(B).

> The Advisory Committee noted that the following factors could be of assistance in passing upon the admissibility of evaluative reports: the timeliness of the investigation; the special skill or experience of the investigator; whether a hearing was held and the level at which it was conducted; possible motivation problems suggested by <u>Palmer v. Hoffman</u>, 318 U.S. 109 . . . (1943)(report prepared by defendant for purposes of litigation not a business record).  Fed. R. Evid. 803(8), 28 U.S.C.A. (1975) Notes of the Advisory Committee.

<u>Denny v. Hutchinson Sales Corp.</u>, 649 F.2d 816, 821 (10th Cir. 1981).  The Court previously has addressed reports' trustworthiness.  <u>See</u> <u>United States v. DeLeon</u>, 316 F. Supp. 3d at 1307 (deeming investigation and incident report untrustworthy when "[a]ll that the Court knows about

the confidential human sources, whose statements form the basis for the reports, are that those individuals, presumably SNM [gang] members, were behind bars when they related information to law enforcement"); DeSantis v. Napolitano, No. CIV 08-1205, 2010 WL 2292592, at *23 (D.N.M. May 26, 2010)(Browning, J.)(characterizing as untrustworthy agency decisions resulting from one-sided investigations without hearings or procedures developing factual records).

Rule 803(8)(i) allows the admission into evidence of "[a] record or statement of a public office. . . [that] sets out . . . the office's activities . . . ." Fed. R. Evid. 803(8)(i). See United States v. Iverson, 818 F.3d 1015, 1021 (10th Cir. 2016)(holding that a webpage that the Federal Deposit Insurance Corporation ("FDIC") maintained listing which banks are insured by the FDIC is a public record, because it "'set out . . . the office's activities' related to deposit insurance." (quoting Fed. R. Evid. 803(8)(a)(i))); Phillips v. Oosterbaan, 508 F. Supp. 3d 1103, 1114 (D. Utah 2020)(Waddoups, J.)(holding admissible a "letter" under rule 803(8) as a "statement" that "sets forth the office's activities" where the letter detailed the work being done by one of the office's employees; United States v. Hardin, 710 F.2d 1231, 1237 (7th Cir. 1983).  Rule 803(8)(iii) allows the admission into evidence in civil actions, and against the government in criminal cases, of "[a] record or statement of a public office . . . [that] sets out . . . factual findings from a legally authorized investigation . . . ." Fed. R. Evid. 803(8)(iii).  "'[C]ontrary to what is often assumed, the language of Rule [803(8)(A)(iii)] does not state that 'factual findings' are admissible, but that 'reports . . . setting forth . . . factual findings' . . . are admissible.'" United States v. DeLeon, 316 F.Supp.3d at 1306 (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 164 (1988))(alteration in United States v. DeLeon)(applying rule 803(8)(A)(iii), because "the enumerated list at the end of the Investigative Report is [a] set of factual findings" and "the Incident Report contains a factual finding -- specifically a finding that more investigation is needed").  Factual findings under rule

- 83 -

803(8)(iii) include, therefore, "factually based conclusions or opinions." Beech Aircraft Corp. v. Rainey, 488 U.S. at 162.  See Perrin v. Anderson, 784 F.2d 1040, 1046-47 (10th Cir.1986)("Courts have construed [factual findings] broadly, however, and regularly have admitted conclusions and opinions found in evaluative reports of public agencies.").

## ANALYSIS

The City of Tulsa argues that there is no genuine dispute of material fact, and that it did not discriminate against S. Bell on the basis of race, did not retaliate against S. Bell, and did not violate the ADA's disability association provision as to S. Bell.  See Motion at 21.  According to the City of Tulsa, S. Bell has "failed to produce even a scintilla of evidence that shows she suffered any adverse employment action for any reason related to her race in violation of Title VII," and has not "create[d] a fact issue" establishing "discrimination under the ADA."  Reply at 1.  In addition, the City of Tulsa contends that the Court should consider the Bell. Decl. only "to the extent the statements are undisputed or clarify confusing aspects" of the Bell Depo.  Reply at 1-2.  The Court concludes that: (i) the Court will disregard the Bell Decl. where it contradicts the Bell Depo.; (ii) the City of Tulsa did not discriminate against S. Bell on the basis of race; (iii) the City of Tulsa did not retaliate against S. Bell; and (iv) the City of Tulsa did not violate S. Bell's rights under the ADA's disability association provision.  Accordingly, the Court will grant summary judgment in the City of Tulsa's favor on all of S. Bell's claims.

## I.   THE COURT WILL NOT RELY ON THE BELL DECL. WHERE IT CONTRADICTS THE BELL DEPO. TO AVOID A SHAM AFFIDAVIT.

As a general proposition, "the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." Franks v. Nimmo, 796 F.2d at 1237.  Therefore, "[u]nder some circumstances, an affidavit or a declaration may be disregarded

if the testimony contradicts a witness's prior sworn statements." Macias v. Sw. Cheese Co., L.L.C., No. CV 12-350, 2014 WL 11430977, at *2 (D.N.M. June 11, 2014)(Hansen J.), aff'd sub nom. Macias v. Sw. Cheese Co., LLC, 624 F. App'x 628 (10th Cir. 2015). The Tenth Circuit "determine[s] whether a contradicting affidavit seeks to create a sham fact issue" by considering three factors (the "Franks factors") that assess the relationship between the prior statements and the later affidavit or declaration: (i) whether the affiant was cross-examined during his or her earlier testimony; (ii) whether the affiant had access to the pertinent evidence at the time of his or her earlier testimony or whether the affidavit was based on newly discovered evidence; and (iii) whether the earlier testimony reflects confusion which the affidavit attempts to explain. See Franks v. Nimmo, 796 F.2d at 1237; Ralston v. Smith & Nephew Richards, Inc., 275 F.3d at 973.

Here, there is no question that S. Bell was cross-examined in the Bell Depo., at which she was accompanied by counsel and counsel for the City of Tulsa questioned her extensively. See Bell Depo. at 1. Moreover, because the Bell Depo. occurred on April 23, 2022, well after all the events to which S. Bell attests had taken place, S. Bell "had access to the pertinent evidence at the time of [her] deposition." Ralston v. Smith & Nephew Richards, Inc., 275 F.3d at 973. See Bell Depo at 1. Finally, there is no indication that the City of Tulsa's questioning during the S. Bell Depo. confused S. Bell, such that she would be justified in clarifying a response she gave in a supplementary affidavit. See Franks v. Nimmo, 796 F.2d at 1237. Accordingly, the Franks factors raise the possibility that the Bell Decl. is a "contradicting affidavit [that] seeks to create a sham fact issue," Ralston v. Smith & Nephew Richards, Inc., 275 F.3d at 973, and thus the Court will disregard the Bell Decl. where it directly contradicts testimony that S. Bell gave in the Bell Depo.

Nevertheless, the Court has not identified, and the City of Tulsa has not directed the Court to, any specific instances in which S. Bell attempts to create a sham fact issue by offering a fact

that directly contradicts testimony she gave during the Bell Depo.  Rather, in the Bell Decl., S. Bell primarily restates the arguments that she offers in her Complaint and Response, and provides statements in the form of opinions.  See, e.g., Bell Decl. ¶ 1, at 3 ("I strongly believe that this action was a result of retaliation by Joyce Powell.").  In addition, other statements in the Bell Decl. are not based upon personal knowledge, so the Court may not consider them for the purposes of the motion.  See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge . . . .");  Bell. Decl. ¶ 3, at 1 ("He began to conspire . . . to get me to quit my employment . . . .").  Finally, despite that the Frank factors suggest the existence of a sham affidavit, and resultantly, there is an attendant risk that S. Bell seeks to create a sham issue of fact, the Court need not disregard the Bell Decl. wholesale.  Courts ordinarily strike conflicting statements from the proffered affidavit rather than disregarding the submission entirely.  See, e.g., Murley v. Se. N.M. Cmty. Action Corp., No. CV 12-668, 2013 WL 12330146, at *9 (D.N.M. June 12, 2013)(Parker, J.)("[T]he remaining portions of Ms. Murley's affidavit generally address matters that are within her personal knowledge and experience, and that do not directly conflict with her deposition testimony, so the Court will not exclude those factual portions of the affidavit."); Macias v. Sw. Cheese Co., L.L.C., 2014 WL 11430977, at *3 ("[B]ased on the direct contradiction between her affidavit and deposition testimony, the Court will strike Plaintiff's statement in ¶ 6 of her affidavit . . . .").  But see Ralston v. Smith & Nephew Richards, Inc., 275 F.3d at 973 (affirming the district court's complete exclusion of an affidavit where it "directly contradicted" only "certain positions" taken by the affiant at a previous deposition).  Accordingly, while the Court will not consider the Bell Decl. to the extent that it conflicts directly with the S. Bell Depo., the Court will not disregard the Bell Decl. in its entirety.

## II.     THE CITY OF TULSA DID NOT DISCRIMINATE AGAINST S. BELL ON THE BASIS OF HER RACE.

The City of Tulsa asserts that there is no genuine dispute of material fact that it did not discriminate against S. Bell on the basis of her race in violation of Title VII and 42 U.S.C. § 1981. See MSJ at 21-26.  Under the McDonnell Douglas framework, S. Bell has the initial burden to establish a prima facie case of race discrimination.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1227.  If S. Bell establishes a prima facie case, the burden shifts to the City of Tulsa to articulate a legitimate, nondiscriminatory reason for disciplining S. Bell and terminating her employment.  See McDonnell Douglas, 411 U.S. at 802.  If the City of Tulsa offers such a reason, the burden reverts to S. Bell to demonstrate that the City of Tulsa's proffered reasons are pretext for discrimination.  See McDonnell Douglas, 411 U.S. at 804-05.  Although the Court determines that S. Bell has established a prima facie case of discrimination, the Court concludes that the City of Tulsa has proffered legitimate, non-discriminatory reasons for S. Bell's discipline and termination and that S. Bell has not demonstrated these reasons are pretextual.  Accordingly, the Court grants summary judgment in the City of Tulsa's favor on S. Bell's Title VII and 42 U.S.C. § 1981 discrimination claims.

### A.     S. BELL ESTABLISHES A PRIMA FACIE CASE OF RACE DISCRIMINATION.

The City of Tulsa argues that S. Bell does not establish a prima facie case of race discrimination.  See MSJ at 22-23.  The purpose of the requirement that the plaintiff establish a prima facia case is to "eliminate[] the most common nondiscriminatory reasons" for a plaintiff's termination, Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. at 254, and, consequentially, "the prima facie stage in the McDonnell Douglas test is not onerous . . . ," Orr v. City of Albuquerque, 417 F.3d at 1152.  A plaintiff demonstrates a prima facie case of discrimination by showing that:

(i) she belongs to a protected class; (ii) she suffered an adverse employment action; and (iii) the circumstances give rise to an inference of discrimination.  See Ibrahim v. All. for Sustainable Energy, LLC, 994 F.3d at 1196.  "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1227 (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. at 252-53).  This all-important factor may be demonstrated in numerous ways.  See Barlow v. C.R. England, Inc., 703 F.3d 497, 505 (10th Cir. 2012).  For instance, the Tenth Circuit has held that "*one way* a plaintiff may establish a prima facie case is to include evidence that her job was not eliminated after her discharge."  Plotke v. White, 405 F.3d 1092, 1100 (10th Cir. 2005)(emphasis in original)(citing Perry v. Woodward, 199 F.3d at 1140).  Likewise, the Tenth Circuit has held that "[a]n inference of discrimination can arise from an employer's favoritism toward a similarly situated employee who is not part of the protected class."  Ibrahim v. All. for Sustainable Energy, LLC, 994 F.3d at 1196.  See Barlow v. C.R. England, Inc., 703 F.3d 497, 505 (10th Cir. 2012)("Plaintiffs can establish evidence of the third prong [of their prima facie case] in various ways, such as 'actions or remarks made by decisionmakers,' 'preferential treatment given to employees outside the protected class,' or 'more generally, upon the timing or sequence of events leading to plaintiff's termination.'" (quoting Plotke v. White, 405 F.3d at 1101))).

Related to this legal framework, the parties offer slightly different nuances at the margins of the general rules outlined above.  The City of Tulsa, for example, argues that S. Bell must show "(1) she was a member of a protected class; (2) she was qualified and satisfactorily performing her job; and (3) she was terminated under circumstances giving rise to an inference of discrimination."  MSJ at 22 (citing Salguero v. City of Clovis, 366 F.3d at 1175).  S. Bell, on the other hand, argues

that she need only demonstrate that "(1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge." Response at 33 (quoting Kendrick v. Penske Transp. Servs. Inc., 220 F.3d at 1229). See Tr. at 15:7-9 (D'Antonio)(arguing that this less onerous standard applies). The two questions that animate the parties' legal dispute about the correct standard, therefore, are: (i) whether, to establish a prima facie case for race discrimination, a plaintiff must demonstrate that she was satisfactorily performing her job, or merely that she was qualified for her job; and (ii) what is required for a plaintiff to show that "the circumstances [surrounding the plaintiff's termination] give rise to an inference of discrimination." Ibrahim v. All. for Sustainable Energy, LLC, 994 F.3d at 1196.

The second dispute is the easiest to resolve. The Tenth Circuit has made clear that "a plaintiff may establish a prima facie case [by] includ[ing] evidence that her job was not eliminated after her discharge." Plotke v. White, 405 F.3d at 1100. See Perry v. Woodward, 199 F.3d at 1140 ("The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical for an employer to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement."). This principle is logical, because one of "the most common nondiscriminatory reasons for discharge in a termination case [is] 'elimination of the job,'" Plotke v. White, 405 F.3d at 1100 (quoting Kendrick v. Penske Transp. Servs. Inc., 220 F.3d at 1229), and the primary purpose of the prima facie requirement is to "eliminate[] the most common nondiscriminatory reasons" for a plaintiff's termination, Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. at 254. Consequentially, the Court concludes that S. Bell need produce only evidence that her job remained open after her termination to establish an inference of discrimination.

The Court also resolves the parties' remaining dispute about the prima facie requirements -- namely, whether satisfactory performance is required in addition to qualification -- in S. Bell's favor.  Requiring that a plaintiff show he or she was satisfactorily performing his or her job at the prima facie stage "improperly conflates the prima facie case with the ultimate question of whether there was intentional discrimination."  Ledbetter v. Unified Gov't of Wyandotte Cnty., No. 21-CV-02502, 2023 WL 6294867, at *6 (D. Kan. September 27, 2023)(Crouse, J.).  This principle is particularly true where, as here, the defendant introduces evidence that the employee was not satisfactorily performing his or her job as evidence of its nondiscriminatory reasons for terminating the employee at the second step of the McDonnell Douglas framework.  See Brainerd v. Schlumberger Tech. Corp., 589 F. App'x 406, 410 (10th Cir. 2015)(reversing the district court where the district court relied on the employer's poor-performance rationale to conclude that the employee had not met her prima facie burden, and concluding that "the district court's analysis of the prima facie case 'put the cart before the horse' by making 'the playing field unlevel for [Brainerd] when [her] burden was supposed to be 'not onerous.'" (quoting Orr v. City of Albuquerque, 417 F.3d at 1151-52)).[107]

---

[107]Brainerd v. Schlumberger Tech. Corp., 589 F. App'x 406 (10th Cir. 2015), is an unpublished opinion, but the Court can rely on a Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Brainerd

The fact that the plaintiff's burden at this stage "is not a heavy one" supports the conclusion that the Court need not consider the plaintiff's job performance at the prima facie stage. Brainerd v. Schlumberger Tech. Corp., 589 F. App'x at 410. Rather, the "real question . . . is whether a plaintiff has shown actions taken by the employer from which one can infer, if such actions remain unexplained, . . . that such actions were based on a discriminatory criterion." Hysten v. Burlington Northern and Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002). Left unexplained, the firing of an otherwise qualified minority employee, where the employee's position is not thereafter terminated, is sufficient to raise the inference of discrimination for prima facie purposes. Accordingly, S. Bell can establish a prima facie case of race discrimination by "showing that: (1) she belongs to a protected class; (2) she was qualified for her job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge." Perry v. Woodward, 199 F.3d at 1135. See Diaz v. City of Tucumcari, No. CIV 11-0090, 2011 WL 6830410, at *20 (D.N.M. December 19, 2011)(Browning, J.)(adopting Perry v. Woodward's prima facie test in the context of a discriminatory discharge).

Here, S. Bell has introduced evidence to support each of the prima facie elements. First, S. Bell establishes, and the City of Tulsa does not dispute, that S. Bell is a member of a protected class. See MSJ at 22; Employee Information at 4. Second, S. Bell has established that she was qualified for her job. S. Bell may establish that she was qualified for her job by offering "'credible evidence that she continued to possess the objective qualifications she held when she was hired,

---

v. Schlumberger Tech. Corp., Nguyen v. Gambro BCT, Inc., 242 F. App'x 483 (10th Cir. 2007), Cooper v. Wal-Mart Stores, Inc., 296 F. App'x 686 (10th Cir. 2008), Maughan v. Alaska Airlines, Inc., 281 F. App'x 803 (10th Cir. 2008), Doyle v. Nordam Grp., Inc., 492 F. App'x 846 (10th Cir. 2012), Smith v. Sprint/United Mgmt. Co., 718 F. App'x 630 (10th Cir. 2017), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time.'" Diaz v. City of Tucumcari, 2011 WL 6830410, at *20 (quoting Nguyen v. Gambro BCT, Inc., 242 F. App'x 483, 489 (10th Cir. 2007)).  S. Bell has produced evidence to support all three methods by which she can show her qualifications.  S. Bell establishes that: (i) she has an advanced degree and was hired on the basis of her experience, see Unofficial Graduate Academic Record, filed January 23, 2023 (Doc. 41-12); Email from Chris Berg to Sondia Bell (dated June 20, 2016), filed January 21, 2023 (Doc. 41-1)("Just wanted to make sure years of experience wasn't going to be a problem.  Looks like you're good there."); cf. Diaz v. City of Tucumcari, 2011 WL 6830410, at *20 ("Diaz appears to concede that she did not take a required certification workshop."); (ii) her work was satisfactory, even though the City of Tulsa disputes this fact, see 2019 Performance Review at 3 (stating that S. Bell "contributed towards our team successfully providing our services as committed 100% of the time despite an increase in service requests of 16% during this period"); and (iii) she held her position for four years, from 2016 to 2020, see Nguyen v. Gambro BCT, Inc., 242 F. App'x at 488 (concluding that the plaintiff provided "evidence . . . sufficient to demonstrate job qualification for the purposes of a prima facie case," where "Nguyen worked at Gambro for almost three years before being terminated").

Third, the parties do not dispute that S. Bell was discharged despite her qualifications.  See MSJ ¶ 66, at 13; Factual Background, supra at 3.  Fourth and finally, the position from which S. Bell was terminated has not been eliminated following her dismissal.  In ruling on a motion for summary judgment, rule 201 of the Federal Rules of Evidence allows courts to consider any evidence of which it may take judicial notice, i.e., facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R.

Evid. 201(b)(2).  See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979)("[A] district court may utilize the doctrines underlying judicial notice in hearing a motion for summary judgment substantially as they would be utilized at trial."); Simon v. Taylor, 252 F. Supp. 3d 1196, 1238 (D.N.M. 2017)(Browning, J.), aff'd, 794 F. App'x 703 (10th Cir. 2019).  "It is not uncommon for courts to take judicial notice of factual information found on the world wide web."  O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1225 (10th Cir. 2007).  Due to their reliability, government websites "are among the most commonly relied upon sources" for online information used as a basis for judicial notice.  Kenneth Broun, et al., McCormick on Evidence, § 330 (8th ed. 2020).  See Montana Green Party v. Jacobsen, 17 F.4th 919, 927 n.3 (9th Cir. 2021)(taking judicial notice of maps and official election results from the Montana Department of State website).   The Court takes judicial notice of the list of job descriptions on the City of Tulsa's website, which includes the position from which S. Bell was terminated, Senior IT Business Support Administrator, and the description of the position also included on the City of Tulsa's website.   See Job Descriptions, City of Tulsa https://cityoftulsa.org/government/departments/human-resources/employment/job-descriptions (last visited March 7, 2024); City of Tulsa, Class Title: Senior IT Business Support Adminstrator [sic], https://cityoftulsa.org/media/5962/3534.pdf (last visited March 7, 2024).  Construed in the light most favorable to S. Bell, this evidence establishes that the position of Senior IT Business Support Administrator was not eliminated after S. Bell was discharged, giving rise to an inference of discrimination.  See Perry v. Woodward, 199 F.3d at 1135.  Consequently, the Court concludes that S. Bell has established a prima facie case of race discrimination at the first step of the McDonnell Douglas framework.

**B.    THE   CITY   OF   TULSA   ARTICULATES   LEGITIMATE, NONDISCRIMINATORY REASONS FOR ITS ACTIONS.**

The Court concludes that the City of Tulsa articulates "legitimate, nondiscriminatory reason[s]" for S. Bell's discipline and termination. McDonnell Douglas, 411 U.S. at 802. "'[T]his stage of the analysis only requires the defendant to articulate a reason for the discipline that is not, on its face, prohibited' and that is 'reasonably specific and clear.'" Frappied v. Affinity Gaming Black Hawk, LLC, 966 F.3d 1038, 1058 (10th Cir. 2020)(quoting E.E.O.C. v. Flasher Co., 986 F.2d 1312, 1316 n.4 (10th Cir. 1992)). "Poor performance is 'the quintessential legitimate, nondiscriminatory reason for termination.'" Brainerd v. Schlumberger Tech. Corp., 589 F. App'x at 412 (quoting Bertsch v. Overstock.com, 684 F.3d 1023, 1029 (10th Cir. 2012), abrogated on other grounds by Lincoln v. BNSF Ry. Co., 900 F.3d 1166 (10th Cir. 2018)). Likewise, the Tenth Circuit has held that "attendance issues, . . . violations of [employer] policy, . . . and attitude issues" constitute legitimate and nondiscriminatory reasons for taking the adverse employment action. Frappied v. Affinity Gaming Black Hawk, LLC, 966 F.3d at 1058.

The City of Tulsa contends that it disciplined and ultimately terminated S. Bell, because "Bell repeatedly ignored the express instructions of her supervisor, refused to cooperate with the HR Department, was rude and disrespectful to other City of Tulsa employees, and was untruthful despite repeated warnings and opportunities to correct the behavior." MSJ at 24. S. Bell does not dispute the City of Tulsa's proffers nondiscriminatory reasons for disciplining and terminating her, but argues that these proffered reasons are pretextual. See Response at 28-29. The Court concludes that the record includes evidence to support the City of Tulsa's argument that it disciplined and terminated S. Bell because of: (i) her "attendance issues," Frappied v. Affinity Gaming Black Hawk, LLC, 966 F.3d at 1058; see Third Pretermination Hearing Notice at 2; Time Records at 39-40; Berg Aff. ¶ 16, at 4; (ii) her "violations of [City of Tulsa] policy," Frappied v.

Affinity Gaming Black Hawk, LLC, 966 F.3d at 1058.  See Termination Report at 1 (confirming

that S. Bell was terminated for "repeated violations of Work Rule 1 and Work Rule 7"); Berg Aff.

¶ 15, at 4; and (iii) her "attitude issues," Third Pretermination Hearing Notice at 3 (describing how

S. Bell "impeded the investigation by being non-responsive and impeded and uncooperative with

HR").  See Termination Report at 1 (indicating S. Bell was terminated for violating "Work Rule

2: Respectful and Courteous Behavior"); Berg Aff. ¶ 22, at 6 ("Sondia refused to leave so I called

security to escort her out.").  Accordingly, the Court concludes that the City of Tulsa has carried

its burden to articulate a legitimate, non-discriminatory reason for its actions.

C.   **S. BELL HAS NOT INTRODUCED EVIDENCE DEMONSTRATING THAT THE CITY OF TULSA'S LEGITIMATE, NON-DISCRIMINATORY REASONS FOR HER DISCIPLINE AND TERMINATION ARE PRETEXTUAL.**

Because the City of Tulsa has supplied legitimate, non-discriminatory reasons for taking

adverse employment actions against S. Bell, the burden shifts back to her to establish that the given

reasons are pretext for discrimination.  See McDonnell Douglas, 411 U.S. at 804-05 ("Once the

defendant meets its burden of production by offering a legitimate rationale in support of its

employment decision, the burden shifts back again to the plaintiff to show that the defendant's

proffered reasons were a pretext for discrimination."); Diaz v. City of Tucumcari, 2011 WL

6830410, at 22 ("The plaintiff bears the burden to produce evidence at the pretext phase sufficient

to support an inference of discrimination to survive summary judgment.").  Cf. Wheat v. Fifth

Third Bank, 785 F.3d 230, 240 (6th Cir. 2015)("[A]t this preliminary stage of the litigation, Wheat

need only identify genuine disputes of fact regarding the legitimacy of the defendant's stated

reasons in order to withstand a motion for summary judgment.").  At this stage, "the factual inquiry

proceeds to a new level of specificity," Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 255,

and "[t]he presumption of discrimination established by the prima facie showing 'simply drops out

of the picture,'" Nguyen v. Gambro BCT, Inc., 242 F. App'x at 489 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993)).   Pretext may be shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).   A plaintiff may also show pretext by establishing that he or she "was treated differently from other similarly-situated, nonprotected employees."   Cooper v. Wal-Mart Stores, Inc., 296 F. App'x 686, 693 (10th Cir. 2008).   Pretext may also be shown by providing direct evidence discrediting the proffered rationale . . . ." Jaramillo v. Adams Cnty. Sch. Dist. 14, 680 F.3d 1267, 1269 (10th Cir. 2012), as amended on denial of reh'g (June 28, 2012).   "Mere conjecture that the employer's explanation is pretext," however, "is insufficient basis to defeat summary judgment."   Jencks v. Modern Woodmen of Am., 479 F.3d 1261, 1267 (10th Cir. 2007).

Here, S. Bell invokes three categories of evidence in support of her argument that the City of Tulsa's proffered reasons for terminating her are pretextual.   See Response at 36-43.   S. Bell argues that the following evidence establishes pretext: (i) her coworkers and supervisors' lack of credibility, and the false allegations leveled against her, see Response at 36-39; (ii) the City of Tulsa "padd[ing]" her disciplinary file to justify her termination, Response at 39-42; and (iii) the City of Tulsa's differential treatment of "similarly situated" employees, Response at 37-38 (quoting Ibrahim v. All. for Sustainable Energy, LLC, 994 F.3d at 1196).   At bottom, even considering the evidence in the light most favorable to the plaintiff, S. Bell has not produced evidence of any "weaknesses" or "inconsistencies" in the City of Tulsa's proffered reasons

sufficient to defeat a motion for summary judgment.  Jaramillo v. Colo. Jud. Dep't, 427 F.3d at

1307.

The thrust of S. Bell's first pretext argument is that the "conflict[s]" between S. Bell and

the City of Tulsa employees against whom S. Bell previously had filed grievances demonstrate

that the City of Tulsa's reasons for disciplining and terminating S. Bell are pretextual.  Response

at 36.  S. Bell focuses primarily on the events and communications surrounding her 2020 request

for paid FMLA leave, alleging that HR employees unnecessarily scrutinized her request, conspired

against her, and bullied her.  See Response at 36-39.  S. Bell argues that Powell "questions the

truth" whether S. Bell was entitled to FMLA relief and provides evidence that Powell emailed

McIntosh: "[I]f we find out he is attending school in person, we can deal with it."  Response at 37

(quoting Email from Joyce Powell to FMLA@cityoftulsa.org (dated September 21, 2019), filed

January 23, 2023 (Doc. 41-39)).  The Court concludes that this evidence is not "inconsistent" with

any of the City of Tulsa's proffered reasons for terminating S. Bell; rather, it is evidence of Powell

performing her role of analyzing City of Tulsa employees' FMLA requests.  Morgan v. Hilti, Inc.,

108 F.3d at 1323.

Likewise, that Powell "waited" for two months before responding to S. Bell's email

complaint about the way her FMLA request was being handled, and stated that S. Bell's behavior

would "not go unchecked," does not demonstrate pretext.  Response at 38-39 (quoting November

17, 2020, Email at 13).  Again, these facts do not demonstrate that the City of Tulsa's "stated

reason for the adverse employment action was false."  Kendrick v. Penske Transp. Servs. Inc., 220

F.3d at 1230.  Taken in a light most favorable to S. Bell, Powell's comment that S. Bell's behavior

"will not go unchecked" functions as a threat that S. Bell would be reprimanded for her "attitude

and tone" during the FMLA process, and for making "false and inflammatory accusations."

November 17, 2020, Email at 13. Far from "contradict[ing]" the City of Tulsa's arguments that it fired S. Bell for violating city policies and for her attitude issues, Powell's statements provide support for these rationales. Morgan v. Hilti, Inc., 108 F.3d at 1323.

In Maughan v. Alaska Airlines, Inc., 281 F. App'x 803 (10th Cir. 2008), which S. Bell cites to support her claim that the disputes regarding her FMLA request establish pretext, for instance, the plaintiff demonstrated that the defendant falsified his performance review ahead of trial in an attempt to buttress its claim that the plaintiff had been fired for poor performance. See 281 F. App'x 803 at 808. The record here presents no such "disturbing procedural irregularity." Maughan v. Alaska Airlines, Inc., 281 F. App'x at 808. To the contrary, the City of Tulsa has presented meticulous evidence detailing the interactions surrounding S. Bell's FMLA request. Through the evidence that S. Bell presents about the FMLA dispute, S. Bell has not identified any weaknesses or inconsistencies that leads the Court to conclude that the City of Tulsa's proffered rationales are "unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d at 1323.

S. Bell next argues that the City of Tulsa's proffered reasons for disciplining and terminating her are pretextual, because she received only positive performance reviews until she lodged grievances against Berg and Powell. See Response at 39-40. After she filed the grievances, S. Bell argues, the City of Tulsa attempted to pad her disciplinary file to mask its discriminatory motive. See Response at 39. S. Bell contends that the City of Tulsa's failure to assign her a new supervisor when Edwards recommended a new supervisor and that Edwards was the officer who oversaw all of S. Bell's pretermination hearings provides evidentiary support for this padding. See Response at 41-42. Taken together, however, these facts do not demonstrate that the City of Tulsa's reasons for terminating S. Bell are unworthy of belief. After S. Bell presented her first oral grievance to Berg on July 17, 2019, in response to the denial of her request to work from

home, see August 2019 Grievance at 2, S. Bell's supervisors noticed "a change in the way she was interacting with her supervisor and co-workers," and S. Bell "began working unusual hours without prior approval," Dellinger Aff. ¶¶ 12-13, at 3.  See Factual Background, supra at 11.  S. Bell was first disciplined in November, 2019, for deviating from her ordinary work schedule, making false statements about a work-related matter, and refusing to obey work directions.  See First Pretermination Hearing Letter at 1-4.   At the time, the City of Tulsa acknowledged that the behavior for which S. Bell was disciplined began after S. Bell's telecommuting request was denied, which occurred on the same date that S. Bell filed her first oral grievance against S. Bell.  See Factual Background, supra at 10.

This evidence demonstrates that the City of Tulsa "honestly believed" the reasons for which S. Bell was punished "and acted in good faith upon those beliefs." Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d 1160, 1170 (10th Cir. 2007)(quoting Rivera v. City & Cnty. of Denver, 365 F.3d 912, at 924-25 (10th Cir. 2004))("'In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision.'" (quoting Watts v. Norman, 270 F.3d 1288, 1295 (10th Cir. 2001))).   The record establishes that S. Bell's attendance issues, violations of City of Tulsa policy, and attitude issues after the denial of her telework request led to her discipline and ultimate termination; the fact that the disciplinary actions taken against her followed the grievances she filed is insufficient to raise a genuine issue of material fact as to pretext.  Furthermore, that Edwards was the officer for all three of S. Bell's pretermination hearings and thereby may have become biased against S. Bell is "[m]ere conjecture" insufficient to raise a dispute as to pretext.  Jencks v. Modern Woodmen of Am., 479 F.3d at 1267.  Likewise, that S. Bell was not assigned a new supervisor does little to "discredit[] the [City of Tulsa's] proffered rationale[s]," Jaramillo v. Adams Cnty. Sch. Dist. 14,

680 F.3d at 1269, because, while it may have been "unwise" not to assign S. Bell a new supervisor, this fact does not "draw into question whether [the City of Tulsa] actually relied, honestly and in good faith" on its proffered reasons for terminating S. Bell.  Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d at 1170.

Finally, S. Bell argues that the City of Tulsa's rationales should not be believed by offering evidence that the City of Tulsa treated differently employees that were similarly situated to S. Bell. Response at 42.  Specifically, S. Bell contends that she was treated differently from Buster and Stickelber, who were allowed to telecommute when she was not, see Response at 42, and that she was treated differently from Caughron, who was not disciplined for the argument she had with S. Bell whereas S. Bell was disciplined, see Response at 40.  "A plaintiff may . . . show pretext . . . by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1230.  "To be 'similarly situated' to the plaintiff, the other employee must 'share the same supervisor' or decision maker."  Smothers v. Solvay Chemicals, Inc., 740 F.3d at 540 (quoting E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 489 (10th Cir. 2006)).  See Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997)("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.").  To determine whether an employee is similarly situated, "[a] court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable." Aramburu v. Boeing Co., 112 F.3d at 1404.  In addition, "employees who are similarly situated must have been disciplined for conduct of comparable seriousness."  McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006).

Buster and Stickelber are not similarly situated employees to S. Bell for the purposes of demonstrating pretext, because they do not share the same supervisor or decisionmaker.  See Factual Background, supra at 34-36.  While Berg served as S. Bell's decisionmaker regarding whether she could work from home, Stickelber and Buster had different supervisors who made the decision to allow them to work from home.  See Factual Background, supra at 34-45.  Dellinger, whom S. Bell argues is a decisionmaker shared by her, Steckelber, and Buster, played no role in determining whether IT employees could work from home; rather, Dellinger "is the final decisionmaker with respect to disciplinary actions for IT employees."  Dellinger Aff. ¶ 4, at 1.  Consequently, Stickelber and Buster could properly be considered similarly situated employees if they, like S. Bell, had been disciplined, but cannot be similarly situated employees here, because they are not subject to the same "company policies" regarding working from home, where different direct supervisors set these policies.  See Aramburu v. Boeing Co., 112 F.3d at 1404.  Moreover, Stickelber and Buster worked in different divisions of the IT department and had job duties that differed significantly from S. Bell's duties.  See Factual Background, supra at 34-35; Dellinger Aff. ¶¶ 10-11, at 3.   Because Stickelber and Buster's job requirements differed from the requirements of S. Bell's job, they were not subject to the "same standards," nor did S. Bell share the same "relevant employment circumstances" that enabled Stickelber and Buster to work from home.  Aramburu v. Boeing Co., 112 F.3d at 1404.  Accordingly, S. Bell has not identified a dispute of material fact as to pretext on the basis that she was treated differently from Stickelber and Buster.

Moreover, the City of Tulsa's treatment of Caughron as compared to its treatment of S. Bell also does not demonstrate pretext.  First, Caughron, unlike Stickelber and Buster, is to S. Bell a "similarly-situated, nonprotected employee[]."  Kendrick v. Penske Transp. Servs., Inc., 220

F.3d at 1230.  S. Bell and Caughron "deal with the same supervisor," Berg, and therefore are "subject to the same standards governing . . . discipline." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1230.  See Factual Background, supra at 3; Caughron Aff. ¶ 3, at 1.  The record also demonstrates that S. Bell and Caughron were "treated differently."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1230.  After Caughron and S. Bell got into an argument over the bathroom, S. Bell was disciplined and Caughron was not.  See Factual Background, supra at 29; Reply at 6.

The question then is whether Caughron engaged in "conduct of comparable seriousness." McGowan v. City of Eufala, 472 F.3d at 745.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1230 (holding that pretext may be shown where the plaintiff identifies similarly situated employees who "violated work rules of comparable seriousness").  The Court concludes that S. Bell was disciplined and Caughron was not, because S. Bell violated work rules that Caughron did not and exhibited more serious conduct.  As an initial matter, both Caughron and S. Bell were investigated for their behavior during the argument on the basis of the corresponding grievances each employee filed against the other.  See Factual Background, supra at 20.  While S. Bell subsequently received a five-day suspension based on the conclusions of the November, 2019, pretermination hearing, and Caughron was not disciplined for her actions during the argument, the undisputed facts show that the discipline that S. Bell received was based on additional and more serious conduct.  S. Bell's conduct during the argument with Caughron did not provide the basis for her first five-day suspension; instead, S. Bell was disciplined for impeding the investigation into the argument, refusing to leave work when she was asked to do so, and making false statements, among other conduct.  See Factual Background, supra at 17-23; First Pretermination Letter at 1-3; First Hearing Findings Email at 1 ("Given the seriousness of Ms. Bell's actions, including numerous examples of impeding an investigation and not following her supervisor's

directives, it is my recommendation that Ms. Bell receive a 5-day suspension with-out pay."). S.

Bell and Caughron, therefore, did not engage in "conduct of comparable seriousness." McGowan

v. City of Eufala, 472 F.3d at 745. Furthermore, S. Bell ultimately was disciplined for violating

City of Tulsa Work Rule One, concerning honesty and loyalty, and Work Rule Seven, concerning

respect for authority. See Factual Background, supra at 28-29. Because Caughron did not violate

these rules based on her conduct during the argument, S. Bell and Caughron did not "violate[]

work rules of comparable seriousness." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1230.

Accordingly, S. Bell has not shown that she was treated differently from any similarly situated

employees. Because the City of Tulsa has provided legitimate, nondiscriminatory reasons for

disciplining and terminating S. Bell, and because S. Bell is unable to identify a dispute of material

fact that these reasons are pretextual, the Court concludes that the City of Tulsa is entitled to

judgment as a matter of law as to S. Bell's race discrimination claims.

## III.   THE CITY OF TULSA DID NOT RETALIATE AGAINST S. BELL FOR ENGAGING IN PROTECTED ACTIVITY.

The City of Tulsa argues that there is no genuine dispute of material fact that it did not

retaliate against S. Bell in violation of Title VII, 42 U.S.C. § 1981, or the ADA, because S. Bell

has not presented sufficient evidence to establish a prima facie case of retaliation. See MSJ at 26-

27. Even if the Court determines S. Bell demonstrated her prima facie case, the City of Tulsa

contends, it has presented legitimate, non-discriminatory reasons for taking adverse employment

actions against S. Bell, and she has not established that these reasons were pretextual. See MSJ at

27-28. The McDonnell Douglas framework likewise applies to S. Bell's retaliation claims. See

Hansen v. SkyWest Airlines, 844 F.3d at 925. To survive summary judgment, S. Bell must first

show that a dispute of material facts exists as to each of the prima facie elements: "(i) she engaged

in protected opposition to discrimination; (ii) she suffered an adverse employment action; and (iii)

there was a causal connection between the protected activity and the adverse action." Bias v. Wilkie, 2022 WL 3019734, at *14. The burden then shifts to the City of Tulsa to show a "non-discriminatory reason for its employment decision." Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999). If the City of Tulsa presents "a non-discriminatory reason for its decision, the burden shifts back to the [p]laintiff to show that 'there is a genuine issue of material fact as to whether the employer's proffered reason for the challenged action is pretextual, i.e., unworthy of belief.'" Anderson v. Coors Brewing Co., 181 F.3d at 1178 (quoting Morgan v. Hilti, Inc., 108 F.3d at 1323).

###   A.   S. BELL ESTABLISHES A PRIMA FACIE CASE OF RETALIATION AS TO HER TERMINATION BUT NOT TO HER TWO SUSPENSIONS.

The City of Tulsa concedes, and the Court agrees, that S. Bell has established the first two elements of her prima facie case. See MSJ at 21-22. First, each of S. Bell's grievances and complaints constitute protected opposition to discrimination, because S. Bell submitted them on the reasonable belief that her supervisors and co-workers were discriminating against her. See Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir. 2004)("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."); Womack v. Del. Highlands Al Servs. Provider, LLC, 883 F. Supp. 2d 1013, 1023 (D. Kan. 2012)(Crow, J.)("Protected opposition can be based on a reasonable, although mistaken, good faith belief that the protested action violated the anti-discrimination law."). Viewed in a light most favorable to S. Bell, in each of her complaints against Berg, Caughron, and Powell, S. Bell "communicates to her employer a belief that the employer has engaged in a form of employment discrimination," an action that "virtually always constitutes the employee's opposition to the activity." Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276 (2009). See Email from Erica Felix-Warwick to Sondia Bell (dated September 23, 2019), filed January 23, 2023 (Doc. 41-40)("I

will have this reviewed and we will officially log your discrimination complaint."); Payan v.

United Parcel Serv., 905 F.3d 1162, 1172 (10th Cir. 2018)("Mr. Payan clearly engaged in protected

opposition when he persistently complained to HR about Mr. Martinez's actions, which he

perceived to be racially motivated.").   In addition, both Title VII and the ADA make such

discrimination in the workplace "an unlawful employment practice."   Petersen v. Utah Dep't of

Corr., 301 F.3d at 1188.   As for the second prong of S. Bell's prima facie case, S. Bell's

suspensions and termination constitute adverse employment actions, because suspensions and

terminations are "harmful to the point that they could well dissuade a reasonable worker from

making or supporting a charge of discrimination."   Burlington N. & Santa Fe Ry. Co. v. White,

548 U.S. 53, 57 (2006).   See Anderson v. Coors Brewing Co., 181 F.3d at 1178 ("We conclude

that Plaintiff suffered adverse employment action when Defendant terminated her."); Burlington

N. & Santa Fe Ry. Co. v. White, 548 U.S. at 80 (Alito, J. concurring)("I would hold that

respondent's suspension without pay likewise satisfied the materially adverse employment action

test.").

The crux of whether S. Bell has shown a prima facie case of retaliation comes at the third

and final prong: whether there is a causal connection between any of the S. Bell's grievances and

her suspensions and termination.   See Bias v. Wilkie, 2022 WL 3019734, at *14.   As an initial

matter, the parties dispute whether temporal proximity alone is sufficient to establish the third

prong of S. Bell's prima facie case.   "In the context of retaliation," the Tenth Circuit has "permitted

plaintiffs to establish a prima facie case of discrimination by showing only close proximity in time

between a protected activity and an adverse action."   Trujillo v. PacifiCorp, 524 F.3d at 1157 n.5.

Accordingly, S. Bell is correct that the third prong of her prima facie case may be shown through

temporal proximity alone, provided the retaliatory action is "*very closely* connected in time to the

protected activity." Anderson v. Coors Brewing Co., 181 F.3d at 1179 (emphasis in original).

Absent a temporal connection that is not close enough, however, S. Bell "must rely on additional

evidence beyond temporal proximity to establish causation." Anderson v. Coors Brewing Co.,

181 F.3d at 1179.[108]  In the Tenth Circuit, courts generally view a gap of greater than three months

between the protected activity and the adverse employment action as being too long to establish

without additional evidence the third prong of a prima facie case of retaliation.  See Bekkem v.

Wilkie, 915 F.3d 1258, 1271 (10th Cir. 2019)("Bekkem")("[W]here a gap of three months or

longer has occurred, a plaintiff must present other evidence -- 'more than mere speculation,

conjecture, or surmise' -- to establish that [his] protected activity was a but-for cause of the adverse

employment action."); Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004)(concluding

that a time period between two to three months, by itself, between an EEO complaint and the

adverse action, is too long to establish temporal proximity); Trujillo v. PacifiCorp, 524 F.3d at

1157 n.5 (listing cases).

S. Bell alleges that her two suspensions and termination all constitute instances of

retaliation.  See Response at 44-46.  The temporal proximity between S. Bell's complaint against

Caughron on August 30, 2019, and her five-day suspension, which was handed down on December

---

[108]In arguing that temporal proximity alone is insufficient to establish the causation prong of S. Bell's prima facie case, the City of Tulsa cites selectively to a Tenth Circuit case that confirms temporal proximity alone is insufficient to establish pretext.  Compare Reply at 8-9 ("[T]he case law is clear that temporal proximity '. . . is not sufficient by itself to raise an issue of fact.' *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000)."), with Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000)("This close temporal proximity suggests pretext, but is not sufficient by itself to raise an issue of fact.").  Despite that temporal proximity alone cannot raise a material dispute as to pretext, it makes sense that the opposite is true in demonstrating causation at the prima facie stage, because the plaintiff's burden is so much lighter at the prima facie stage when compared to his or her burden at the pretext stage.  See Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 255-56 (1981).

9, 2019, is 100 days.  See Factual Background, supra at 20, 29.[109]  This time period is insufficient alone to establish the third prong of S. Bell's prima facie case.  See Bekkem v. Wilkie, 915 F.3d at 1271 ("[A] three-month gap between protected activity and an adverse action is too long to support an inference of causation on its own."); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(holding that a three-month period, standing alone, is insufficient to establish causation).  That the record contains no additional evidence apart from temporal proximity which might establish causation as to S. Bell's five-day suspension supports the Court's conclusion.  Piercy v. Maketa, 480 F.3d 1192, 1198-99 (10th Cir. 2007)("[T]he passage of time does not necessarily bar a plaintiff's retaliation claim if additional evidence establishes the retaliatory motive.").  The record is clear that the cause of S. Bell's five-day suspension was her impeding the investigation into her complaint about what Caughron said during the argument, among other conduct, and not the fact that S. Bell complained about Caughron's conduct during the argument itself.  See Factual Background, supra at 24.

The temporal proximity between S. Bell's complaint against Caughron on August 30, 2019, and her ten-day suspension, which was handed down on September 3, 2020, is 369 days.  See

---

[109]S. Bell argues that there is only a two-day gap between her oral grievance against Berg on July 17, 2019, and subsequent adverse employment action, because Berg's allegations regarding her behavior, which ultimately led to her suspension, discussed S. Bell's conduct two-days after she filed her grievance.  See Response at 44.  This argument is not persuasive, however, because an employee's conduct cannot be an adverse employment action; rather, it is the employer who takes the adverse employment action.  Payan v. United Parcel Serv., 905 F.3d at 1172.  The temporal proximity between S. Bell's complaint against Berg on July 17, 2019, and her five-day suspension, which was handed down on December 9, 2019, is, instead, 145 days.  See Factual Background, supra at 7-8, 28.  This time period alone is insufficient to establish temporal proximity because it is far longer than three months.  See Bekkem v. Wilkie, 915 F.3d 1258, 1271 (10th Cir. 2019).  Because the time period between S. Bell's complaint against Caughron and S. Bell's first suspension is shorter, the Court will consider it for the purposes of S. Bell's prima facie case of retaliation.

Factual Background, supra at 20, 42.[110]  369 days, without more, is too great a time gap to establish

an inference of causation.  See Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181-82 (10th

Cir. 2006)(concluding that a time gap of nine months is too temporally remote to support an

inference of causation).  The temporal proximity between S. Bell's email complaint[111] against

Powell on October 12, 2020, and her termination, which occurred on December 3, 2020, is 52

days. See Factual Background, supra at 47, 49-50.  This time period is less than three months, and

fits squarely within the time gap that the Tenth Circuit has held is sufficiently close to establish an

inference of causation.  See Ramirez v. Okla. Dep't of Mental Health, 41 F.3d 584, 596 (10th Cir.

1994)(holding that the one-and-one-half month period between protected activity and adverse

action may, by itself, establish causation), overruled on other grounds, Ellis v. Univ. of Kan. Med.

Ctr., 163 F.3d 1186, 1194-97 (10th Cir. 1998).  Consequentially, the Court concludes that S. Bell

has established a prima facie case of retaliation as to her termination, but not in regard to her five-

and ten-day suspensions.[112]

---

[110]S. Bell argues that her ten-day suspension "was a form of retaliation against Plaintiff for utilizing the grievance procedures and lodging complaints about discrimination," but does not identify a particular protected activity that might establish temporal proximity with this adverse employment action.  Response at 45.  S. Bell's complaint against Caughron for discrimination is the nearest instance of protected activity to the ten-day suspension.  See Factual Background, supra at 20.

[111] S. Bell's email complaint constitutes a protected activity.  In the email, S. Bell queries whether she is a target of retaliation "because I'm African American . . . ?"  Email from Sondia Bell to Joyce Powell at 10-11 (dated October 12, 2020), filed December 22, 2022 (Doc. 31-26).  In asking this question, S. Bell "communicates to her employer a belief that the employer has engaged in a form of employment discrimination," an action that "virtually always constitutes the employee's opposition to the activity."  Crawford v. Metropolitan Government of Nashville and Davidson County, 555 U.S. 271, 276 (2009).

[112]In the Bell Aff., S. Bell states: "I believe that The City of Tulsa intentionally terminated my health insurance, just as another form of harassment and retaliation."  Bell Aff. ¶ 15, at 3.

"Affidavits are," however, "vehicles for the presentation of facts . . . not legal arguments," and "legal arguments and summations in affidavits will be disregarded by the court." E. F. Hutton & Co. v. Brown, 305 F. Supp. 371, 383 (S.D. Tex. 1969)(Noel, J.). See Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must . . . set out facts that would be admissible in evidence . . . ."); Likhite v. Rehoboth McKinley Christian Healthcare Servs., Inc., No. CV 06-0227, 2006 WL 8443288, at *3 (D.N.M. November 9, 2006)(Smith, M.J.)("An affidavit submitted by counsel for a party is not the proper vehicle in which to present arguments to support the party's position."). In addition, S. Bell clarified at the February 3, 2023, hearing that she was only arguing that her two suspensions and termination constituted adverse employment actions. Tr. at 36:13-21 (Court, D'Antonio). Despite that S. Bell does not argue that the termination of her insurance constitutes retaliation, however, the Court briefly will analyze the issue. As discussed in the Factual Background, supra at 30-33, because the Court must construe the evidence in a light most favorable to S. Bell, the Court credits S. Bell's version of events surrounding the termination of her insurance: S. Bell signed up for insurance coverage, but, nevertheless, S. Bell's insurance coverage was terminated, and S. Bell experienced difficulty in obtaining care for J. Bell during the three weeks that elapsed before S. Bell's coverage was reinstated. The Court concludes that S. Bell cannot establish a prima facie case of retaliation based on the termination of her health insurance, and even if she could establish a prima facie case, S. Bell cannot demonstrate pretext.

S. Bell states a prima facie case of retaliation if she can show that: (i) she engaged in protected activity; (ii) she was subject to an adverse employment action; and (iii) there was a causal connection between the protected activity and the adverse action. See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202. First, it is undisputed that S. Bell engaged in multiple instances of protected activity by filing complaints and grievances against her supervisors and coworkers. See Section III.A, supra at 104. Second, courts have consistently held that the "[cancelation] of healthcare benefits is undoubtedly an adverse action . . . ." Watson v. USD No. 500, Kansas City, Kan, No. 19-1044, 2021 WL 963392, at *4 (D. Kan. March 15, 2021)(Melgren, J.). Even though the City of Tulsa expeditiously reinstated S. Bell's insurance coverage once it was notified that S. Bell's coverage had been terminated, the hassle of a three-week lapse in coverage is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).

A retaliation claim based on the termination of S. Bell's insurance, however, falters on the third prima facie prong -- causation. The protected activity that is temporally closest to the December 30, 2019, termination of S. Bell's health insurance is S. Bell's August 30, 2019, complaint against Caughron. See Factual Background, supra at 20, 31. S. Bell has not, however, put forth any evidence linking her complaint against Caughron to the termination of her health insurance, and "[f]our months is too large a time gap to establish a causal connection." Proctor v. United Parcel Serv., 502 F.3d at 1208. See Bekkem, 915 F.3d at 1271 ("[W]here a gap of three months or longer has occurred, a plaintiff must present other evidence . . . to establish that her protected activity was a but-for cause of the adverse employment action."). Moreover, there is no evidence to indicate that the City of Tulsa employees tasked with managing employee health insurance benefits knew anything about S. Bell's grievance against Caughron. See Walton v. N.M.

**B.   S. BELL DOES NOT DEMONSTRATE THAT THE CITY OF TULSA'S RATIONALE FOR FIRING HER IS PRETEXTUAL.**

As discussed above, the City of Tulsa has provided legitimate, non-discriminatory reasons

for terminating S. Bell.  See Analysis Section II.B, supra at 94-95.  Accordingly, the burden shifts

to S. Bell to prove that the City of Tulsa's reasons are "merely a pretext for discrimination."

---

State Land Off., 113 F. Supp. 3d at 1198 ("Walton has not presented evidence showing that Olah or Powell . . . had any knowledge of her informal complaints.[ ]  Walton, thus, does not satisfy the causation prong.").

Even if S. Bell could establish a prima facie case, she has not carried her burden to demonstrate pretext.  Because S. Bell never argued that discriminatory animus motivated the cancellation of her insurance, the City of Tulsa did not have an opportunity to offer a nondiscriminatory rationale for the cancellation.  That the City of Tulsa brought the benefits cancellation to S. Bell's attention and worked with her to reinstate her insurance coverage, however, demonstrates that the cancellation of S. Bell's insurance was the result of a misunderstanding, and the Court presumes that the City of Tulsa would offer this fact as a legitimate, nondiscriminatory reason for the adverse action.  See Watson v. USD No. 500, Kansas City, Kan., 2021 WL 963392, at *4 ("[T]he District argues that the termination of Watson's benefits was the result of a misunderstanding.").  S. Bell has not shown that this proffered explanation is weak, implausible, or inconsistent, such that a reasonable factfinder could conclude that retaliatory animus motivated the action, which she must do to demonstrate pretext.  See Jaramillo v. Colo. Jud. Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005).

Viewing the evidence in a light most favorable to S. Bell, the closest the record comes to demonstrating an inconsistency in the City of Tulsa's explanation is the fact that Cowen informed S. Bell, in October, 2019, that she "enrolled in benefits for 2020," but the record shows that this was not true, because, in actuality, S. Bell had not completed the enrollment process in full, and her benefits were cancelled at the end of the year.  Cowen Email at 1.  See Factual Background, supra at 31-33.  The record contains no evidence demonstrating, however, that Cowen lied to S. Bell, knew about any of S. Bell's protected activity, or sought to retaliate against her in any way. See Piercy v. Maketa, 480 F.3d 1192, 1201 (10th Cir. 2007)("[C]onflicting evidence only affects summary judgment if it is relevant to the inquiry.").  To the contrary, the City of Tulsa consistently has maintained that the cancellation of S. Bell's benefits was the result of a miscommunication in the process of signing up for health insurance coverage in the new year.  See Factual Background, supra at 42-33; Hiatt v. Colo. Seminary, 858 F.3d 1307, 1319 (10th Cir. 2017)("The consistency of their explanations cuts against a finding of pretext.").  Thirty-two other employees experienced the same issue and had their health insurance terminated at the same time that S. Bell's insurance was terminated.  See Factual Background, supra at 31.  When the City of Tulsa recognized the issue, it worked with these employees to clarify what had gone wrong during the signup process and reinstated the employee's benefits such that they were backdated to January 1, 2020.  See Factual Background, supra at 32-33.  Accordingly, S. Bell has not demonstrated a triable issue on pretext as to the termination of her insurance benefits.

Jaramillo v. Colo. Jud. Dep't., 427 F.3d at 1307.  Although the Court already has concluded that

the reasons that the City of Tulsa offers for terminating S. Bell are not pretextual in the context of

S. Bell's race discrimination claim, see Analysis Section II.C, at 95-102, the Court considers

whether the City of Tulsa's rationale was mere pretext for retaliation, i.e., whether S. Bell was

terminated because she complained about Powell's alleged discrimination against her in violation

of Title VII and the ADA.  S. Bell may establish pretext by producing "direct evidence refuting

the proffered rationale," Lounds v. Lincare, Inc., 812 F.3d 1208, 1234 (10th Cir. 2015), or by

showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action," Zisumbo v. Ogden Regl. Med. Ctr., 801

F.3d 1185, 1201 (10th Cir. 2015).  To determine whether a proffered reason for a decision is

pretextual, courts examine the facts as they appeared to the person making the decision to

terminate, not as they appeared to the plaintiff.  See Sarkar v. McCallin, 636 F.3d 572, 576 (10th

Cir. 2011)("[T]he relevant inquiry is not whether the employer's proffered reasons were wise, fair

or correct, but whether it honestly believed those reasons and acted in good faith upon those

beliefs.").  To survive summary judgment, "an employee must proffer evidence that shows each

of the employer's justifications are pretextual." Tyler v. RE/MAX Mountain States, Inc., 232 F.3d

808, 814 (10th Cir. 2000).  This general rule, however, comes with a caveat: where "an employer

provides multiple explanations for an action," courts must "still look to whether 'the multiple

grounds offered by the [employer] . . . are so intertwined, or the pretextual character of one of them

[is] so fishy [or] suspicious,' or whether the employer has been 'shown to have li[ed] in an

outrageous manner . . . about a number of issues.'" Doyle v. Nordam Grp., Inc., 492 F. App'x

846, 853 (10th Cir. 2012)(quoting Tyler v. RE/MAX Mountain States, Inc., 232 F.3d at 814).  See

Trujillo v. Bd. of Educ. of Albuquerque Pub. Sch., 410 F. Supp. 2d 1033, 1047 (D.N.M.

2005)(Browning, J.)("The Court concludes that the genuine issue on the second reason casts enough doubt on the other two reasons that a jury might still find in Trujillo's favor.").  One truly bad apple, in this context, may well spoil the bunch.

As an initial matter, while the 52-day time gap between S. Bell's email complaint about Powell and her termination is sufficient to establish S. Bell's prima facie case, additional evidence is necessary to demonstrate pretext.  See Frank v. Heartland Rehab. Hosp., LLC, No. 22-3031, 2023 WL 4444655, at *5 (10th Cir. July 11, 2023)("[W]hile timing can create a prima facie case for retaliation, it must be combined with other evidence to show pretext.").  Consequentially, while the Court will consider temporal proximity as part of its pretext determination, S. Bell must adduce additional evidence.  The City of Tulsa's reasons for terminating S. Bell are: (i) the fact that S. Bell continued to exhibit "unprofessional, disrespectful, and condescending behavior" despite that S. Bell had received two previous suspensions and directions to change her behavior her behavior; (ii) S. Bell's behavior during the September 25, 2019, telephone call with Powell and McIntosh; (iii) the uncooperative nature of the email S. Bell sent on October 12, 2020, and the false accusation included therein that Powell violated S. Bell's HIPPA rights.  Termination Recommendation Email at 1.  See MSJ at 24; Factual Background, supra at 48-50; Third Pretermination Hearing Notice at 1-3.  The Court concludes that S. Bell has not established a genuine issue of fact as to the City of Tulsa's first and second reasons for terminating S. Bell, but concludes that a genuine issue exists as to the City of Tulsa's third proffered reason.  The Court concludes, nonetheless, that "the pretextual character" of the City of Tulsa's third reason is not "so fishy and suspicious" nor "so intertwined" with the City of Tulsa's additional proffered reasons in a way that "casts substantial doubt" on these additional reasons such that "the jury could reasonably find the employer lacks credibility."  Tyler v. RE/MAX Mountain States, Inc., 232 F.3d at 814.  Accordingly, the Court

concludes that S. Bell has not adduced sufficient evidence to create a genuine issue that the City

of Tulsa's rationale for her termination is pretextual. [113]  The Court explains these conclusion in

turn.

> **1.**   **S. Bell Does Not Establish that the City of Tulsa's First Reason for Terminating Her is Pretextual.**

First, the Court concludes that S. Bell has not satisfied her burden to establish a dispute of

material fact that the City of Tulsa's first reason for S. Bell's termination -- that S. Bell continued

to behave unprofessionally and disrespectfully in contradiction to her supervisors' directions that

she change her behavior following her two recent suspensions -- is mere pretext.  See Smith v.

Sprint/United Mgmt. Co., 718 F. App'x 630, 633 (10th Cir. 2017)(crediting the plaintiff's "long

history of corrective actions regarding his attendance" as a legitimate, non-discriminatory reason

for his termination and concluding that the plaintiff ultimately "did not present evidence of pretext

to support his retaliation claim").  Before S. Bell's termination, the City of Tulsa reprimanded and

suspended S. Bell on two separate occasions, and, following each suspension, provided S. Bell

with a letter outlining the City of Tulsa's expectations for her upon her return to work.  See Factual

Background, supra at 39, 42.  S. Bell's most recent suspension -- for insubordination and failure

to follow her supervisors' directions -- occurred three months before her termination.  See Factual

Background, supra at 42.  Moreover, despite that Edwards recommended that S. Bell be terminated

on that occasion, Dellinger decided to give S. Bell another chance and reiterated the City of Tulsa's

---

[113]S. Bell argues that "the fact that neither Chris Berg or Joyce Powell sought discipline against Plaintiff until after she filed grievances against them, shows pretext."  Response at 40, 42. To establish a triable issue as to pretext for her retaliation claim, however, S. Bell must provide evidence that the reason the City of Tulsa disciplined her was because she filed the grievances and not merely that she was disciplined after she filed the grievances.

expectations for S. Bell upon her return from the suspension.  See Factual Background, supra at

42.  The letter specifies that S. Bell is expected not to make any "false or inflammatory

accusations," and to improve her "attitude and work relationships."  September 3, 2020, Letter at

1.  In the letter, Dellinger explains that S. Bell's failure to conform with these requirements may

result in disciplinary action "up to and including termination."  September 3, 2020, Letter at 2.

S. Bell does not identify any evidence that undercuts the City of Tulsa's rationale that S.

Bell was terminated based on this history of continued insubordination even after she was warned

twice that her behavior needed to change or her termination may result.  In Crowe v. ADT Sec.

Servs., Inc., 649 F.3d 1189 (10th Cir. 2011), the Tenth Circuit affirmed the district court's entry

of summary judgment on the plaintiff's retaliation claim in favor of the defendant on similar facts.

See 649 F.3d at 1197-99.  In Crowe v. ADT Sec. Servs., Inc., the employer, ADT Security Services

("ADT"), "came forward with a legitimate reason for terminating Mr. Crowe: his extensive history

of alleged sexual harassment and insubordination."  649 F.3d at 1196.  Crowe argued that there

was "a genuine dispute of material fact as to whether ADT's explanation was pretextual," because

ADT fired Crowe "based solely on three complaints that occurred two months after he engaged in

protected activity" by complaining "about the lack of African-Americans in management."  649

F.3d at 1197.  The Tenth Circuit disagreed, concluding that "ADT justified termination of Mr.

Crowe based on his entire personnel file, particularly his long history of alleged sexual harassment

and insubordination."  649 F.3d at 1198.

> ADT did not effectuate an abrupt about-face and determine that Mr. Crowe's post-
> protected-activity behavior -- which was similar to the alleged conduct that had
> reoccurred since 1999 -- warranted termination in and of itself.  Rather, ADT
> looked at Mr. Crowe's troubled personnel history, determined that it had "truly
> exhausted all efforts to maintain his employ," and decided that continuing to
> employ Mr. Crowe was no longer a viable option.

649 F.3d at 1198.

Here too, the City of Tulsa did not "effectuate an abrupt about-face" following S. Bell's October 12, 2020, email complaint, Crowe v. ADT Sec. Servs., Inc., 649 F.3d at 1198; rather, the Third Pretermination Packet and Edwards' rationale for recommending S. Bell's termination "lists and discusses in some detail [S. Bell's] full personnel history," Crowe v. ADT Sec. Servs., Inc., 649 F.3d at 1198; Factual Background, supra at 42.  The undisputed record is clear that the City of Tulsa implemented a program of progressive discipline and provided S. Bell with multiple opportunities to change her behavior before concluding that her termination was necessary.  See Morgan v. Hilti, Inc., 108 F.3d at 1324 ("Hilti issued oral and written warnings about the consequences of poor attendance both before and after [the plaintiff] filed the charge of discrimination. The additional warnings, followed by discharge . . . simply completed the disciplinary process already set in motion.").  Moreover, concluding that the City of Tulsa's "prior leniency raises an inference of pretext . . . would have the peculiar result of penalizing employers which, like [the City of Tulsa] did in this case, attempt to rectify alleged inappropriate behavior instead of immediately terminating an employee upon the first transgression." Crowe v. ADT Sec. Servs., Inc., 649 F.3d at 1198.  Consequentially, S. Bell has not provided evidence from which a reasonable jury could conclude that firing S. Bell based on her continued failure to cooperate and "rude and disrespectful" behavior "despite repeated warnings and opportunities to correct the behavior" is pretextual.  MSJ at 24.

**2.      S. Bell Does Not Establish that the City of Tulsa's Second Reason for Terminating Her is Pretextual.**

Second, S. Bell contends that the City of Tulsa's justification for terminating her because of her "disrespectful, condescending, and threatening actions" during the September 25, 2019, telephone call about S. Bell's FMLA request is pretext for its retaliation against her for subsequently complaining about Powell's allegedly discriminatory behavior.  Factual Background,

supra at 49 (quoting Termination Recommendation Email at 1). See Response at 36. In Wheat v.

Fifth Third Bank, 785 F.3d 230 (6th Cir. 2015), the employer contended, as the City of Tulsa has

here, that the employee's "refusal to cooperate" and "answer . . . questions" during an interview

served as justification for termination. 785 F.3d at 240. The United States Court of Appeals for

the Sixth Circuit concluded that the plaintiff had identified a genuine dispute of fact that this reason

was pretextual, because the plaintiff provided evidence that he did not want to answer questions

because he felt they were irrelevant to the subject of the conversation and because he was never

given an opportunity to give his own story. See Wheat v. Fifth Third Bank, 785 F.3d at 240. Here,

by contrast, S. Bell has not provided a rationale why she refused to answer the questions, and the

questions she refused to answer invited her to provide her side of the story. See Factual

Background, supra at 44. In addition, the Sixth Circuit determined that a genuine issue as to pretext

existed, because the plaintiff provided evidence refuting his employer's rationale that she was

terminated for making "veiled threats." Wheat v. Fifth Third Bank, 785 F.3d at 240-41. The

employee's statement that he would "take care of it" himself, the Sixth Circuit reasoned, was

"nothing if not ambiguous and . . . cannot necessarily be considered threatening at all." Wheat v.

Fifth Third Bank, 785 F.3d at 241. S. Bell's assertion that she would "make sure that everything

goes national," which she purported that she could do because her family has "ties to high

connections," on the other hand, is more specific and unambiguous. Factual Background, supra at

46. The City of Tulsa has consistently maintained that a central reason for terminating S. Bell was

her unprofessional and uncooperative behavior on the September 25, 2020, telephone call mere

weeks after she had received a written reminder that her behavior needed to improve. See Factual

Background, supra at 42, 48-50. In addition, the record contains no "weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions" in relation to this rationale, see Zisumbo v.

Ogden Regl. Med. Ctr., 801 F.3d at 1201; rather, the record rather makes clear that the City of Tulsa "honestly believed" that S. Bell's behavior during the September 25, 2020, telephone call justified her termination "and acted in good faith upon th[is] belief[]," Sarkar v. McCallin, 636 F.3d at 576. S. Bell has not adduced evidence, therefore, that would enable a reasonable juror to conclude that the City of Tulsa's rationale that it fired S. Bell because of her behavior during the September 25, 2020, telephone call was pretextual.

### 3.   S. Bell Establishes That the City of Tulsa's Third Reason for Terminating Her is Pretextual.

Third, S. Bell argues that the City of Tulsa's justification for terminating her because of the false accusations that she made in the October 12, 2020, email is pretextual. See Response at 38-39. In Bekkem, 915 F.3d 1258, Bekkem, a Department of Veterans Affairs ("VA") employee, was reprimanded for "exhibit[ing] inappropriate conduct in an email," 915 F.3d at 1264, after she included in an email to her colleagues the question: "Maybe some money changed hands to make this happen?" 915 F.3d at 1274. The VA justified Bekkem's discipline on the basis that this question constituted "an accusation of bribery in her email, and this accusation of criminal behavior warranted a reprimand." Bekkem, 915 F.3d at 1274. The VA's "proposed reprimand . . . which was incorporated by reference into the actual reprimand" included a paragraph describing the incident for which the employee was reprimanded:

> **Specification 3**: On or about August 27, 2013 you sent an inappropriate email to several employees who you labeled "Colleagues." In the email you alleged various complaints regarding the pay of physicians at this facility. In your email you made an allegation by stating, "Maybe some money changed hands to make this happen?"

Bekkem, 915 F.3d at 1273-74 (quoting the record). While "[t]he VA acknowledge[d] that the reprimand also mentions Plaintiffs 'alleg[ation of] various complaints regarding the pay of physicians at [the VA],'" the VA maintained that the "reprimand itself was based only on the

accusation of bribery described in the third sentence" of the proposed reprimand.  Bekkem, 915

F.3d at 1274 (quoting the record)(only third and fourth alterations in Bekkem).  The Tenth Circuit

held, however, that the inclusion of the fact that Bekkem complained about physician pay

alongside her allegation of bribery was sufficient to establish a dispute of material fact as to pretext

and reversed the district court's entry of summary judgment:

> [The VA's contention that it only disciplined Bekkem for her allegation of bribery]
> may be a plausible explanation of the reprimand, but it is not the only plausible
> explanation. Although a jury might ultimately agree with the VA's explanation, the
> facts taken in the light most favorable to Plaintiff are sufficient to support a
> reasonable inference that the reprimand actually mentioned Plaintiff's allegations
> of discrimination for the simple reason that Plaintiff's supervisor wanted to punish
> her for sending her colleagues an email that alleged the VA was discriminating
> against female, foreign-born, non-white physicians. Given the timing and the
> wording of the reprimand, we are persuaded that Plaintiff has met her burden of
> showing that a reasonable jury could find the VA's explanation to be "pretextual -
> - i.e., unworthy of belief . . . ."

Bekkem, 915 F.3d at 1274 (quoting Morgan v. Hilti, Inc., 108 F.3d at 1323.

The significant parallels between the situation in Bekkem and the situation here leads the

Court to conclude that a genuine issue exists as to the City of Tulsa's proffered reason that it fired

S. Bell because of her October 12, 2020, email.  Both S. Bell and Bekkem were disciplined for

making allegations in an email complaining about their respective employers: for Bekkem, making

an allegation of bribery, 915 F.3d at 1274; for S. Bell, making an allegation that a co-worker

violated her HIPPA rights, see October 12, 2020, Email at 10-11.  In both cases, despite S. Bell

and Bekkem's respective employer identifying these allegations as the reason for taking

disciplinary action, the documents memorializing the allegations also include references to

protected activities in which S. Bell and Bekkem engaged.  In Bekkem's case, the VA referenced,

alongside its allegation that Bekkem made an inappropriate claim of bribery, the contention: "'In

the email you alleged various complaints regarding the pay of physicians at this facility.'"  915

F.3d at 1274 (quoting the record).   Similarly, in a section of the Third Pretermination Hearing

Notice titled "Work Rule Violations" the City of Tulsa included the following paragraph:

> On October 12, 2020, Ms. Bell responded to Ms. Powell's e-mail in essentially the same combative and uncooperative manner as she exhibited on the September 25th call. Ms. Bell again failed to address any of Ms. Powell's questions or requests and again used her response to attack Ms. Powell, the HR Department, and IT Management with false and unsubstantiated claims of racial discrimination, retaliation, harassment, denial of FMLA, violation of HIPPA laws, and threats to her safety.

Third Pretermination Hearing Notice at 2 (emphasis added).  The City of Tulsa, thus, includes,

alongside its allegations that S. Bell made "false and unsubstantiated claims of . . . violation

HIPPA laws" -- one of the City of Tulsa's proffered nondiscriminatory rationales for terminating

S. Bell -- an allegation that S. Bell made "claims of racial discrimination, retaliation, [and]

harassment."  Third Pretermination Hearing Notice at 2.  This paragraph gives rise to a concern

similar to that in Bekkem "that the reprimand actually mentioned [S. Bell's] allegations of

discrimination for the simple reason that [S. Bell's] supervisor wanted to punish her for sending

her colleagues an email that alleged the [City of Tulsa] was discriminating" against her.  915 F.3d

at 1274.  Accordingly, "[a]lthough a jury might ultimately agree" that one of the City of Tulsa'

reasons for firing S. Bell was that she made an unsubstantiated claim that Powell violated her

HIPPA rights, the facts taken in the light most favorable to S. Bell are sufficient to support a

reasonable inference that the Third Pretermination Hearing Notice mentioned S. Bell's allegations

of discrimination because the City of Tulsa sought to punish her for making these protected claims.

Bekkem, 915 F.3d at 1274.  Therefore, as to this narrow rationale for justifying S. Bell's

termination, a genuine dispute of material fact exists about whether this justification was

pretextual, and the Court will consider whether it discredits the City of Tulsa's additional, non-

pretextual justifications.

    **4.**      <u>**The Pretextual Character of the City of Tulsa's Third Reason for Terminating S. Bell Does Not Undermine the City of Tulsa's Legitimate, Non-Pretextual Reasons**</u>.

To survive summary judgment, a plaintiff must normally show that each of the defendant's proffered reasons for not hiring her are pretextual. <u>See</u> <u>Tyler v. RE/MAX Mountain States, Inc.</u>, 232 F.3d at 814. Accordingly, the general rule advises that, because S. Bell has supplied evidence suggesting only one, but not all, of the City of Tulsa's proffered reasons for her termination is pretextual, she cannot survive summary judgment. "In some cases, however, a successful attack on part of the employer's legitimate, non-discriminatory explanation is enough to survive summary judgment even if one or more of the proffered reasons has not been discredited." <u>Jaramillo v. Colorado Jud. Dep't</u>, 427 F.3d at 1310. "Debunking one of the employer's explanations defeats the case for summary judgment 'only if the company has offered no other reason that, if that reason stood alone (more precisely if it did not have support from the tainted reason), would have caused the company to take the action of which the plaintiff is complaining.'" <u>Jaramillo v. Colorado Jud. Dep't</u>, 427 F.3d at 1310 (quoting <u>Russell v. Acme-Evans Co.</u>, 51 F.3d 64, 69 (7th Cir. 1995)).

The record makes clear that, here, standing alone, that S. Bell continued to act rudely, disrespectfully, and unprofessionally in addition to her behavior on the September 25, 2020, telephone call independently would have caused the City of Tulsa to terminate S. Bell. Although the Third Pretermination Hearing Notice mentions S. Bell's October 12, 2020, email as a basis for one of S. Bell's work rule violations, it makes clear that the primary rationale for terminating S. Bell is her interference with the HR department's work during the September 25, 2023, telephone call and S. Bell's "clear pattern of . . . lack of honesty and loyalty, respect for authority, and respectful and courteous behavior in the performance of her duties and responsibilities." Third Pretermination Hearing Notice at 3. The emphasis on these two reasons, and not on S. Bell's

October 12, 2020, email, remains consistent and carries through to Edwards' Termination Recommendation Email and the Termination Report summarizing S. Bell's termination, both of which mention expressly the September 25, 2020, telephone call and S. Bell's history of work rule violations, but make no reference to the October 25, 2020, email.   See Termination Recommendation Email at 1; Termination Report at  1; Factual Background, supra at 48-50. Likewise, the Dellinger Aff. provides that Dellinger's decision to terminate S. Bell "was not made based on anything other than Sondia's repeated failure to follow the City of Tulsa and the IT Department's rules, policies and procedures," and the fact that "we had repeatedly worked with Sondia to improve her behavior, but nothing was working."   Dellinger Aff. ¶¶ 25-26 at 6. Accordingly, the Court concludes that the City of Tulsa would have still terminated S. Bell's employment had she never sent the October 12, 2023, email, because the city had additional, independent reasons that, alone, would have led the City of Tulsa to take the same action.

The Tenth Circuit has further identified that a plaintiff may still survive summary judgment on his or her retaliation claim despite failing to demonstrate pretext as to all of the defendant's proffered reasons where:

> (1) the reasons are so intertwined that a showing of pretext as to one raises a genuine question whether the remaining reason is valid, see [Russell v. Acme-Evans Co., 51 F.3d 64, 70 (7th Cir.1995)]; (2) the pretextual character of one explanation is "so fishy and suspicious," [Russell v. Acme-Evans Co., 51 F.3d at 70], that a jury could "find that the employer (or its decisionmaker) lacks all credibility," Chapman v. AI Transport, 229 F.3d 1012, 1050 (11th Cir. 2000)(en banc)(Birch, J., concurring and dissenting); (3) the employer offers a plethora of reasons, and the plaintiff raises substantial doubt about a number of them, Tyler[ v. RE/MAX Mountain States, Inc.], 232 F.3d at 814; (4) the plaintiff discredits each of the employer's objective explanations, leaving only subjective reasons to justify its decision, see Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1298-99 (D.C. Cir. 1998) (en banc); or (5) the employer has changed its explanation under circumstances that suggest dishonesty or bad faith, Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1380-81 (10th Cir. 1994).

Jaramillo v. Colorado Jud. Dep't, 427 F.3d at 1310 (alterations added).  None of these exceptions

apply to S. Bell's case.

First, the reasons that the City of Tulsa offers are not "so intertwined that a showing of

pretext as to" the October 12, 2020, Email "raises a genuine question whether the remaining

reason[s are] valid."  Jaramillo v. Colorado Jud. Dep't, 427 F.3d at 1310.  As discussed in Section

III.B.2, supra at 115-16, S. Bell's behavior during the September 25, 2020, phone call, for example,

constitutes a separate and unrelated reason for firing S. Bell that is not "dependent upon" the

October 12, 2020, Email rationale.  Jaramillo v. Colorado Jud. Dep't, 427 F.3d at 1310.  Second,

the showing of pretext is not so strong that it "destroy[s]" the City of Tulsa's "credibility."

Jaramillo v. Colorado Jud. Dep't, 427 F.3d at 1310.  No City of Tulsa employee has been "shown

to be a liar in an outrageous manner," for instance, Tyler v. RE/MAX Mountain States, Inc., 232

F.3d at 814 (quoting Chapman v. Al Transport, 229 F.3d 1012. 1049-51 (10th Cir. 2000)(Birch,

J., concurring in part and dissenting in part)), and the potential inference that the Third

Pretermination Hearing Notice's passing reference to S. Bell's claim of discrimination raises does

not "undermine the [City of Tulsa's] credibility to the point that a reasonable jury could not find

in its favor," Jaramillo v. Colorado Jud. Dep't, 427 F.3d at 1310.  Third, S. Bell has not shown the

City of Tulsa "offered a significant number of pretextual reasons"; rather, S. Bell establishes a

genuine issue of pretext as to only one reason.  Jaramillo v. Colorado Jud. Dep't, 427 F.3d at 1310-

11 ("With the exception of a single comment by Ms. Donovan, it has offered the same explanation

from the beginning.").  Fourth, S. Bell has not "eliminated all objective explanations of the [City

of Tulsa's] decision."  Jaramillo v. Colorado Jud. Dep't, 427 F.3d at 1311.  By contrast, the record

amply supports the City of Tulsa's explanation that it fired S. Bell for her behavior on the

September 25, 2020, telephone call and continued insubordination, "which is sufficient to support

a good faith belief" that S. Bell's termination objectively was called for.  Jaramillo v. Colorado Jud. Dep't, 427 F.3d at 1311.  Cf. Aka v. Wash. Hosp. Ctr., 156 F.3d at 1298-99 (concluding that the plaintiff raised a genuine question of fact regarding pretext where the employer's only remaining justification for not hiring the plaintiff was the employer's subjective assessment of the applicants' enthusiasm).  Finally, the City of Tulsa has never "changed its explanation" but has remained consistent in its rationale for terminating S. Bell throughout.  Jaramillo v. Colorado Jud. Dep't, 427 F.3d at 1310.  See Factual Background, supra at 48-50.  Accordingly, S. Bell has not "cast[] substantial doubt on many of the employer's multiple reasons."  Tyler v. RE/MAX Mountain States, Inc., 232 F.3d at 814.

Although S. Bell does not, at the summary judgment stage, have a burden to establish conclusively whether the City of Tulsa's reasons for suspending and terminating her were pretextual, she is required to establish a genuine factual dispute "that a retaliatory motive was the 'but for' cause" of her termination.  Rodriguez v. Brown, No. 21-1124, 2022 WL 3453401, at *15 (10th Cir. Aug. 18, 2022)(no citation given for quotation).  S. Bell has not carried her burden of demonstrating that each of the City of Tulsa's proffered, non-retaliatory motivations for terminating her were pretextual, nor that the pretextual nature of the City of Tulsa's third reason for her termination renders the City of Tulsa's other reasons sufficiently uncredible.  Rather, the City of Tulsa's justifications remained consistent, and the record shows that the City of Tulsa provided S. Bell with multiple warnings and opportunities to change her behavior throughout her employment; there is no evidence that the City of Tulsa's overall rationale is false, incoherent, or contradictory.  See Morgan v. Hilti, Inc., 108 F.3d at 1323.  Accordingly, because the reasons for S. Bell's termination are not so unworthy of belief so as to be pretextual, the Court concludes that

the City of Tulsa is entitled to judgment as a matter of law on S. Bell's retaliation claims under Title VII or the ADA.

## IV.   THE CITY OF TULSA DID NOT VIOLATE S. BELL'S RIGHTS UNDER THE ADA BY TERMINATING HER BECAUSE OF HER RELATIONSHIP WITH <u>J. BELL</u>.

The City of Tulsa asserts that there is no genuine dispute of material fact that it did not violate S. Bell's rights under the ADA, because S. Bell has provided no evidence on which an inference can be made that the City of Tulsa took disciplinary action against S. Bell because of her child's disability.  <u>See</u> Reply at 10.[114]  Claims brought under the ADA's "disability association" provision follow the familiar <u>McDonnell Douglas</u> framework.  <u>DePaula v. Easter Seals El Mirador</u>, 859 F.3d 957, 969 n.18 (10th Cir. 2017)("We clarify -- as we did in <u>Den Hartog</u> -- that the burden-shifting scheme of <u>McDonnell Douglas</u> applies to ADA association discrimination claims.").  S. Bell can establish her prima facie case that the City of Tulsa discriminated against her based on her relationship with J. Bell by demonstrating that: (i) she was qualified for her job; (ii) she suffered an adverse employment action; (iii) the City of Tulsa knew that S. Bell had a son with a disability;

---

[114]The City of Tulsa argues that S. Bell's complaint is "clear that the basis of her ADA claim is that she was denied the ability to work from home to care for her child with a disability," but that after S. Bell learned that "such a claim is not viable under the law," she "revised her claim in an effort to defeat summary judgment."  Reply at 10.  While the Complaint is somewhat ambiguous as to the nature of S. Bell's ADA claim, it states clearly that S. Bell's claim is "for ADA Disability Association Discrimination."  Complaint ¶ 47, at 7.  In addition, even if S. Bell's ADA association claim had shifted between her Complaint and Response, the Court may treat such a shift as a request to amend the complaint and review S. Bell's ADA association claim as presented in her response.  <u>See</u> <u>McGuinness v. Univ. of N.M. Sch. of Med.</u>, 170 F.3d 974, 979 (10th Cir. 1998)("Because we may treat new issues raised in a plaintiff's response to a summary judgment motion as a request to amend, we also review Mr. McGuinness' § 12112(b)(4) 'association discrimination' claim." (no citation given for quotation)); <u>Viernow v. Euripides Dev. Corp.</u>, 157 F.3d 785, 790 n.9 (10th Cir. 1998)("Issues raised for the first time in a plaintiff's response to a motion for summary judgment may be considered a request to amend the complaint, pursuant to Fed. R. Civ. P. 15.").

and (iv) S. Bell's discipline and firing "occurred under circumstances raising a reasonable inference that the [J. Bell's] disability . . . was a determining factor in [the City of Tulsa]'s decision." Trujillo v. PacifiCorp, 524 F.3d at 1155.

S. Bell has satisfied the first three elements required to establish a prima facie case of association discrimination. As previously discussed, S. Bell was qualified for her job, see supra at 92-93, and S. Bell's suspensions and termination qualify as adverse employment actions, see Analysis Section III.A, supra at 105. S. Bell has also provided evidence establishing -- and the City of Tulsa does not dispute -- that the City of Tulsa knew J. Bell had a disability. The record is replete with communications between S. Bell and City of Tulsa employees about J. Bell's treatment and S. Bell's adjustments to her schedule to assist in J. Bell's care. See, e.g., Factual Background, supra at 47. See Abdel-Khalek v. Ernst & Young, L.L.P., No. CIV 97-4514, 1999 WL 190790, at *5 (S.D.N.Y. April 7, 1999)(Koeltl, J.)(recognizing that the plaintiff's communication with her employer about her child's disability and "evidence indicating that 'it was general knowledge around the office that [the plaintiff] had given birth to a daughter with serious physical disabilities'" supported a finding that the employer knew about the disability (quoting the record)). Cf. Den Hartog v. Wasatch Acad., 129 F.3d at 1082 ("A family relationship is the paradigmatic example of a 'relationship' under the association provision of the ADA." (quoting 29 C.F.R. § 1630.8 (1996)).

Accordingly, the success of S. Bell's ADA association discrimination claim turns on whether S. Bell has adduced enough evidence to support a finding that she was disciplined and her employment was terminated under circumstances that raise a reasonable inference that S. Bell's association with J. Bell was a determining factor in the City of Tulsa's decision to take adverse employment action against S. Bell. See Trujillo v. PacifiCorp, 524 F.3d at 1155. The Tenth Circuit

has identified two ways in which such an inference may arise that apply to this case: "distraction" and "expense." Trujillo v. PacifiCorp, 524 F.3d at 1155 (quoting Larimer v. Int'l Bus. Machs. Corp., 370 F.3d 698, 700 (7th Cir. 2004)). In the "distraction" situation, an adverse employment action is taken, because "'the employee is somewhat inattentive at work because his . . . child has a disability that requires his attention.'" Trujillo v. PacifiCorp, 524 F.3d at 1155 (quoting Larimer v. Int'l Bus. Machs. Corp., 370 F.3d at 700). For example, in Kelleher v. Fred A. Cook, Inc., 939 F.3d 465 (2d Cir. 2019), the United States Court of Appeals for the Second Circuit concluded that an inference of discriminatory motive was established where the plaintiff provided evidence that his "employer thought that [his] daughter was a distraction, and concern over distraction was a 'determining factor' in [his] termination." 939 F.3d at 470 (no citation given for quotation)("Kelleher was told that 'his problems at home were not the company's problems' at the March 27, 2015 meeting, and he was effectively demoted after he missed a day's work to care for his daughter." (quoting record)). See Abdel-Khalek v. Ernst & Young, L.L.P., 1999 WL 190790, at *5 (finding "a disputed genuine issue of fact" as to the third prong of the plaintiff's prima facie case where the plaintiff's "managers . . . expressed the opinion . . . that the plaintiff would not be able to do her job when she returned to work because she would be preoccupied with her daughter").

In the "expense" situation, an adverse employment action is taken, because the employee's relation "'has a disability that is costly to the employer because the [relation] is covered by the company's health plan.'" Trujillo v. PacifiCorp, 524 F.3d at 1155 (quoting Larimer v. Int'l Bus. Machs. Corp., 370 F.3d at 700). For example, in Trujillo v. PacifiCorp, the Tenth Circuit determined that the plaintiffs raised an inference of discriminatory motive where the employer fired the plaintiffs shortly after their son was diagnosed with cancer, and presented evidence about

the employer's concern about the costs of the son's illness and general efforts to cut employee health costs. See 524 F.3d at 1155-58. In reaching this conclusion, the Tenth Circuit also established that close temporal proximity between an event relating to the plaintiff's relationship with their disabled relative and the adverse employment action may be important in establishing a prima facie case of association discrimination case, but is not sufficient alone to establish the fourth prong of the plaintiff's prima facie case. See Trujillo v. PacifiCorp, 524 F.3d at 1157 & n.5 ("Our reference to these cases is not intended to suggest that an association discrimination plaintiff can establish the fourth prong of the prima facie case by showing temporal proximity alone.").

Here, in support of her argument that J. Bell's disability played a determining role in her termination, S. Bell offers evidence of: (i) the temporal proximity between the FMLA telephone call with Powell and McIntosh and her termination; (ii) conversations between S. Bell, Powell, and McIntosh that S. Bell purports indicate a "conspiracy" against her; and (iii) evidence that work attendance issues attributable to S. Bell's need to care for J. Bell led to her termination. Response at 48-50. First, the temporal proximity between the phone call S. Bell identifies and S. Bell's termination may be relevant to determining whether S. Bell has established the fourth prong of her ADA association claim. See Trujillo v. PacifiCorp, 524 F.3d at 1157.[115] Here, approximately ten weeks elapsed between the September 25, 2020, telephone call, and S. Bell's termination on December 3, 2020. See Factual Background, supra at 3, 44. In Trujillo v. PacifiCorp, the Tenth

---

[115]S. Bell argues that "her receipt of the pre-Termination notice" should constitute the adverse employment action by which to measure the temporal proximity from the FMLA telephone call. Response at 50. The mere notice of a hearing to determine whether an adverse employment action should be taken, however, is not "'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" Payan v. United Parcel Serv., 905 F.3d at 1172 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 57).

Circuit held that the temporal proximity between the cancer relapse of the two employees' child and the employer's decision to terminate both employees -- a time period of less than three weeks for one parent-employee and six weeks for the other -- "powerfully demonstrates the necessary reasonable inference that PacifiCorp terminated the Trujillos for an illegal reason." 524 F.3d at 1157-58. Because the time period between the FMLA telephone call and S. Bell's termination nearly doubles that in Trujillo v. PacifiCorp, the case is not strong help for S. Bell. See Factual Background, supra at 3, 44. Accordingly, while the Court considers the ten-weeks that elapsed between the FMLA telephone call and S. Bell's termination as a "'circumstance'" in determining whether S. Bell has raised a reasonable inference that J. Bell's disability was a determining factor in her termination, the Court does not assign great weight to this fact. Trujillo v. PacifiCorp, 524 F.3d at 1157 (quoting Den Hartog v. Wasatch Acad., 129 F.3d at 1085).

Second, S. Bell argues that because the September 25, 2020, telephone call with Powell and McIntosh concerned her request to take leave to care for J. Bell, and because Powell and McIntosh "scrutinized Plaintiff's request and caused her hardships by requesting additional and unnecessary information," S. Bell contends, this telephone call constitutes sufficient evidence to raise an inference that J. Bell's disability was a determining factor in her termination. Response at 48-49. Taking S. Bell's argument in a light most favorable to her, this argument most closely tracks with the "expense" form of association discrimination. Trujillo v. PacifiCorp, 524 F.3d at 1155. Although S. Bell does not argue directly that she was terminated because J. Bell's care was too expensive for the City of Tulsa, S. Bell's argument that Powell and McIntosh conspired to have her terminated can be understood as an attempt by the City of Tulsa to avoid the expense and hassle of addressing and managing S. Bell's numerous leave requests during the COVID-19 pandemic. See Factual Background, supra at 43-44.

Nevertheless, S. Bell has not adduced sufficient evidence to support this argument. S. Bell argues that the evidence indicates that Powell "question[ed] the truth" of her representation that J. Bell was not attending in-person school and S. Bell was therefore entitled to leave under the FMLA. Response at 49. Powell's job, however, requires her to review and determine S. Bell's eligibility for leave, so the fact that she may have had misgivings whether S. Bell was entitled to the leave she requested does not support a reasonable inference that S. Bell was terminated because of J. Bell's disability. See Factual Background, supra at 44; November 17, 2020, Email at 13. Likewise, that Powell and McIntosh scheduled a telephone call to finalize S. Bell's leave request and reconcile her leave records is not inconsistent with McIntosh's prior email confirming that she was entitled to leave, because the City of Tulsa allowed S. Bell to continue to take leave under the FMLA even while the review process was being completed. See Third Pretermination Hearing Notice at 2. Finally, while S. Bell's insurance was terminated at the end of 2019, S. Bell adduces no evidence indicating her insurance was terminated as a result of the expense of J. Bell's care. See Lester v. City of Lafayette, No. 13-CV-01997, 2015 WL 881677, at *3-4 (D. Colo. February 27, 2015)(Arguello, J.)("Ms. Lester has presented no evidence that the City was tracking the cost of her and her daughter's health care or that her daughter's care was unusually or particularly expensive."). Moreover, thirty-two additional employees had their insurance cancelled when S. Bell's insurance was cancelled because of the same error, and the City of Tulsa acknowledged the issue, backdated S. Bell's insurance coverage, and reinstated S. Bell's coverage. See Factual Background, supra at 31-33. Cf. Trujillo v. PacifiCorp, 524 F.3d at 1156-57 (concluding that "close temporal proximity" and explicit evidence that the employer was concerned about its employees' child's healthcare costs "established the necessary inference that PacifiCorp wanted to rid itself of these employees because their son's terminal illness made them too expensive").

Third, S. Bell argues that Berg did not grant her request to work from home, because he "discriminatorily believed that Plaintiff would not be focused on her work because she had a child with special needs."  Response at 39.  S. Bell's argument sounds in the "distraction" form of association discrimination.  Trujillo v. PacifiCorp, 524 F.3d at 1155.  The uncontroverted facts, however, do not support a reasonable inference that S. Bell was terminated because the City of Tulsa was concerned that she would be distracted at work because of J. Bell.  S. Bell missed work on numerous occasions to care for J. Bell.  See Factual Background, supra at 11-13. The ADA prevents an employer from "make an adverse employment decision based on the 'belie[f] that the [employee] would have to miss work' in order to care for a disabled person."  Rogers v. Int'l Marine Terminals, Inc., 87 F.3d 755, 760 (5th Cir. 1996)(quoting Comment, 29 C.F.R. § 1630)(alterations in Rogers v. Int'l Marine Terminals, Inc.).  The record, however, contains no evidence that S. Bell suffered an adverse employment action because she missed work to care for J. Bell; rather, S. Bell was disciplined only when she did not seek authorization to change her work schedule, as City of Tulsa work policy requires.  See Factual Background, supra at 23-24.  Where S. Bell requested ahead of time to flex her time and adjust her work schedule to care for J. Bell, she almost always was allowed to do so.  See Factual Background, supra at 17.  See Rogers v. Int'l Marine Terminals, Inc., 87 F.3d at 760 ("While IMT was aware that Rogers occasionally missed work to care for his wife, the record does not suggest that IMT fired Rogers for that reason."); McGuinness v. Univ. of N.M. Sch. of Med., 170 F.3d 974, 980 (10th Cir. 1998)("He presented evidence that the school knew he had a child with cerebral palsy, but not that such awareness was a 'determining factor' in the decision to make him repeat the first-year program." (quoting Den Hartog v. Wasatch Acad., 129 F.3d at 1085)).

What is more, the uncontroverted facts here do not contain evidence similar to those the Second Circuit found sufficient to satisfy the fourth prong of the prima facie case in Kelleher v. Fred A. Cook, Inc., 939 F.3d at 470.  In Kelleher v. Fred A. Cook, Inc., in response to Kelleher's request to work an adjusted schedule to care for his sick child, Kelleher's supervisor denied his request on the ground that "'his problems at home were not the company's problems.'"  939 F.3d at 470 (quoting the record).  Here, by contrast, Berg denied S. Bell's request, because the team with which Berg worked was short-staffed, and because Berg had a policy not to allow any of his employees to work from home given the nature of the services that the team provided.  See Factual Background, supra at 7.  See also Gayles v. Roswell Park Cancer Inst. Corp., No. CIV 22-0750, 2023 WL 6304020, at *14 (W.D.N.Y. September 28, 2023)(Reiss, J.)(dismissing the plaintiff's ADA association claim under rule 12(b)(6) of the Federal Rules of Civil Procedure where the plaintiff's supervisor "stated that her [work-from-home] request was denied due to 'the needs of the department' and because she was 'not comfortable with Plaintiff working and answering calls from home.'" (quoting the record)).  In addition, Kelleher was inexplicably demoted the day after he took off work to care for his daughter following her near-fatal seizure, see Kelleher v. Fred A. Cook, Inc., 939 F.3d at 467, whereas S. Bell was disciplined not for taking time off to care for J. Bell, but for her behavior, for her failure to follow the direction of her supervisors, and for her changing her work schedule without prior authorization, see Factual Background, supra at 23-24; Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 432 (2d Cir. 2016)("Graziadio has not presented evidence that she was fired because her employer suspected distraction or concern for Vincent would cause her to perform her work inadequately; rather, she has presented evidence that she was terminated because her employer felt she had taken too much leave from work to care for her sons.").  In sum, there is no genuine material fact issue whether S. Bell was disciplined or

terminated because the City of Tulsa was concerned that S. Bell's need to care for J. Bell would distract her.

Even if S. Bell were able to establish a prima facie case of ADA association discrimination, the City of Tulsa has provided legitimate reasons for terminating S. Bell that are unrelated to her relationship with J. Bell, and S. Bell has not demonstrated that any of these rationales are pretextual.  The City of Tulsa provides that S. Bell's termination was based on her history of rude and unprofessional behavior.  See Analysis Section III.B, supra at 112.  See Stansberry v. Air Wis. Airlines Corp., 651 F.3d 482, 488 (6th Cir. 2011)("The record is replete with evidence that Stansberry was not performing his job to Air Wisconsin's satisfaction and devoid of evidence to suggest that his discharge was based on any unfounded fears that his wife's illness might cause him to be inattentive or distracted . . . .").  In response, S. Bell incorporates her prior race-discrimination pretext argument regarding witness credibility, the padding of her disciplinary file, and differently treated similarly situated employees.  See Response at 45 ("Plaintiff adopts her argument on pretext, as outlined in section 'III (B)', above.").  These arguments not only fail to demonstrate pretext for the reasons discussed in Section III.B, supra at 110-23, but also because they do nothing to cast into doubt that the City of Tulsa fired her, after employing progressive discipline for over a year, because of S. Bell's "rudeness" and "untruthfulness" during the FMLA process.  Reply at 10.  Cf. Trujillo v. PacifiCorp, 524 F.3d at 1159 (concluding that the employer's proffered reason for terminating the plaintiffs was pretextual where similarly situated employees were "progressively disciplined" whereas the plaintiffs were immediately terminated, and where the employer failed to conduct a "fair investigation" into the employee's alleged work policy violations).  Although S. Bell does not, at the summary judgment stage, have a burden to establish conclusively whether the City of Tulsa's stated reasons for taking adverse employment actions

against her were pretextual, she was required to "establish that there is a genuine factual dispute with regard to the truth." <u>Swackhammer v. Sprint/United Mgmt. Co.</u>, 493 F.3d at 1170. Because S. Bell has not demonstrated such a dispute, the Court grants the City of Tulsa's motion for summary judgment as to S. Bell's ADA association claim.

In sum, the Court concludes that there is no genuine dispute: (i) whether the City of Tulsa discriminated against S. Bell on the basis of race in violation of Title VII or 42 U.S.C. § 1981; (ii) whether the City of Tulsa retaliated against S. Bell for engaging in protected activities in violation of Title VII or the ADA; (iii) or whether the City of Tulsa violated S. Bell's rights under the ADA. The Court further concludes that the City of Tulsa is entitled to judgment as a matter of law on each of S. Bell's claims. Accordingly, the Court will grant the MSJ.

**IT IS ORDERED** that Defendant City of Tulsa's Motion for Summary Judgment and Brief in Support, filed December 16, 2022 (Doc. 31), is granted.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Kwame T. Mumina
Cynthia Rowe D'Antonio
Green Johnson Mumina & D'Antonio
Oklahoma City, Oklahoma

    *Attorneys for the Plaintiff*

Kristina L. Gray
  Litigation Division Manager
Terri Michelle McGrew
  Attorney
City of Tulsa
Tulsa, Oklahoma

    *Attorneys for the Defendant*

## IN THE UNITED STATES DISTRICT COURT FOR

## THE NORTHERN DISTRICT OF OKLAHOMA

SONDIA BELL,

   Plaintiff,

vs.               No. CIV 21-0061 JB/CDL

CITY OF TULSA,

   Defendant.

## **<u>FINAL JUDGMENT</u>**

  **THIS MATTER** comes before the Court on the Order, filed September 29, 2023 (Doc. 54).  In the Order, the Court dismisses with prejudice all of the Plaintiff's claims against the Defendant.  <u>See</u> Order at 1.  There being no more parties, claims, or issues before the Court, the Court enters Final Judgment, pursuant to rule 58(a) of the Federal Rules of Civil Procedure, disposing of this case.

  **IT IS ORDERED** that: (i) the Complaint, filed February 16, 2021 (Doc. 1), is dismissed; (ii) the Plaintiff's claims are dismissed with prejudice; and (iii) Final Judgment is entered.


                _____

                UNITED STATES DISTRICT JUDGE


*Counsel:*

Kwame T. Mumina
Cynthia Rowe D'Antonio
Green Johnson Mumina & D'Antonio
Oklahoma City, Oklahoma

*Attorneys for the Plaintiff*

Kristina L. Gray
  Litigation Division Manager
Terri Michelle McGrew
  Attorney
City of Tulsa
Tulsa, Oklahoma

*Attorneys for the Defendant*